Bench Decision from Excerpt of March 26, 2015 Hearing Transcript

**In Re:**

*LIGHTSQUARED INC., et al.*

*Case No. 12-12080-scc*

---

*March 26, 2015*

---

*eScribers, LLC*

*(973) 406-2250*

*operations@escribers.net*

*www.escribers.net*

*To purchase copies of this transcript, please contact us.*

**Min-U-Script® with Word Index**

1  very much.

2          THE COURT:  Okay.  This is what we are going to do.  I

3  am sending you out to lunch for an hour, and then we are going

4  to come back and I am going to give you a decision, all right?

5  We will see you at 3.  You may leave your materials here.

6          MR. LEBLANC:  Thank you, Your Honor.

7          THE COURT:  Thank you.

8      (Recess from 1:59 p.m. until 3:05 p.m.)

9          THE COURT:  Please have a seat.

10          All right.  I'm going to read you a bench decision.

11  It's going to take a while.

12          Let me preface this by saying that because we have

13  been at this for so long and because this is such a costly

14  process, I determined that I wasn't going to let perfect be the

15  enemy of done.  So this is not a publishable, perfect decision,

16  but hopefully it does the job.

17          A little over one year ago, LightSquared presented its

18  third amended joint plan for confirmation.  Notwithstanding its

19  widespread support by significant stakeholders, the plan

20  suffered from myriad defects and was denied confirmation.  That

21  was then, this is now.  And between then and now, much has

22  transpired.  More than a dozen plans have been announced or

23  proposed.  New investors have come and gone.  Countless hours

24  of human capital have been expended seeking a solution to the

25  vexing issues that have kept LightSquared's Chapter 11 cases

1  before this Court for almost three years.  Surprisingly, the

2  future was foretold by LightSquared's largest stakeholder who,

3  remarkably, continued to oppose plan confirmation until just a

4  few days ago.  Testifying for the Court during the SPSO

5  equitable subordination hearing in January 2014, Mr. Charles

6  Ergen, SPSO's principal, observe that, "God wasn't making more

7  spectrum.  There's a law of physics, there is only so much

8  spectrum in the universe.  And the usage of that spectrum was

9  doubling every year."  As he has trumpeted repeatedly to

10  investors and analysts avidly following DISH's evolution from a

11  family-owned company with a truck and some satellite dishes to

12  a dominant force in the wireless spectrum marketplace, everyone

13  and everything, from your children to your pets to your smart

14  car and even your refrigerator, will continue to demand more

15  and more spectrum.  Mr. Ergen is right.  And the recently

16  concluded FCC auction for 65 megahertz of spectrum has erased

17  any doubt that LightSquared's spectrum holdings are valuable

18  indeed.  Just how value was one of the critical questions

19  presented by the plan of reorganization that is before the

20  Court.

21         No description of the background of these Chapter 11

22  cases would be complete without mention of the one thing that

23  has remained constant throughout this bankruptcy battle

24  biblical proportions.  Proposed transactions, possible plans,

25  and protracted litigation may also have come and gone but

1  SPSO's refrain remained the same, month after month: "Just pay

2  us in full cash and we will happily leave LightSquared's

3  capital structure."  And then just last week, at 6 p.m., at the

4  end of the sixth long day of the confirmation hearing,

5  LightSquared's Special Committee announced that the seemingly

6  impossible had been achieved: a 1.5 billion dollar commitment

7  letter had been signed that would enable the Debtors to pay

8  SPSO, in full, in cash, on the effective date of the Debtors'

9  Modified Second Amended Joint Plan Pursuant to Chapter 11 of

10  the Bankruptcy Code (hereinafter, the "Plan").

11          SPSO has now accepted the "swift and complete exit"

12  requested in its objection to confirmation and has in fact

13  withdrawn such objection.  The objections to confirmation

14  lodged by various holders of Preferred Interests, including the

15  Providence, Solus, and Centaurus parties, have also been

16  withdrawn or otherwise resolved.  Only one objection to

17  confirmation of the Plan remains outstanding.  Mr. Sanjiv

18  Ahuja, a holder of approximately 7.5 percent of the existing

19  Common Equity Interests of LightSquared Inc., asserts that the

20  Plan is based on a "brazen undervaluation" and that such equity

21  interests should receive a distribution.  In perhaps the most

22  ironic -- and baseless -- observation of all, Mr. Ahuja asserts

23  in his recently filed memorandum in opposition to confirmation,

24  that with respect to confirmation, "There are no disputed

25  issues of fact."  If only it were so.

**LIGHTSQUARED, INC.**

1      The Court finds that the Debtors have carried their

2  burden of proof with respect to the structure and valuation

3  premise of the Plan and have otherwise demonstrated that the

4  Plan complies with all applicable provisions of the Bankruptcy

5  Code.  For the reasons set forth below, the remaining objection

6  to confirmation is overruled.  The Plan is confirmed.

7      Background.

8      While the Court assumes familiarity with the extensive

9  prior record of these proceedings and with this Court's prior

10 decision denying confirmation of the Debtors' Third Amended

11 Joint Plan, 513 B.R. 56 (Bankr. S.D.N.Y. 2014), the Court will

12 provide limited factual background for the purposes of this

13 Bench Decision.

14      Regulatory background.

15      On September 28, 2012, LightSquared filed with the FCC

16 a series of applications seeking to modify various of its

17 licenses (collectively, the "License Modification Application")

18 to, among other things:

19      Authorize LightSquared to use the 1675-1680 megahertz

20 spectrum band (the "NOAA Spectrum") on a shared basis with

21 certain government users including NOAA.

22      Permit LightSquared to conduct terrestrial operations

23 "pairing" its 1670-1680 megahertz of New Downlink (consisting

24 of the NOAA Spectrum and the 1607-1675 megahertz spectrum

25 leased from CrownCastle) with two 10 megahertz L-band uplink

1  channels in which LightSquared currently is authorized to

2  operate, 10 megahertz 1627.5 to 1637.5 megahertz ("Uplink 1")

3  and 10 megahertz uplink at 1646.7 to 1656.7 megahertz or Uplink

4  2; and

5          Permanently relinquish LightSquared's right to use its

6  upper 10 megahertz of L-band downlink spectrum (a 10 megahertz

7  band at 1545.2 to 1555.2 megahertz) for terrestrial purposes

8  (i.e., that portion of the spectrum closest to the band

9  designated for GPS devices).

10          In conjunction with submitting the License

11  Modification Application, LightSquared also asked that the FCC

12  open a proceeding via a petition for rulemaking, filed on

13  November 2, 2012, to make an administrative change amending the

14  U.S. Table of Frequency Allocations to add a primary allocation

15  permitting nonfederal terrestrial mobile use of the NOAA

16  Spectrum.  Thus, LightSquared has been pursuing a solution

17  through the License Modification Application that would provide

18  it with 30 megahertz of spectrum, an amount LightSquared

19  states, that is sufficient to implement its business plan.

20  LightSquared has also requested that the FCC open an additional

21  proceeding via a petition for rulemaking to examine the

22  conditions and operational parameters under which its 10

23  megahertz downlink at 1526 to 1536 megahertz (the "Lower

24  Downlink") could be used sometime in the future for terrestrial

25  service.

1          As of the date of this Bench Decision, the License

2   Modification Application remains pending.  The Plan is not

3   conditioned on the grant of the License Modification

4   Application.

5          The Plan.

6          On January 20, 2015, LightSquared filed solicitation

7   versions of the Plan and its accompanying specific disclosure

8   statement, which disclosure statement was approved by order

9   dated January 20, 2015.  The Plan has been proposed by a group

10  of Plan Proponents comprised of (a) Fortress Credit

11  Opportunities Advisors LLC, by and on behalf of certain of its

12  and its affiliates' managed funds and/or accounts ("Fortress"),

13  (b) Centerbridge Partners, L.P., on behalf of certain of its

14  affiliated funds ("Centerbridge"), (c) Harbinger

15   Capital Partners LLC, on behalf of itself and each of its and

16  its affiliates' managed funds and/or accounts that hold Claims

17  and/or Equity Interests ("Harbinger"), and (d) LightSquared.

18  In addition to the Plan proponents, the Plan is supported by

19  SIG Holdings, Inc. and/or one of its designated affiliates

20  ("SIG" and, collectively with Fortress, Centerbridge, and

21  Harbinger, the "New Investors"), MAST Capital Management, LLC

22  and its managed funds and accounts that are Inc. DIP Lenders

23  and Holders of Prepetition Inc. Non-subordinated Claims

24  (collectively "MAST"), and the Prepetition Inc. Agent.

25          The Plan contemplates, among other things, all as

1    reflected in the revised versions of the Plan and related
2    documents that have been filed on the docket of these cases,
3    (A) new money investments by the New Investors in exchange for
4    a combination of preferred and common equity, (B) the
5    conversion of the Prepetition LP Facility Claims into new
6    second lien debt obligations, (C) SIG's purchase of the
7    Prepetition Inc. Facility Non-Supported Claims for the Acquired
8    Inc. Facility Claims purchase price and the conversion of the
9    Acquired Inc. Facility Claims into the reorganized LightSquared
10   Inc. Facility, (D) the payment in full, in cash, of
11   LightSquared's general unsecured claims, (E) the provision of
12   approximately 210 million dollars of the New Inc. -- of New
13   Inc. DIP Claims by the New Investors (including by SIG
14   converting forty-one million dollars of DIP Inc. Claims into
15   New Inc. DIP Claims, (F) the provision of 1.25 billion dollars
16   in new-money working capital for the Reorganized Debtors, (G)
17   the assumption of certain liabilities, (H) the resolution of
18   all inter-Estate disputes, and (I) as part of the negotiated
19   settlement reached between Harbinger and the other Plan
20   Proponents, the contribution by Harbinger and its Claims and
21   Causes of Action against the FCC and GPS Industry, the appeal
22   of the Bankruptcy Court's rulings in connection with the Ergen
23   Adversary Proceeding, the RICO action commenced against Ergen
24   and certain of its affiliates, and any other claims or causes
25   of action in connection with the Debtors, their business, or

1 any interest in the Debtors (collectively, the "Harbinger

2 Litigations").

3        The confirmation hearing on the Plan took place over

4 eight days, beginning on March 9, 2015, with closing arguments

5 held today, March 26, 2015.  On March 17, 2015, prior to the

6 final day of testimony at the Confirmation Hearing and in

7 accordance with prior announcements on the record of the

8 hearing, made by counsel to the special committee of the boards

9 of directors for LightSquared Inc. and LightSquared LP (the

10 "Special Committee"), the Debtors, on behalf of the Plan

11 Proponents, filed modified versions of the Plan and the Second

12 Lien Exit Credit Agreement (Docket No. 2238).  On March 26,

13 2015, prior to today's closing arguments, the Debtors, on

14 behalf of the Plan Proponents, filed a further modified version

15 of the Plan at Docket 2265 as well as the joinders to the Plan

16 Support Agreement executed by Cerberus Capital Management, L.P.

17 and Solus on March 26, 2015 (Docket No. 2268).  At today's

18 hearing, counsel for LightSquared described for the Court the

19 detailed terms of the modified Plan, the revised confirmation

20 order, and the settlements with various parties embodied in the

21 relevant Plan documents.

22        In addition to confirmation of the Plan, several other

23 motions were heard at the Confirmation Hearing and will be

24 discussed herein.

25        The Objections to Confirmation

1    Objections to confirmation of the Plan were filed by

2  numerous parties, including: (i) SP Special Opportunities, LLC

3  ("SPSO"), (ii) Providence TMT Special Situations Fund LP and

4  Providence TMT Debt Opportunity Fund II LP (collectively,

5  "Providence"), (iii) Centaurus Capital, L.P., Keith Holst, and

6  Stephen Douglas (collectively, the "Centaurus Parties"), (iv)

7  Mr. Sanjiv Ahuja, and (v) Solus Alternative Asset Management LP

8  or Solus.  All such objections and/or reservation rights have

9  now been resolved or withdrawn with the exception of Mr.

10  Ahuja's objection.  In accordance with the procedure

11  established on the record of the March 18th hearing for the

12  filing of additional objections to the modified version of the

13  Plan, on March 25, 2015, Mr. Ahuja filed a post-trial brief in

14  opposition to confirmation of the Plan, together with a

15  supporting declaration of Mr. Avery Samet.  Mr. Ahuja's counsel

16  argued in support of his objection at closing arguments held

17  today, March 26, 2015.

18    In connection with the withdrawal of their objection

19  to confirmation of the Plan and the negotiated arrangements and

20  satisfactory treatment of these parties set forth in the Plan

21  as modified, Providence and the Centaurus Parties each filed

22  motions for orders pursuant to Raoul 3018(a) of the Federal

23  Rules of Bankruptcy Procedure (See Docket Nos. 2242 and 2244),

24  formally withdrawing their objections to the Plan and seeking

25  to change their votes to accept the Plan.  The 3018 motions are

1    granted.  On March 24, 2015, SPSO filed a notice of withdrawal

2    of its objection to the Plan withdrawing its objection and

3    reserving its right to object to the proposed confirmation

4    order, which objection was placed on the record during closing

5    argument.  Counsel for DISH also appeared and voiced an

6    objection to certain language in the proposed confirmation

7    order.  On March 26, 2015, Solus filed a notice of withdrawal

8    which, among other things, withdrew its objections to the Plan,

9    the Inc. DIP Motion, and the Alternative Transaction Fee.

10           Evidentiary matters

11           The Court now turns to a number of evidentiary matters

12   raised by the parties prior to and during the trial.

13           I.   Motions with respect to Expert Witness Mr. Jim

14   Millstein.

15               A.   Motion in Limine to Exclude the Peters

16   Submission and Reliance Thereon.

17               By way of background, it is important to note

18   that in preparation for the Confirmation Hearing, the parties

19   agree to certain discovery-related deadlines, including a

20   deadline of February 25, 2015 at 11:59 p.m., for SPSO to

21   designate potential experts (if any) and to submit the report

22   of such expert or experts.  In compliance with this deadline,

23   SPSO designated Mr. Jim Millstein as its valuation expert.  In

24   connection with its objection to confirmation of the Plan,

25   which objection was also filed on February 25, 2015 at or about

**LIGHTSQUARED, INC.**

1   11:59 p.m., SPSO filed the Declaration of James C. Dugan, which

2   annexes Mr. Millstein's expert report as Exhibit F.  The

3   Millstein report is thirty-nine pages long and contains a

4   number of appendices; Appendix G is an eighty-four-page report

5   entitled "Value of L-band Spectrum: Significant Differences and

6   Similarities Between L-band Spectrum and Key Commercial Mobile

7   Wireless Bands," which was prepared at Mr. Millstein's request

8   by non-witness Tom Peters, a former Chief Engineer of the

9   Wireless Telecommunications Bureau of the Federal

10  Communications Commission.  The Millstein report cites to and

11  relies upon the Peters Submission for technical information

12  regarding wireless spectrum, the comparability of various

13  blocks of spectrum, and other matters relating to wireless

14  networks, which information was utilized by Mr. Millstein

15  preparing his evaluation -- his valuation analysis.  Mr. Peters

16  was not identified as an expert witness by SPSO by the February

17  25, 2015 deadline.

18              On February 28, 2015, the Debtors filed a Motion

19  in Limine for an order pursuing to Rules 702, 703, and 802 of

20  the Federal Rules of Evidence (i) excluding from the

21  evidentiary record for the Confirmation Hearing (a) the Peters

22  Submission, which is appended as Exhibit G to the Millstein

23  Report and (b) those portions of the Millstein Report that

24  recite, refer, or rely upon the Peters Submission; (ii) barring

25  any testimony by Mr. Millstein at the Confirmation Hearing that

1  is based in any way on the Peters Submission; and (iii)

2  striking from the declaration of James C.  Dugan filed in

3  support of the objection to the Plan filed by SPSO the Peters

4  Submission and all portions of the Millstein Report that

5  recite, refer to, or rely upon the Peters Submission.  In

6  support of the Motion in Limine, the Debtors filed the

7  Declaration of Aaron L. Renenger, dated February 27, 2015.  On

8  March 1, 2015, SPSO filed an objection to the Motion in Limine.

9  On March 4, 2015, the Debtors filed a further reply to the

10 Motion in Limine, together with (i) the Declaration of Maqbool

11 Aliani and (ii) the Supplemental Declaration of Aaron L.

12 Renenger; and the Ad Hoc Secured Group of LightSquared LP

13 Lenders filed their response in support of the Motion in

14 Limine.  The Motion in Limine was accompanied by a Motion to

15 Shorten Time requesting a hearing on the Motion in Limine as

16 soon as practicable.  The Debtors also sent the Court a letter

17 requesting a discovery conference with respect to the Motion in

18 Limine, which conference was held on Monday, March 2, 2015.

19          On March 4, 2015, SPSO filed on at docket of the case

20 an e-mail sent at 3:47 p.m.  On March 3rd to the Court's

21 Chambers, the Debtors, and certain parties in interest which,

22 contrary to SPSO's prior representations that Mr. Peters would

23 not be offered as a witness, informed the Court and the parties

24 for the first time of SPSO's intention to present Mr. Peters

25 for live testimony at the Confirmation Hearing, stating that

1    SPSO believes "this is the most expeditious, and least

2    distracting, method to get the evidence to Your Honor on the

3    core issue at next week's hearing -- the value of

4    LightSquared's spectrum."  Also on March 4, 2015, the Debtors

5    filed a reply to the motion together with the Declaration of

6    Maqbool Aliani and the Supplemental Declaration of Aaron

7    Renenger, and the Ad Hoc Secured Group filed their response in

8    support of the motion.  At a hearing on March 4, 2015, prior to

9    the ruling on the Motion in Limine, the Court heard from the

10   parties regarding the Motion in Limine and regarding SPSO's

11   e-mail that it had now determined to offer Mr. Peters as a live

12   witness.  LightSquared argued vehemently that SPSO should not

13   be permitted to belatedly identify Mr. Peters as a testifying

14   expert, as it would be prejudicial to the Debtors as they

15   prepare for the upcoming Confirmation Hearing.  LightSquared

16   emphasized that the deadline for expert designations had passed

17   a week earlier, that the Confirmation Hearing was less than a

18   week away, and that the remaining days before the Confirmation

19   Hearing were "booked solid" with the depositions of Mr.

20   Millstein, Mr. Hootnick, and Mr. Merson.  SPSO's attempt to

21   "simply arrogate to itself an exception from the Court's

22   deadline" in order to call Mr. Peters at this late stage should

23   not be countenanced, argued LightSquared.  See its reply at

24   page 4.

25              The Motion in Limine was granted on the record on

**LIGHTSQUARED, INC.**

1    March 4, 2015 and by order dated March 5, 2015.  At that time,

2    the Court indicated that a more detailed ruling on the Motion

3    in Limine would be incorporated in the Court's confirmation

4    decision.  In light of the withdrawal of SPSO's objection to

5    the confirmation, it is unnecessary to burden the record even

6    more with the Court's more detailed rulings on the Motion in

7    Limine.

8         B.   The Motion in Limine to Preclude the Testimony

9    of Expert Witness Mr. Jim Millstein.

10        At commencement of the Confirmation Hearing, the

11   Debtors announced on the record their intention to file a

12   motion to preclude any testimony by Mr. Millstein regarding

13   technical spectrum-related issues, including any valuation

14   evidence based on the comparability of spectrum bands, during

15   the Confirmation Hearing.  The Debtors submitted the motion and

16   the supported declaration of Aaron L. Renenger on March 10,

17   2015, prior to Mr. Millstein's live testimony, but stated in

18   the motion and on the record of the Confirmation Hearing that

19   they did not oppose the Court's reserving decision on the

20   motion until after the Court heard Mr. Millstein's testimony in

21   full.  SPSO filed an objection to the motion.

22        Mr. Millstein began his testimony on March 17, 2015;

23   the Debtors conducted an extensive voir dire after Mr.

24   Millstein's qualifications were introduced and renewed their

25   request to preclude Mr. Millstein from offering an expert

1    opinion on valuation of Debtors' spectrum assets.  On the

2    record of the hearing held on March 17, 2015, the Court denied

3    the Debtors' motion to preclude Mr. Millstein's testimony on

4    any technical, spectrum-related issues stating that, in light

5    of Mr. Millstein's extensive experience and qualifications in

6    the field of corporate restructuring and investment banking,

7    which includes years of experience in matters involving complex

8    asset valuations, the Court would permit Mr. Millstein to offer

9    his expert opinion, subject to cross-examination, and would

10   afford appropriate weight to his testimony in rendering a

11   decision on confirmation of the Plan.  See transcript 3/17/15

12   at 123 to 126.  Mr. Millstein's testimony thereafter resumed

13   and concluded on March 18th.

14           C.   The Millstein "Fee Issue"

15           During the voir dire of Mr. Millstein, the Debtors for

16   the first time raised an issue with respect to Mr. Millstein's

17   fee structure, specifically arguing that Mr. Millstein's fee

18   arrangement with SPSO, which was amended after the conclusion

19   of mediation to provide for an additional three million dollar

20   "consummation fee" payable under certain circumstances,

21   constitutes a violates of New York law that prohibits a lawyer

22   from offering compensation to a witness contingent upon the

23   outcome of a matter, which the Debtors argue is exactly what

24   occurred by the addition of the three million dollar additional

25   fee at the point in time when SPSO determined to move forward

1   with its objection to the Plan.  The Debtors cited various

2   cases from this District in support of their argument; counsel

3   for Mr. Ahuja indicated on the record and in his post-trial

4   brief that he joined in the Debtors' objection.  See 3/17

5   transcript at 56 to 57; Ahuja Post-trial Objection, page 6,

6   note 9.  SPSO vigorously disputes the Debtors' characterization

7   of the Millstein fee arrangement and had intended to file an

8   additional brief addressing the issues.  In light of subsequent

9   developments, however, the Court finds that the Millstein fee

10   issue is moot.  Accordingly, this decision will not address the

11   issues raised by the Debtors or Mr. Ahuja with respect to Mr.

12   Millstein's fee arrangement.

13           Other evidentiary matters

14           The Motion of SPSO to Exclude the Opinions of Mr.

15   Hootnick, Mr. Orszag, and Mr. Andrew Merson.

16           On February 27, 2015, SPSO filed a motion to exclude

17   the opinions of each of the Debtors' expert witnesses: Mark

18   Hootnick, Jonathan Orszag, and Mr. Millstein, and also filed in

19   support thereof the Declaration of Mr. Tariq Mundiya.  The

20   Debtors objected to the motion on March 7, joined by the Ad Hoc

21   Secured Group, and SPSO replied on March 11, 2015.  Mr.

22   Hootnick testified on March 10th and March 11th, and Mr. Merson

23   and Mr. Orszag testified on March 12th.  On the record of the

24   hearings of March 12th and 16th, the Court denied the motion to

25   exclude the opinions of Mr. Merson and Mr. Hootnick.  With

1  respect to Mr. Orszag, for the reasons stated on the record on

2  March 16th, 2015, the Court denied the motion to exclude with

3  respect to his first opinion but granted the motion to exclude

4  Mr. Orszag's second opinion, which dealt with a so-called

5  probabilistic analysis.

6          Next, the Motion for Leave to Supplement the Objection

7  of SPSO to the Plan

8          At the close of business on the final business day

9  before the commencement of the Confirmation Hearing, March 6,

10  2015, SPSO filed the motion for leave to supplement its

11  objection to the Plan.  By the motion, SPSO asserted that,

12  because depositions continued beyond the deadline for parties

13  to file objections to confirmation of the Plan, it did not have

14  the ability to include all available sworn testimony in its

15  objection.  Specifically, by the motion, SPSO sought to include

16  the following in its previously-filed objection: (i) a

17  supplement which raised arguments originating from the

18  deposition testimony of Mr. Vivek Melwani of Centerbridge and

19  from a declaration signed by Mr. David Daigle, a partner of

20  Capital Research and Management Company, and (ii) a

21  supplemental declaration of Rachel C. Strickland which annexed

22  (a) excerpts from the deposition of Mr. Vivek Melwani taken on

23  February 26, 2015 and (b) the declaration of Mr. David Daigle,

24  dated February 26, 2015.  At the commencement of the

25  Confirmation Hearing, the Court granted the motion to

1    supplement with respect to the deposition testimony of Mr.

2    Melwani and denied the motion with respect to the declaration

3    of Mr. Daigle.  The Court instructed SPSO to refile the motion

4    to supplement and its exhibits (the supplement itself and the

5    related declaration) to include only the portion of its

6    supplement related to Mr. Melwani, which SPSO did the following

7    day.  (See Docket No. 2215).  On March 18, 2015, SPSO and the

8    Debtors jointly submitted a transcript of Mr. Melwani's

9    deposition reflecting the designations and counter-designations

10    of the parties.

11          Next, the Motion to Preclude the Debtors from Relying

12    on Mediation Discussions

13          On the eve of the Confirmation Hearing, SPSO also

14    filed a Motion and Memorandum of Law to (i) preclude the

15    Debtors from relying upon any information or discussions

16    relating to the mediation and (ii) strike any portions of the

17    Debtors' confirmation brief that's based in any way on the

18    mediation.  The Court addressed this motion at the commencement

19    of the Confirmation Hearing.  At that time, counsel to SPSO

20    explained that the motion was filed "as a precautionary matter"

21    with respect to testimony that was anticipated to be presented

22    at the hearing, particularly since SPSO believed that portions

23    of the Debtors' confirmation brief went beyond a mere

24    recitation of facts and revealed the substance of mediation

25    discussions.  SPSO's counsel stated that it merely sought to

1   put the mediation privilege on the Court's radar screen prior

2   to the hearing.  The Debtors stated their objection to the

3   motion to the extent it sought to strike statements in their

4   brief that they believed were not problematic with respect to

5   the mediation privilege.  On the record of the hearing, the

6   Court acknowledged that it was cognizant of these issues and

7   would respect and enforce the mediation privilege.  No further

8   disposition of this motion is required.

9          The Confirmation Hearing

10          Over the course of seven days, the Debtors offered the

11   testimony of numerous witnesses.  Testimony was particularly

12   focused on the issue of the value of LightSquared's spectrum

13   and Moelis & Company's use of two different valuation

14   approaches: (i) the Current Spectrum Approach, which applies

15   comparable transaction values (from the years 2009 to 2012) to

16   LightSquared's L-band spectrum (and applies values from the

17   recently concluded Auction 97 to the already-in-use CrownCastle

18   spectrum and (ii) the Alternative Spectrum Use Approach, which

19   contemplates a potential deployment arrangement of (a)

20   LightSquared's 10 megahertz of unpaired Uplink 2 and (b) a

21   5-by-5 pairing of the upper 5 megahertz of Uplink 1 and the 5

22   megahertz of CrownCastle downlink spectrum, and which ascribes

23   no value to LightSquared's other spectrum.  While the

24   Alternative Spectrum Use Approach involves only a subset of

25   LightSquared's spectrum and assumes regulatory approval for the

1    terrestrial use of such spectrum, as discussed herein,

2    LightSquared argued that this approach was best able to capture

3    the significant value inherent in LightSquared's spectrum

4    assets, as evidenced by the dramatic increase in spectrum value

5    observed in Auction 97, which auction results were used as

6    comparables in the Alternative Use Spectrum Use Approach.

7             The confirmation testimony

8             Mr. Douglas Smith, the CEO, President, and Chairman of

9    LightSquared, gave extensive testimony in support of

10   confirmation of the Plan.  Mr. Smith testified about a variety

11   of topics, including, most significantly, his participation in

12   the mediation process; the prognosis that led to the

13   formulation and prosecution of the Plan; and the basis for the

14   valuation premise of the Plan.  He explained that he was very

15   involved in the mediation process, either through in-person

16   meetings or immediate reports from advisors as to the substance

17   of advisor-only meetings.  Mr. Smith testified as to his

18   recollection of developments occurring between August and

19   October of 2014, including the discussion and proposal of

20   various plan frameworks.  Mr. Smith testified that the first

21   plan that the parties agreed had garnered enough consensus to

22   be announced to the Court as a "framework" was reached on

23   October 31, 2014 (the "October 31st plan").  Mr. Smith

24   testified that the October 31st Plan ultimately failed because

25   of too many open issues relating to the Plan, although

1    LightSquared had been prepared to move forward with the October

2    31st plan.

3          Mr. Smith explained that the Plan being presented for

4    confirmation is supported by the New Investors and was greatly

5    influenced by the results of Auction 97, the recently concluded

6    auction spectrum conducted by the FCC.  Mr. Smith indicated

7    that he believed all parties had worked in good faith to come

8    to a consensual plan but ultimately could not reach a fully

9    consensual plan.  Mr. Smith further testified that he believes

10   the Plan provided LightSquared a viable path to reorganization

11   because the Plan provides substantial liquidity, allows

12   LightSquared to satisfy creditors' claims and interests, and

13   enables LightSquared to emerge from bankruptcy.  Mr. Smith said

14   that his understanding -- that it is his understanding that

15   LightSquared will have enough cash "runway" to reach the first

16   half of 2018.

17          With respect to valuation, Mr. Smith explained that he

18   had requested that Moelis prepare a valuation analysis based on

19   the Alternative Spectrum Use Approach.  He believed that the

20   Current Spectrum Approach undervalued LightSquared's assets

21   because the comparable transactions or "comps" used in the

22   Current Spectrum Approach not only involved higher frequency

23   spectrum than the spectrum owned or controlled by LightSquared

24   but, more significantly, were "dated" inasmuch as, in his view,

25   things had substantially changed in the wireless spectrum

1   industry and marketplace and the compatibilities no longer

2   fully reflected the values of spectrum today.  Mr. Smith

3   testified that he was concerned that the Current Spectrum

4   Approach did not and could not take Auction 97 into account.

5          Mr. Smith testified that the decision to assign no

6   value to 25 megahertz of the L-band spectrum (that is, the two

7   megahertz blocks of downlink and the lower 5 megahertz of

8   Uplink 1) in the Alternative Spectrum Use Approach was done to

9   be conservative.  Mr. Smith testified that, in his view, the

10  Alternative Spectrum Use Approach does not fully capture the

11  value of LightSquared in that it is based on a 5-by-5 megahertz

12  band of paired spectrum and 10 megahertz of unpaired uplink.

13  The Alternative Spectrum Use Approach reflects an option that

14  involves less regulatory risk and therefore Mr. Smith expressed

15  a high level of confidence that it could be cleared for use in

16  a relatively short time frame.  The spectrum not included in

17  the Alternative Spectrum Use Approach could still be used or

18  monetized in various ways (for example, at lower power or to

19  cover smaller geographic areas) but there was no explicit value

20  or time frame placed on this option.  Among other things, Mr.

21  Smith emphasized that the Alternative Spectrum Use Approach

22  would not be pursued in lieu of the continuing pursuit of the

23  pending License Modification Application and that there is no

24  certainty as to when the License Modification Application

25  process would be completed.

1          With respect to the results of Auction 97, Mr. Smith

2    testified that he believes that Auction 97 is highly relevant

3    to the value of LightSquared's spectrum.  First and foremost,

4    it shows that the market is willing to pay more for spectrum

5    generally.  Moreover, the AWS-3 spectrum sold in Auction 97 is

6    mid-band spectrum, but LightSquared's spectrum is lower-band

7    spectrum and is thus more desirable for that and several other

8    reasons.

9          Mr. Smith's testimony was compelling.  Simply put, he

10   displayed consummate mastery of every aspect of the Plan and of

11   LightSquared's business and regulatory challenges.  He

12   displayed thorough familiarity with the technical aspects of

13   LightSquared's spectrum and myriad aspects of wireless networks

14   generally.  Although he was cross-examined extensively by

15   counsel for SPSO, Providence, and Centaurus, Mr. Smith gave no

16   ground.  The Court affords his testimony great weight.

17         Mr. Mark Hootnick

18         Mr. Hootnick, a Managing Director of Moelis & Company,

19   was also called as a witness in support of confirmation.

20   Demonstrating a remarkable amount of knowledge about

21   LightSquared's history, business, and spectrum assets, Mr.

22   Hootnick offered extensive testimony on plan valuation issues

23   that was complete, coherent, and compelling.  Mr. Hootnick

24   speaks the language of spectrum fluently, notwithstanding the

25   fact that he is an investment banker with no formal technical

## LIGHTSQUARED, INC.

1    training.

2          With respect to the specifics of the valuation work

3    performed by him and his team at Moelis, Mr. Hootnick submitted

4    an expert report which was admitted into evidence and he

5    testified on a variety of subjects.  Notable aspects of his

6    testimony include the following points:

7          1.  The CAGR, or compound annual growth rate, of the

8    value of paired spectrum between 2006 and 2015 is twenty-five

9    percent, based on a comparison between FCC Auction 66 and FCC

10   Auction 97.  Mr. Hootnick believes this growth rate may be even

11   higher in recent years due to the greater demand in the

12   marketplace for data.  In this action to Auction 97, Mr.

13   Hootnick used as a benchmark the spectrum-driven appreciation

14   of the stock price of DISH to support his conclusion that the

15   value of spectrum has increased dramatically.

16         2.  The Current Spectrum Approach undervalues

17   LightSquared's spectrum assess.

18         3.  The Alternative Spectrum Use Approach uses Auction

19   97 gross bid data as of January 23, 2014 and applies it to a 5

20   megahertz by 5 megahertz paired block of spectrum and a 10

21   megahertz block unpaired uplink.  Using various ranges of

22   dollars per megahertz POP, Moelis placed a net enterprise value

23   of approximately 9.6 billion dollars at the midpoint on this

24   spectrum configuration.

25         4.  The NOLs in the hands of LightSquared have no

1    value.

2          Mr. Hootnick's election to use as a comp the B1 block

3    (as opposed to the A1 block) from Auction 97 was not

4    significantly undermined by any testimony offered in opposition

5    by SPSO's expert, Mr. Millstein.  Moreover, Mr. Hootnick's

6    valuation took into account certain so-called incumbency issues

7    of three to ten years that exist with respect to the spectrum

8    sold in Auction 97.  Mr. Hootnick acknowledged that, if the

9    pending License Modification Application were ultimately

10   approved by the FCC, ultimately would be -- LightSquared may be

11   worth dramatically more.  Significantly, Mr. Hootnick offered

12   no opinion as to the timing of any FCC action from either the

13   LightSquared License Modification Application or the date on

14   which the configuration contemplated by the Alternative

15   Spectrum Use Approach could be implemented.

16         Mr. Hootnick's valuation testimony was lent additional

17   support by the testimony of Mr. Andrew Merson (who, as one

18   tweet apparently accurately stated, "knows a lot about

19   spectrum") and a portion of his testimony -- a portion of the

20   testimony of Mr. Jonathan Orszag.  Mr. Hootnick's valuation

21   analysis was extensively criticized by SPSO's expert, Mr. Jim

22   Millstein.  The Court affords little weight to Mr. Millstein's

23   valuation of LightSquared's spectrum assets.  In light of the

24   resolution of SPSO's objection to confirmation, it is

25   unnecessary to provide a detailed critique of the Millstein

1    Expert Report and Testimony.

2              Mr. Hootnick also gave extensive testimony supporting

3    the Debtors' proffered liquidation analysis and the Debtors'

4    request for approval of the proposed DIP financing and exit

5    financing.  He testified to the conservative nature of the

6    proposed reorganized company's cash projections, noting that

7    they reflect no potential savings that may result from, among

8    other things, renegotiating the Inmarsat Cooperation Agreement.

9    Finally, with respect to the value of the Inc. NOLs, Mr.

10   Hootnick explained that Inc. has no cash flow and no ability to

11   use the NOLs, lending support to the treatment of the NOLs

12   pursuant to the Plan.

13             The Debtors also presented the testimony of Mr. Alan

14   Carr, who has served as a member of the Special Committee since

15   September 2013.  Mr. Carr detailed his participation in the

16   plan process and described as well his involvement in the

17   months of mediation under the supervision of Judge Robert

18   Drain.  Confirming that the goal of the Special Committee at

19   all times was to maximize value, seek broad consensus, and

20   treat creditors fairly, Mr. Carr explained that he was

21   personally and actively involved in all aspects of the plan

22   process over the past year.  He emphatically stated that the

23   Special Committee had never excluded anyone from plan

24   negotiations.  Among other things, Mr. Carr explained the

25   importance of and value to the estates in removing the

1    uncertainty and risk related to the Harbinger Litigations and,

2    although the Special Committee did not prepare a formal

3    valuation of the Harbinger Litigations, it did conclude that

4    the value placed on it in the Plan was fair.  Mr. Carr's

5    testimony provided credible support and good faith of the Plan

6    Proponents, the reasonableness of the alternative transaction

7    fee, and also provided support for the Modified KEIP.

8              The Objection of Mr. Sanjiv Ahuja

9              Pursuant to an employment agreement, dated as of

10   October 2009 (as amended, the "Employment agreement"), by and

11   among Sanjiv Ahuja, Harbinger, and LightSquared LP, Mr. Ahuja

12   served as Chairman of the Board of Directors and Chief

13   Executive Officer of LightSquared.  By letter dated February

14   23, 2012, consistent with the terms of the Employment

15   Agreement, Mr. Ahuja resigned his position as Chief Executive

16   Officer of LightSquared, effective February 10, 2012.  By

17   letter dated May 9, 2012 (the "Bonus Letter" and, together with

18   the Employment Agreement, the "Employment Documents") the

19   Debtors memorialized the terms of Mr. Ahuja's 2011 bonus.

20             On July 6, 2012, subsequent to the petition date, Mr.

21   Ahuja, Harbinger, and the Debtors entered into a settlement

22   agreement (the "Settlement Agreement") to terminate Mr. Ahuja's

23   employment with the Debtors and to resolve and settle any

24   claims Mr. Ahuja may have had arising from the Employment

25   Documents and/or arising from his employment with the Debtors

1  (collectively, the "Executive Claims").  Specifically, the

2  Settlement Agreement provided that (i) Mr. Ahuja's employment

3  with the Debtors would terminate and he would resign as

4  Chairman of the Board of Directors, (ii) the employment

5  documents would be deemed rejected pursuant to Section 365 of

6  the Bankruptcy Code, and (iii) in full and complete

7  satisfaction of the executive claims, Mr. Ahuja would receive

8  (a) the 750,000 dollars allowed unsecured nonpriority claim

9  against LightSquared LP and (b) an allowed common equity

10 interest in the amount of 8,832,354 shares of Existing Inc.

11 Common Equity Interests.  On July 6, 2012, the Debtors filed a

12 motion with the Court seeking approval of the Settlement

13 Agreement ("Settlement Agreement Motion").  No objections to

14 the Settlement Agreement Motion were filed, and on July 17,

15 2012, following a hearing of the motion, the Court entered an

16 order approving the Settlement Agreement (Docket No. 223).

17          By his objection to confirmation of the Plan and post-

18 trial brief, Mr. Ahuja argues that the Plan cannot be confirmed

19 because it is not fair and equitable to holders of existing

20 Inc. Common Stock Equity Interests in that (i) it provides for

21 claimants senior to Existing Inc. Common Stock Equity Interests

22 to receive more than full compensation for their claims, which

23 he intends is a violation of the absolute priority rule, and

24 (ii) the Plan Proponents have failed to show that an exception

25 to the absolute priority rule applies to the Plan.

1        Mr. Ahuja makes two arguments in support of his

2   assertion that the Plan violates the absolute priority rule,

3   both of which are premised on his conclusion that there is a

4   substantial equity cushion in the Reorganized Debtors.  In

5   order to reach his conclusion that the enterprise value of the

6   Debtors exceeds the sum of all outline outstanding claims, Mr.

7   Ahuja begins with the premise that the going concern enterprise

8   valuation of the Reorganized Debtors is 9.6 billion dollars and

9   notes that, by simply subtracting the 4.3 billion dollars in

10  claims from such valuation, value exists.  Accordingly, argues

11  Mr. Ahuja (i) the Plan is a per se valuation of the absolute

12  priority rule under In re Bush Industries, Inc., 315 B.R. 292

13  (Bankr. W.D.N.Y. 2004) because it cancels the Existing Inc.

14  Common Stock Equity Interests despite the enterprise value of

15  the Debtors exceeding the sum of all outstanding claims against

16  the estates, and (ii) the absolute priority rule is violated

17  because each of the New Investors will receive the full value

18  of their claims plus common stock in the Reorganized Debtors,

19  which common stock has value based on the substantial equity

20  cushion.

21        Mr. Ahuja next asserts that the Plan Proponents have

22  failed to demonstrate that an exception to the absolute

23  priority rule exists.  Citing to the Debtors' confirmation

24  brief, Mr. Ahuja concludes that the Plan Proponents were

25  attempting to invoke the new value exception to the absolutely

1    priority rule and asserts that the new value exception, which

2    Mr. Ahuja argues is "strongly disproved of in this Circuit",

3    does not apply to the Plan because the Plan fails to establish

4    that any of the New Investors are contributing new capital that

5    is (1) new, (2) substantial, (3) money or money's worth, (4)

6    necessary for a successful reorganization, and (5) reasonably

7    equivalent to the property being received, which, if

8    established, would permit them to invoke the new value

9    exception to the absolutely priority rule in accordance with In

10   re Bonner Mall Partnership, 2 F.3d 899 (9th Cir.1993) and Case

11   v. Los Angeles Lumber Products, 308 U.S. 106 (1939).

12          With respect to Harbinger in particular, Mr. Ahuja

13   argues that Harbinger's contribution of the Harbinger's

14   Litigations cannot constitute new value because the Harbinger

15   Litigations do not satisfy the "money or money's worth,"

16   "necessary for a successful reorganization" and "reasonably

17   equivalent" prongs of the new value test.  First, Mr. Ahuja

18   argues that the Harbinger Litigations are not money or money's

19   worth because the Plan Proponents do not contend that the

20   Harbinger Litigations will provide actual litigation proceeds

21   to Reorganized Debtors and no party has attempted to quantify

22   the benefit of removing the cloud of uncertainty surrounding

23   the Debtors.  Building on the premise that the Harbinger

24   Litigations are not money or money's worth, Mr. Ahuja next

25   argues that the Harbinger Litigations are not necessary for a

1    successful reorganization because the cooperation -- because

2    the contribution of the Harbinger Litigations are not in fact

3    Harbinger providing fresh capital but rather merely

4    "cooperation by old equity."  Finally, Mr. Ahuja argues that

5    the Harbinger Litigations do not meet the "reasonably

6    equivalent" value prong because the Debtors put forth no

7    evidence regarding the value of the Harbinger Litigations.

8           With respect to Fortress and Centerbridge, Mr. Ahuja

9    argues the 89.5 million dollars that Fortress and Centerbridge

10   will contribute in exchange for 34.3 percent of the common

11   equity of the Reorganized Debtors is not reasonably equivalent

12   value to the "enormous future value that Fortress and

13   Centerbridge anticipate they will receive on its account."  In

14   support of this assertion, Mr. Ahuja points to the sizable

15   equity cushion that he alleges the Reorganized Debtors will

16   have and further argues that the Debtors have failed to meet

17   their burden to prove that no other party was willing to

18   contribute more for the common equity allocated to Fortress and

19   Centerbridge.

20          Finally, with respect to SIG, Mr. Ahuja argues that

21   SIG is providing no new value to the Reorganized Debtors and

22   certainly not the reasonably equivalent value of the equity

23   interests SIG is to receive pursuant to the Plan.  Citing to In

24   re Snyder, 105 B.R. 898 (Bankr.C.D.Ill. 1989), aff'd, 967 F.2d

25   1126 (7th Cir. 1992), Mr. Ahuja asserts that SIG's release of

1    collateral from its lien is not "money or money's worth"

2    because a lien release creates no new funds and further argues

3    that, even if a lien release is "money or money's worth," the

4    Debtors have failed to show that it is reasonably equivalent to

5    the equity interests SIG is receiving in return.

6           As noted above, Mr. Ahuja's objection to the Plan is

7    entirely premised on the notion that the Reorganized Debtors

8    will emerge with a substantial equity cushion while ignoring

9    that any such equity cushion could not exist but for the many

10   interrelated transactions that undergird the Plan.  Mr. Ahuja

11   presented no evidence in support of his assertion that a

12   substantial equity cushion at Inc. exists.  Rather, he relied

13   on the valuation presented by the Debtors and specifically on

14   the Debtors' Alternative Spectrum Use Approach valuation,

15   which, as already discussed, provides for the combined

16   enterprise valuation midpoint of the 9.6 billion dollars on

17   which Mr. Ahuja relies.

18          While the Court has found the Alternative Spectrum Use

19   Approach valuation presented by Mr. Hootnick to be compelling

20   as to the value of the Debtors' spectrum assets, the Court

21   cannot afford the Alternative Spectrum Use Approach all the

22   weight necessary to conclude, with the requisite certainty,

23   that the Reorganized Debtors will with certainty have an equity

24   cushion sufficient to provide a recovery to any holder of

25   Existing Inc. Common Equity Interests.  First, the Alternative

1    Spectrum Use Approach involves a subset of the spectrum rights

2    covered by the Debtors' License Modification Application and

3    assumes that the FCC will grant the additional regulatory

4    approval necessary to make use of that L-band spectrum on a

5    "terrestrial-only" basis.  See Debtors' Confirmation Brief at

6    paragraph 42.  As the Court made clear in its prior decision

7    denying confirmation of the Debtors' Third Amended Joint Plan,

8    uncertainty -- the uncertainty of FCC -- of the timing of FCC

9    approvals is relevant to valuation.  Moreover, as Mr. Smith

10   confirmed in his testimony, the Debtors are currently pursuing

11   the entirety of the License Modification Application and have

12   no plans to seek FCC approval for terrestrial use solely of the

13   subset of spectrum contained in the Alternative Spectrum Use

14   Approach until the License Modification Application is no

15   longer pending.  With respect to the License Modification

16   Application, again, the timing of FCC approval remains unknown.

17   As counsel for the FCC stated on the record of March 17, 2015

18   hearing, and the statement in these Chapter 11 cases by the FCC

19   on January 27, 2014 at Docket 1235, the FCC does not support

20   any plan in these cases and has provided no indication

21   regarding the timing with respect to the License Modification

22   Application or any other matters involving LightSquared.

23        Accordingly, while Mr. Ahuja invites the Court to

24   conclude that there is a substantial equity cushion based upon

25   the Alternative Spectrum Use Approach, the regulatory

1  challenges attendant to the realization of the full 9.6 billion

2  dollar valuation remains uncertain and precludes the definitive

3  finding of the existence of the equity cushion that Mr. Ahuja

4  has sought to establish.

5       Moreover, the Plan enables the Debtors to unlock

6  significant value by combining the assets of the Inc. and the

7  LP estates to operate as a going-concern enterprise with the

8  support of the contributions of the New Investors.  As counsel

9  for the Debtors articulated so clearly during closing

10  arguments, but for the contributions that are being made by the

11  New Investors, the Debtors' creditors would not be paid

12  anywhere in full.  The fallacy of Mr. Ahuja's argument is that,

13  without these considerations, there would be no value flowing

14  to, let alone through, the Debtors' debt obligations to satisfy

15  the claims of the creditors in full, creditors who are

16  indisputably senior to Mr. Ahuja in the capital structure.  For

17  example, the Plan transaction with respect to SIG will take

18  almost 400 million dollars of secured debt at LightSquared Inc.

19  and convert it into equity at a Reorganized LightSquared Inc.,

20  relieving the Inc. estates of their secured obligations and a

21  portion of their DIP financing.  Without such a contribution,

22  an equitization of debt in this matter would not othewise be

23  possible.  Mr. Hootnick, moreover, has testified that the NOLs

24  have no value to the Debtors, and while their value in the

25  hands of SIG is unclear, that's of no moment.  Centerbridge and

1   Fortress are also contributing eighty-nine million dollars in

2   the aggregate in new money investments in exchange for

3   preferred interest in New LightSquared.  With respect to

4   Harbinger, who is also giving up its 227 million dollars in

5   Prepetition Inc. Subordinated Claims in exchange for preferred

6   interest in New LightSquared, Mr. Hootnick testified that the

7   contribution by Harbinger of the Harbinger Litigations has

8   enabled the Debtors to unlock significant value from New

9   Investors which would otherwise have been unable to be realized

10  by the joint estates, particularly with respect to Harbinger's

11  pending action against the FCC.  The equity cushion to which

12  Mr. Ahuja points simply would not exist in the absence of each

13  of the transactions with the New Investors, and because the

14  accretion of debt on LightSquared's post-emergence capital

15  structure will inevitably eat into this equity cushion until

16  value can be realized, the amount of such equity cushion, if

17  any, is incorrectly overstated by Mr. Ahuja.

18          Moreover, no holder of Existing Inc. Common Equity

19  Interests will receive any recovery under the Plan on account

20  of its common equity, including any former employees of

21  LightSquared.  The value of the assets of the Inc. Debtors

22  standing alone -- without recourse to the assets of the LP

23  Debtors and without combining the value of the Inc. and LP

24  assets in one going-concern enterprise -- is insufficient to

25  support a recovery for common equity holders.  No stakeholder

1    senior to Mr. Ahuja in the LightSquared capital structure is

2    being paid more than in full, nor is the absolute priority rule

3    in any way violated by the Plan's distribution scheme.  Each of

4    the New Investors is senior to Mr. Ahuja in the capital

5    structure and is in no way jumping ahead of common equity.

6          For all of these reasons, the Court finds that the

7    Plan does not discriminate unfairly and is fair and equitable

8    with respect to Class 14 (Existing Inc. Common Stock Equity

9    Interests), and it overrules Mr. Ahuja's objection to

10   confirmation.

11         Other Motions

12         Motions Related to Implementation of the Plan.

13         LightSquared has several pending motions for which it

14   seeks approval in connection with implementation of the

15   provisions of the Plan as modified.  They are: (i) Motion for

16   Order Authorizing Payment of Alternative Transaction Fee in

17   Connection with Proposed Plan of Reorganization, dated December

18   31, 2014 (the "Alternative Transaction Fee Motion"), (ii)

19   Motion for an Order, Pursuant to 11 U.S.C. Sections 105, 361,

20   362, 363, 364, and 507, (A) Approving Postpetition Financing,

21   (B) Authorizing Use of Cash Collateral, if any, (C) Granting

22   Liens and Providing Superpriority Administrative Expense

23   Status, (D) Granting Adequate Protection, and (E) Modifying

24   Automatic Stay, dated February 9, 2015 (the Inc. DIP Motion"),

25   and (iii) Motion for an Order, Pursuant to 11 U.S.C. Sections

1  105(a) and 363, Authorizing LightSquared to (A) Enter Into and
2  Perform Under Letters Related to 1.515 billion dollar Second
3  Lien Exit Financing Arrangements, (B) Pay Fees and Expenses in
4  Connection Therewith, and (C) Provide Related Indemnities,
5  dated March 18, 2015 (the "Jefferies Motion").

6          Pursuant to the Alternative Transaction Fee Motion,
7  LightSquared seeks approval of a 200 million dollar alternative
8  transaction fee that is payable to the New Investors only on a
9  subordinated basis and only in the event that LightSquared
10 closes an alternative transaction through which all
11 constituents (other than holders of Existing Inc. Common Stock
12 Equity Interests) are (a) paid in full, in cash or (b)
13 otherwise accept treatment in lieu of such cash, provided,
14 however, that if the holder of a claim or equity interest is
15 also a proponent of such transaction or funds, arranges, or
16 otherwise supports a plan proposed by its affiliate for such a
17 transaction, then such holder does not need to be offered to be
18 paid in full, in cash, in order for the Alternative Transaction
19 Fee to be triggered.  In response to the now-withdrawn
20 objections to the Alternative Transaction Fee Motion, the
21 Debtors argued that, because the Alternative Transaction Fee is
22 payable only under optimal circumstances for these estates, it
23 is distinguishable from traditional, more onerous break-up fees
24 which are payable upon the consummation of any alternative
25 transaction, thus rendering the Alternative Transaction Fee far

**LIGHTSQUARED, INC.**

1    more protective of stakeholders.  The Debtors have established

2    that the Alternative Transaction Fee is supported by the

3    Debtors' sound business judgment; solidifies the support of the

4    New Investors for LightSquared's restructuring; is a necessary

5    condition of the Plan; and will not "chill" additional bidding

6    on LightSquared's assets, given the size of the fee compared to

7    the size of investment in LightSquared that would be necessary

8    to trigger payment of the fee.  Mr. Hootnick's testimony

9    supported all of the foregoing.  The Alternative Transaction

10   Fee is approved and any remaining objections to the fee are

11   overruled.

12        The Inc. DIP Motion seeks approval of a new post-

13   confirmation credit facility (the "New Investor Inc. DIP

14   Facility") that will only be necessary in the event that it is

15   needed for a financing alternative to the DIP facility approved

16   by the Court on January 20, 2015 (the "Eighth Replacement DIP

17   Facility"), which contemplates post-confirmation financing for

18   the Inc. estates in substantially the same amount as the New

19   Investor Inc. DIP Facility.  The stated purpose of the New

20   Investor Inc. Facility, according to the Debtors, is to provide

21   funding necessary to, among other things, implement the Plan,

22   and the facility only comes into existence and LightSquared

23   only has sought its approval in the event the Court confirms

24   the Plan and the Eighth Replacement DIP Facility does not fund.

25   By the declaration of Mark S. Hootnick filed in support of the

1    Inc. DIP Motion and on the record of the Confirmation Hearing,

2    the Debtors have adequately demonstrated their exercise of

3    sound business judgment in seeking approval of the New Investor

4    Inc. DIP Facility in order to create extra assurance that they

5    will have sufficient liquidity to consummate the Plan and to

6    fund the Inc. Debtors through the Effective Date.  The Court

7    will grant the Inc. DIP Motion.

8           As announced on the record of the hearing held on

9    March 17, 2015, the Debtors have obtained a fully underwritten

10   commitment in connection with the Second Lien Exit Facility in

11   the amount of 1.515 billion dollars, the aggregate principal

12   amount necessary to satisfy SPSO's claims in full assuming a

13   December 17, 2015 effective date.  By the Jefferies Motion, the

14   Debtors seek entry of an order authorizing LightSquared to (a)

15   enter into and perform under (i) a commitment letter with

16   Jefferies Finance LLC for 1.515 billion dollar commitment and

17   (ii) a fee letter with Jefferies, (b) pay certain fees and

18   expenses associated with the commitment letter and the fee

19   letter, and (c) provide related indemnities.  Concurrent with

20   the filing of the Jefferies Motion, the Debtors filed a motion

21   seeking authority to file the fee letter under seal and a

22   motion seeking to shorten the period of the time prior to the

23   hearing on the Jefferies Motion.  On the record of the March

24   18th hearing, the Court granted the motion to shorten time and

25   scheduled the hearing on the Jefferies Motion for March 26,

2015, the time of closing arguments on confirmation.  No

objections were filed to the Jefferies Motion.  At closing

argument, counsel for the Debtors proffered the testimony of

Mark Hootnick of Moelis in support of the Jefferies Motion.

         The Debtors have demonstrated that had entry into and

performance under the commitment letter and fee letter are in

the best interests of the estate and are based upon the sound

business judgment of the Debtors and the Special Committee in

that (i) the decision to enter into the 1.515 billion dollar

commitment was made an on informed basis after determining that

such commitment paves the way for an exit from bankruptcy that

maximizing value for the Debtors' stakeholders, and (ii) the

commitment letter and fee letter were negotiated at arm's

length and in good faith.  Notably, certain of the fee terms

were favorably negotiated by the Debtors; for example, the

commitment fee of approximately eleven million dollars owed to

Jefferies will not be paid in cash but rather will be paid in

kind for the issuance of Second Lien Term Loans and is payable

only if the Plan goes effective and the Debtors draw on the

commitment.  The Court will grant the Jefferies Motion and the

related motion to file the fee letter under seal.

         Finally, the Motion to Authorize LightSquared to

Modify and Extend the Existing Key Employee Incentive Plan

         On October 3, 2012, the Court entered an order

approving the Debtors' Key Employee Incentive Plan or the

1  "Existing KEIP" [Docket No. 394].  Pursuant to the Existing

2  KEIP approved by the Court, the Debtors are authorized to offer

3  cash bonus incentives to four key employees: Douglas Smith,

4  Marc Montager, Curtis Lu, and Jeffrey Carlisle (collectively,

5  the "Key Employees") in connection with the following incentive

6  objections:

7          The Cash Preservation Objective:  The Key Employees

8  have the opportunity to earn cash bonuses based on achieving

9  savings related to the Debtors' total operating expenses

10  spending as a percent of the Debtors' consolidated budget.

11  This objective required two measurement dates and each Key

12  Employee had the opportunity to earn in the aggregate up to 125

13  percent of his annual salary.

14          The Regulatory Objectives:  The Key Employees had the

15  opportunity to earn cash bonuses totaling up to 200 percent of

16  their annual salaries based upon the achievement of three

17  regulatory objectives.  Twenty percent of the cash bonuses will

18  be paid upon the satisfaction of each of the first and second

19  regulatory objectives and sixty percent of the cash bonuses

20  would be paid on account of the satisfaction of the third

21  regulatory objective.  The Debtors paid the Key Employees 1.76

22  billion dollars on account of satisfying both the first and

23  second regulatory objectives.  The Key Employees did not

24  satisfy the third regulatory objective prior to its December

25  31, 2013 deadline.

1          The emergence objective:

2          The Key Employees had the opportunity to earn cash

3    bonuses totaling up to 200 percent of their annual salaries

4    upon the confirmation of Chapter 11 plan, or Court approval of

5    a sale of substantially all of Debtors' assets based upon a

6    timing-sensitive sliding scale.  The Key Employees did not

7    achieve this objective prior to its December 31, 2013 deadline.

8          On February 9, 2015, the Debtors filed a motion

9    seeking to modify and extend the Existing KEIP [Docket No.

10   2065] (the "KEIP Motion").  The modified KEIP proposed on

11   February 9th provided for cash bonuses for the Key Employees

12   upon the achievement of each of the following objectives:

13         Confirmation Objective:  The Debtors proposed to award

14   the Key Employees a cash bonus forty percent of each Key

15   Employee's annual salary that would be (a) earned upon the

16   entry of an order confirming the Plan and (b) paid upon the

17   earlier of (i) the "Inc. Facilities Claims Purchase Date

18   Closing" under the Plan and (ii) thirty days after the entry of

19   such confirmation order (provided that there is no stay of such

20   confirmation order in effect at such time).

21         The Effective Date Objective:  The Debtors propose to

22   award the Key Employees a cash bonus of forty percent of their

23   annual salary that would be (a) earned upon the FCC's approval

24   of a change of control, as set for under and pursuant to the

25   Plan and (b) paid within thirty days of the effective date of

1    the Plan.

2          The Cash Preservation Objective:  The Debtors'
3    proposed cash preservation objective was similar to the cash
4    preservation objective of the Existing KEIP but proposed to
5    award cash bonuses based upon a modified sliding scale.

6          On February, 25, 2015, SPSO filed an objection to the
7    February 9 KEIP [Docket No. 2154].  SPSO objected specifically
8    to the Confirmation Objective and the Effective Date Objective,
9    arguing that (a) such features of the Modified KEIP are
10   disguised retention plans that do not meet the standards of
11   Section 503(c)(1) of the Bankruptcy Code and (b) that, even if
12   the Confirmation Objective and the Effective Date Objective are
13   true incentive plans properly analyzed under Sections 360(b)
14   and 503(c)(1) of the Bankruptcy Code, the Debtors made no
15   showing that the Confirmation Objective and the Effective Date
16   Objective are a proper exercise of the Debtors' business
17   judgment.

18         On March 5th, the Debtors filed a supplement to the
19   February 9th KEIP and a reply to SPSO's objection [Docket No.
20   2181].  Following consultation with the United States Trustee,
21   the Debtors agreed to amend the February 9th KEIP (as amended,
22   the "Modified KEIP") to reduce the cash bonuses payable to the
23   Key Employees upon achievement of Confirmation Objective from
24   forty percent of annual salary to thirty percent of annual
25   salary and to increase the cash bonuses payable through

1    achievement of the Cash Preservation Objective.

2            Notwithstanding these changes -- and the fact that

3    SPSO is now being paid in full in cash on the Plan Effective

4    Date -- SPSO's objections to the February 9th KEIP, and

5    specifically to the Confirmation Objective and the effective

6    date objective, remain outstanding.  Other than pure

7    schadenfreude, the reason for SPSO's stance on the Modified

8    KEIP is difficult to understand.

9            In determining whether Section 503(c)(1) applies to a

10    proposed compensation plan, courts have looked to whether the

11    proposed compensation plan is incentivizing or retentive in

12    nature.  See e.g., In re Hawker Beechcraft, Inc., 479 B.R. 308,

13    312 (Bankr. S.D.N.Y. 2012)("the threshold question...is whether

14    the KEIP is a true incentive plan or a disguised retention

15    plan"); In re: Velo Holdings, 472 B.R. 201 at 209 (Bankr.

16    S.D.N.Y. 2012)("Sections 503(c)(1) limits payments to insiders

17    for the purpose of retention and applies to those employee

18    retention provisions that are essentially pay-to-stay key

19    employee retention programs.")  Courts recognize that, while a

20    proposed compensation plan "may contain some retentive effect,

21    that 'does not mean that the plan, overall, is retentive rather

22    than incentivizing in nature.'"  In re Velo Holdings, 472 B.R.

23    at 210 (quoting In re Dana Corporation, 358 B.R. 567 at 571

24    (Bankr. S.D.N.Y. 2001); see also In re Global Home Products,

25    LLC, 369 B.R. 778 at 785 (Bankr.D. Del. 2007)("The entire

1    analysis changes if a bonus plan is not primarily motivated to

2    retain personnel or is not in nature of severance.")

3            By their terms, the Confirmation Objective and

4    Effective Date Objective are incentivized and not retentive in

5    nature because each of the Confirmation Objective and the

6    Effective Date Objective can be achieved only if the Key

7    Employees do more than simply remain employees of the Debtors.

8    First, to achieve either objective, the Debtors must confirm a

9    plan, a task that, as these cases have shown, could not be

10    achieved without significant efforts beyond the scope of the

11    Key Employees' general duties as employees of the Debtors,

12    including responding to changes in the circumstances of these

13    cases, negotiating with perspective exist facility lenders,

14    preparing for a confirmation hearing, and a host of other

15    duties beyond an ordinary course of management of the Debtors'

16    business and assets.  Second, to achieve the Effective Date

17    Objective, the Key Employees must obtain the FCC's approval for

18    a change of control.  The FCC does not simply rubber stamp

19    change of control applications.  To obtain FCC approval, the

20    Key Employees will need to actively supervisor and manage the

21    filing and pendency of the application, including responding to

22    any changes in the regulatory environment or request by the

23    FCC; simply filling out the forms and putting them in the mail

24    is unlikely to be sufficient.  Similarly, the Cash Preservation

25    Objective, to which SPSO has not objected, is incentivizing in

1  nature in that the Key Employees will be paid if they reduce

2  operating expenses relative to the Debtors' budget and thereby

3  increase the value of the Debtors' estates.  Accordingly, the

4  Modified KEIP is incentivizing in nature and does not need to

5  be analyzed under Section 503(c)(1).

6         As Section 503(c)(1) is inapplicable, and there are no

7  severance payments contemplated by the Modified KEIP that would

8  implicate Section 503(c)(2), the Modified KEIP will be analyzed

9  under Section 503(c)(3).  "If Sections 503(c)(1) and (c)(2) are

10  not operative, a court may consider whether the payments are

11  permissible under Section 503(c)(3)..."  In re Dana

12  Corporation, 358 B.R. at 576.  Courts have held that Section

13  503(c)(3) creates a standard for incentivizing payments outside

14  the ordinary course of a Debtors' business, no different than

15  the business judgments under 363(b).  See In re Velo Holdings,

16  In re Dana Corporation.

17         In applying the business judgment standard in the

18  context of a compensation plan, courts have considered the

19  following factors:

20         Is there a reasonable relationship between the plan

21  proposed and the results to be obtained -- that is -- will the

22  key employees stay for as long as it takes for the debtor to

23  reorganize or market assets or, in the case of a performance

24  incentive, is a plan calculated to achieve the desired

25  performance?

1        Is the cost of the plan reasonable in the context of

2   the debtor's assets, liabilities and earning potential?

3        Is the scope of the plan fair and reasonable?

4        Is the plan or proposal consistent with industry

5   standards?

6        What were the due diligence efforts of the debtors in

7   investigating the need for a plan; analyzing which key

8   employees need to be incentivized.

9        Did the debtor receive independent counsel in

10  performing due diligence and in creating and authorizing the

11  inventive compensation?

12       See In re Dana Corporation, 358 B.R. at 567-77.  The

13  Modified KEIP satisfies each of these factors.  First, there is

14  more than a reasonable relationship between the Modified KEIP

15  and the desired performance.  The Debtors' business plan and

16  goals are, principally, to achieve confirmation of a plan, to

17  preserve as much cash as possible, and to meet the conditions

18  necessary to implement a confirmed Chapter 11 plan.  The

19  Modified KEIP provides for incentive payments directly tied to

20  each of these goals and nothing more.  Additionally, the Key

21  Employees' general knowledge of the wireless industry and

22  regulatory environment, as well as their specific knowledge of

23  the Debtors' business and assets and business relationships

24  will be highly instrumental in achieving the objectives of the

25  Debtors.  As Mr. Hootnick testified, this particular management

1    is "the only group that can get what needs to be done

2    completed." (3/11/15 Tr. at page 22, lines 12 to 19.)  Second,

3    the cost of the Modified KEIP is reasonable.  The total

4    potential cash payout achievable under the Modified KEIP,

5    approximately 2.86 million dollars, is less than the total cash

6    payout that was achievable under the Existing KEIP previously

7    approved by the Court and, significantly, the United States

8    Trustee is of the view that the cost of the Modified KEIP is

9    not unreasonable considering the facts and circumstances of

10   these Chapter 11 cases.  Third, the Modified KEIP does not

11   discriminate among the Key Employees, and the Modified KEIP has

12   been tailored to include only those employees that lead an area

13   critical to the Debtors' reorganization efforts.  Fourth, the

14   Court is satisfied that the Modified KEIP is consistent with

15   industry standards and KEIPs approved by courts in this

16   district and elsewhere and that the Debtors and the Special

17   Committee engaged in appropriate diligence and received

18   appropriate counsel in formulating the Modified KEIP.

19   Accordingly, the Court finds that the Modified KEIP is a sound

20   exercise of the Debtors' business judgment under Sections

21   503(c)(3)and 363(b).  SPSO's objection is overruled.  The KEIP

22   Motion is granted with respect to the Modified KEIP.

23          Finally, it is worth noting that throughout the

24   incredibly turbulent three years of these Chapter 11 cases,

25   members of the LightSquared management team have spent

1    countless hours in this courthouse and dozens of hours on the

2    witness stand.  They have been steady and steadfast in their

3    pursuit of LightSquared's business and restructuring

4    objectives, notwithstanding being buffeted in various

5    directions by the various stakeholders, all of who owe them a

6    tremendous -- and in this Court view -- a nondischargeable debt

7    of gratitude.

8            MR. BARR:  Thank you very much, Your Honor, and

9    appreciate, obviously, the kind words for management.  We

10   wholeheartedly --

11           THE COURT:  You all owe Judge Gonzales a debt of

12   gratitude, because I right now am missing his class that I'm

13   supposed to be teaching.

14           MR. BARR:  I'm sorry about that, but thank you for

15   staying.

16           THE COURT:  I am, too.

17           MR. BARR:  Your Honor, just a few housekeeping

18   before --

19           THE COURT:  Right.

20           MR. BARR:  -- we wrap up.  So --

21           THE COURT:  Did we -- you didn't finish going through

22   the confirmation order?

23           MR. BARR:  I did not.

24           THE COURT:  Okay.  We have never, I think,

25   formally -- just give me a moment.