# 15-cv-02342 (KBF)

## United States District Court

*for the*

## Southern District of New York

_____

SANJIV AHUJA,

*Appellant,*

—against—

LIGHTSQUARED INC., *et. al.*,

*Appellees.*

_____

ON APPEAL FROM THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK (CHAPMAN, J.)

IN RE LIGHTSQUARED INC., *ET. AL.*, BANKR. CASE NO. 12-12080

## BRIEF FOR DEBTOR-APPELLEES

MILBANK, TWEED, HADLEY & McCLOY LLP
MATTHEW S. BARR
ALAN J. STONE
MICHAEL L. HIRSCHFELD
ANDREW M. LEBLANC
28 Liberty Street
New York, New York 10005-1413
(212) 530-5000
astone@milbank.com

*Attorneys for Debtors and Debtors in Possession*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Rule 8012 of the Federal Rules of Bankruptcy Procedure,

LightSquared Inc. and certain of its affiliates, as debtors and debtors in possession

in the above-captioned chapter 11 cases and Appellees in this appeal, each

non-governmental parties, through their undersigned attorneys of record, hereby

certify that the following list reflects the corporations that directly or indirectly

own 10 percent or more of the common equity interests for each debtor:

| Name of Debtor | Direct Owner(s) | Indirect Owner(s) |
|---|---|---|
| LightSquared Inc. | HGW US Holding Company, L.P. | |
| One Dot Four Corp. | LightSquared Inc. | HGW US Holding Company L.P. |
| SkyTerra Rollup LLC | LightSquared Inc. | HGW US Holding Company L.P. |
| SkyTerra Rollup Sub LLC | SkyTerra Rollup LLC | HGW US Holding Company L.P. LightSquared Inc. |
| LightSquared Investors Holdings Inc. | LightSquared Inc. | HGW US Holding Company L.P. |
| SkyTerra Investors LLC | LightSquared Investors Holdings Inc. | HGW US Holding Company L.P. LightSquared Inc. |
| TMI Communications Delaware, Limited Partnership | LightSquared Investors Holdings Inc. | HGW US Holding Company L.P. LightSquared Inc. |
| LightSquared GP Inc. | LightSquared Investors Holdings Inc. TMI Communications Delaware, Limited Partnership | HGW US Holding Company L.P. LightSquared Inc. |
| LightSquared LP | LightSquared Investors Holdings Inc. TMI Communications Delaware, Limited Partnership | HGW US Holding Company L.P. LightSquared Inc. |

| Name of Debtor | Direct Owner(s) | Indirect Owner(s) |
|---|---|---|
| ATC Technologies, LLC | LightSquared LP | HGW US Holding Company L.P. LightSquared Inc. LightSquared Investors Holdings Inc. TMI Communications Delaware, Limited Partnership |
| LightSquared Corp. | LightSquared LP | HGW US Holding Company L.P. LightSquared Inc. LightSquared Investors Holdings Inc. TMI Communications Delaware, Limited Partnership |
| LightSquared Finance Co. | LightSquared LP | HGW US Holding Company L.P. LightSquared Inc. LightSquared Investors Holdings Inc. TMI Communications Delaware, Limited Partnership |
| LightSquared Network LLC | LightSquared LP | HGW US Holding Company L.P. LightSquared Inc. LightSquared Investors Holdings Inc. TMI Communications Delaware, Limited Partnership |
| LightSquared Inc. of Virginia | LightSquared LP | HGW US Holding Company L.P. LightSquared Inc. LightSquared Investors Holdings Inc. TMI Communications Delaware, Limited Partnership |

| Name of Debtor | Direct Owner(s) | Indirect Owner(s) |
|---|---|---|
| LightSquared Subsidiary LLC | LightSquared LP | HGW US Holding Company L.P. LightSquared Inc. LightSquared Investors Holdings Inc. TMI Communications Delaware, Limited Partnership |
| Lightsquared Bermuda Ltd. | LightSquared LP | HGW US Holding Company L.P. LightSquared Inc. LightSquared Investors Holdings Inc. TMI Communications Delaware, Limited Partnership |
| SkyTerra Holdings (Canada) Inc. | LightSquared LP | HGW US Holding Company L.P. LightSquared Inc. LightSquared Investors Holdings Inc. TMI Communications Delaware, Limited Partnership |
| SkyTerra (Canada) Inc. | LightSquared LP SkyTerra Holdings (Canada) Inc. | HGW US Holding Company L.P. LightSquared Inc. LightSquared Investors Holdings Inc. TMI Communications Delaware, Limited Partnership |
| One Dot Six Corp. | LightSquared Inc. | HGW US Holding Company L.P. |
| One Dot Six TVCC Corp. | One Dot Six Corp. | HGW US Holding Company L.P. LightSquared Inc. |

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ........................................................ i

PRELIMINARY STATEMENT ....................................................................1

COUNTER-STATEMENT OF ISSUES ...................................................6

STATEMENT OF THE CASE.................................................................8

ARGUMENT .........................................................................................30

I.   THE PLAN DOES NOT VIOLATE THE ABSOLUTE PRIORITY
     RULE AND IS FAIR AND EQUITABLE TO AHUJA AND OTHER
     HOLDERS OF OUT-OF-THE-MONEY COMMON EQUITY
     INTERESTS ...................................................................................30

     A.   The Bankruptcy Court Did Not Accept the $9.6 Billion
          Valuation ...........................................................................31

     B.   Ahuja Fails To Assess Creditor and Interest Holder Recoveries
          on the Standalone Basis Required by the Supreme Court .................32

     C.   Ahuja Has Not Shown that the Bankruptcy Court's Factual
          Determinations Regarding Valuation Were Clearly Erroneous.........37

     D.   Ahuja Misapprehends the New Value Exception to the
          Absolute Priority Rule and Erroneously Suggests It Applies
          Here ...................................................................................42

II.  HOLDERS OF COMMON EQUITY ALL RECEIVE THE SAME
     TREATMENT UNDER THE PLAN: CANCELLATION OF THEIR
     VALUELESS INTERESTS ...........................................................44

III. THE PLAN PROCESS WAS A MODEL OF GOOD FAITH AND
     COMPLIED WITH ALL APPLICABLE LAWS .........................................47

CONCLUSION ......................................................................................57

ANNEX

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Abraham v. Emerson Radio Corp.*,
   901 A.2d 751 (Del. Ch. 2006) ...........................................................49

*In re Adelphia Commc'ns Corp.*,
   368 B.R 140 (Bankr. S.D.N.Y. 2007).................................................46

*Argo Fund Ltd. v. Bd. of Dirs. of Telecom. Argentina, S.A. (In re Bd.
   of Dirs. of Telecom Argentina, S.A.)*,
   528 F.3d 162 (2d Cir. 2008) ..........................................................7, 48

*Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'Ship*,
   526 U.S. 434 (1999)...........................................................................42

*In re Bush Indus., Inc.*,
   315 B.R. 292 (Bankr. W.D.N.Y 2004) ..........................................39, 51

*Case v. L.A. Lumber Prods. Co.*,
   308 U.S. 106 (1939)...........................................................................43

*In re Cellular Info. Sys., Inc.*,
   171 B.R. 926 (Bankr. S.D.N.Y. 1994).................................................39

*In re Chemtura Corp.*,
   439 B.R. 561 (Bankr. S.D.N.Y. 2010)......................................39, 41, 42

*Coltex Loop Cent. Three Partners, L.P. v. BT/SAP Pool C Assocs.,
   L.P. (In re Coltex Loop Cent. Three Partners, L.P.)*,
   138 F.3d 39 (2d Cir. 1998) ................................................................43

*Consol. Rock Prods. v. Du Bois*,
   312 U.S. 510 (1941)......................................................................passim

*In re Cysive, Inc. S'holders Litig.*,
   836 A.2d 531 (Del. Ch. 2003) ...........................................................50

*In re Drexel Burnham Lambert Grp.*,
   138 B.R. 714 (Bankr. S.D.N.Y. 1992)................................................35

*In re Genco Shipping & Trading Ltd.*,
   513 B.R. 233 (Bankr. S.D.N.Y. 2014)..........................................passim

# TABLE OF AUTHORITIES

**Page(s)**

*Gen. Motors Acceptance Corp. v. Valenti (In re Valenti)*,
    105 F.3d 55 (2d Cir. 1997) ................................................................40

*In re Haskell Dawes, Inc.*,
    199 B.R. 867 (Bankr. E.D. Pa. 1996) .................................................39

*JPMorgan Chase Bank, N.A. v. Charter Commc'ns Operating, LLC
    (In re Charter Commc'ns, Inc.)*,
    419 B.R. 221 (Bankr. S.D.N.Y.  2009) ...............................................50

*Kahn v. Lynch Commc'n Sys., Inc.*,
    638 A.2d 1110 (Del. 1994) .................................................................50

*Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.)*,
    843 F.2d 636 (2d Cir. 1988) ...............................................................48

*Koelbl v. Glessing (In re Koelbl)*,
    751 F.2d 137 (2d Cir. 1984) ..........................................................7, 56

*Krist v. Kolombos Rest., Inc.*,
    688 F.3d 89 (2d Cir. 2012) ...................................................................7

*Lawson v. Ford Motor Co. (In re Roblin Indus., Inc.)*,
    78 F.3d 30 (2d Cir. 1996) ...............................................................6, 40

*In re Leslie Fay Cos., Inc.*,
    207 B.R. 764 (Bankr. S.D.N.Y. 1997)................................................47

*McCarthy v. S.E.C.*,
    406 F.3d 179 (2d Cir. 2005) ...............................................................49

*In re Modern Steel Treating Co.*,
    130 B.R. 60 (Bankr. N.D. Ill. 1991) ...................................................47

*Moran v. Household Int'l, Inc.*,
    500 A.2d 1346 (Del. 1985) .................................................................53

*Nat'l Rural Utils. Coop. Fin. Corp. v. Wabash Valley Power Ass'n (In
    re Wabash Valley Power Ass'n, Inc.)*,
    111 B.R. 752 (S.D. Ind. 1990).............................................................39

*Norton v. Sam's Club, Wal-Mart Corp.*,
    145 F.3d 114 (2d Cir. 1998) ...............................................................49

## TABLE OF AUTHORITIES

**Page(s)**

*Norwest Bank Worthington v. Ahlers*,
    485 U.S. 197 (1988)................................................................30

*Pension Benefit Guar. Corp. v. Braniff Airways, Inc. (In re Braniff
    Airways, Inc.)*,
    700 F.2d 935 (5th Cir. 1983) ...............................................55

*Perez v. Terrestar Corp. (In re Terrastar Corp.)*,
    No. 13 Civ. 562, 2013 U.S. Dist. LEXIS 118918 (Bankr. S.D.NY.
    Aug. 16, 2013) .............................................................6, 45

*Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc.
    v. Anderson*,
    390 U.S. 414 (1968)................................................................34

*Spitzer v. Stichman*,
    278 F.2d 402 (2d Cir. 1960) ....................................................6

*In re Toy & Sports Warehouse, Inc.*,
    37 B.R. 141 (Bankr. S.D.N.Y. 1984)....................................36

**Statutes and Rules**

11 U.S.C. § 1123..............................................................*passim*

11 U.S.C. § 1129..............................................................*passim*

**Other Authorities**

Balotti & Finkelstein's Delaware Law of Corporations & Business
    Organizations § 5.11, 2006 WL 2450940........................................53

7 Collier on Bankruptcy ¶ 1123.01 (16th ed.) ........................................46

## PRELIMINARY STATEMENT

Appellant Sanjiv Ahuja ("Ahuja") posits that the enterprise value of LightSquared is $9.6 billion, a figure which exceeds the total of its liabilities. According to Ahuja, this mandates that as the holder of common shares of LightSquared Inc. ("L2Inc"), he receive an equity interest in the post-emergence reconstituted successor to a different entity, LightSquared LP ("L2LP"). Because the Modified Second Amended Joint Plan Pursuant to Chapter 11 of Bankruptcy Code ("Plan") did not provide him such an equity participation, Ahuja contends the Bankruptcy Court erred when confirming it—an error Ahuja argues is compounded by the fact that under the Plan another holder of L2Inc common shares, Appellee Harbinger Capital Partners, LLC ("Harbinger"), will receive nearly half the common stock in the reconstituted successor to L2LP ("New LightSquared"). Although the Plan makes clear that the common stock granted to Harbinger was **not** conferred on account of its L2Inc common equity interest, but rather on account of its claim as a secured lender to L2Inc and in return for Harbinger's contribution of certain legal claims against third parties, Ahuja asserts, based on the claimed $9.6 billion valuation, that this was not the case. Ahuja argues that the Plan violates the absolute priority and equal treatment rules embodied, respectively, in 11 U.S.C. §§ 1129(b) and 1123(a)(4); fiduciary duties of controlling shareholders under Delaware law; and the provisions of a settlement

agreement executed by Ahuja and others in 2012 ("Settlement Agreement").  As
shown herein, Ahuja's appellate argument is assembled from false premises.  None
of the claimed violations has occurred, and the Bankruptcy Court's confirmation of
the Plan should be affirmed.

   False Premise #1:  Ahuja argues that the Bankruptcy Court "found"
that the enterprise value of the reorganized company was $9.6 billion.  The
Bankruptcy Court made no such finding.  The $9.6 billion valuation offered at the
confirmation hearing by LightSquared was based unambiguously on an assumption
that the Federal Communications Commission ("FCC") would grant permission to
the reorganized company to conduct terrestrial wireless telecommunications
operations using its L-Band spectrum—permission LightSquared does not
presently enjoy, and has been actively trying to obtain since 2011.  A year earlier,
when asked to confirm LightSquared's previously-filed plan of reorganization, the
Bankruptcy Court rejected that plan because it, too, was based on a speculative
assumption concerning FCC approval to conduct terrestrial wireless
telecommunications operations using the L-Band spectrum.  During a hearing
relating to LightSquared's disclosure statement for the Plan held scant weeks
before the commencement of the confirmation hearing, the Bankruptcy Court
admonished LightSquared's counsel against reliance upon an assumption of
regulatory approval.  And, at the conclusion of LightSquared's affirmative case at

the confirmation hearing, an Assistant United States Attorney, who had attended each day of the hearing, rose to inform the Bankruptcy Court on behalf of the FCC that the FCC could not predict either the substance or the timing of any decision it might make regarding terrestrial use of LightSquared's L-Band spectrum. Although the Bankruptcy Court acknowledged that LightSquared had endeavored to set the regulatory bar lower this time, in an effort to show a greater likelihood of obtaining approval, the Bankruptcy Court nevertheless found that the regulatory uncertainty was too great to permit a valuation sufficient to create an equity cushion at L2Inc, much less the $9.6 billion valuation on which Ahuja attempts to rely.  (Appendix ("App") 1138-1140 (3/26/2015 Hr'g Tr. 128:17-130:3 (Court)).) Rather, the Bankruptcy Court found that the post-reorganization value of all LightSquared's assets was insufficient to reach holders of common equity interests. Ahuja points to nothing indicating the Bankruptcy Court's ruling in this respect was clearly erroneous.

        False Premise #2:  Ahuja completely ignores the corporate structure of the LightSquared debtors, instead throwing every entity and every asset into a single pot, and treating the cases below as if the debtors' separate estates had been substantively consolidated.  Ahuja falsely asserts that the $9.6 billion value he ascribes to the reorganized company is the relevant enterprise value, and that the "failure" to utilize this value when assessing Ahuja's right to recovery establishes

that the Bankruptcy Court failed to follow Supreme Court precedent mandating that creditor and interest holder recoveries be based on a debtor's enterprise value, freed from the burdens of chapter 11. There was, however, no substantive consolidation, and it is therefore essential to treat the assets, creditors, and capital structures of L2Inc separately from those of L2LP when evaluating Ahuja's right to recovery, if any, as a holder of L2Inc common shares—the only interest at issue here. An assessment of L2Inc's enterprise value on a stand-alone basis, as required by the very Supreme Court precedent on which Ahuja purports to rely, does not support a recovery by Ahuja.

False Premise #3: Ahuja argues that he is entitled to reap the benefit of and participate in any value created through compromises and contributions made by creditors and interest holders who are senior to him. He is not. Misleadingly invoking jurisprudence concerning the "new value exception to the absolute priority rule," which is inapplicable here, Ahuja would have the Court believe that if a junior creditor holding a $250 million claim that is out-of-the-money by $50 million and comes ahead of $50 million of general unsecured claims agrees, as part of a plan of reorganization, to invest an additional $150 million as working capital for the reorganized debtor, the contribution of that working capital would make the debtor solvent (by $50 million) and require that holders of the debtor's common equity receive all the equity in the reorganized company. This is

- 4 -

not the law, yet the facts of this case are substantively no different from those in the foregoing hypothetical.

    <u>False Premise #4</u>:  Ahuja posits that Harbinger, L2Inc's largest common stockholder, owed a fiduciary duty to minority common stockholders, including Ahuja, which was violated by Harbinger's participation in a plan of reorganization in which Ahuja's treatment did not match Harbinger's.  In addition to ignoring the fact that Harbinger's recoveries under the Plan are not on account of its stockholder interest at L2Inc, Ahuja also ignores the fact that Harbinger did not exercise control over L2Inc as regards the Plan.  The Plan was negotiated and approved on behalf of L2Inc by a special committee of independent directors with no connection to Harbinger ("<u>Special Committee</u>") appointed at the urging and with the supervision of the Bankruptcy Court in 2013, precisely to eliminate the potential for Harbinger to exert undue influence in connection with plan formation and asset sales.  In fact, all Harbinger nominee directors resigned from the L2Inc board of directors in June 2014, as the mediation that eventually produced the Plan was about to begin.  The factual predicate for imposition of the controlling stockholder fiduciary duty asserted by Ahuja simply does not exist.

## COUNTER-STATEMENT OF ISSUES

I.    DOES THE PLAN PROVIDE FOR HOLDERS OF L2INC COMMON

EQUITY INTERESTS TO RECEIVE THE VALUE OF THEIR INTERESTS (11 U.S.C. §

1129(B)(2)(C))?

The Bankruptcy Court answered in the affirmative, finding that the

standalone value of L2Inc did not reach L2Inc common equity, and that the value

of the combined enterprise post-reorganization did not exceed the amount of debt

and preferred stock liquidation preferences senior to common equity interests.  The

valuation findings on which the Bankruptcy Court's ruling is based are factual

findings that cannot be overturned unless shown to be clearly erroneous.  *See*

*Spitzer v. Stichman*, 278 F.2d 402, 410-11 (2d Cir. 1960); *Perez v. Terrestar Corp.*

*(In re Terrastar Corp.)*, No. 13 Civ. 562, 2013 U.S. Dist. LEXIS 118918, at *13

(Bankr. S.D.NY. Aug. 16, 2013); *see also Lawson v. Ford Motor Co. (In re Roblin*

*Indus., Inc.)*, 78 F.3d 30, 35 (2d Cir. 1996).

II.    DOES THE PLAN PROVIDE THE SAME TREATMENT FOR

HARBINGER'S L2INC COMMON EQUITY INTERESTS AS IT DOES FOR THE OTHER

COMMON EQUITY INTERESTS IN L2INC (11 U.S.C. § 1123(A)(4))?

The Bankruptcy Court answered in the affirmative, finding that

Harbinger received common equity in New LightSquared on account of its secured

claims and contribution of litigation claims, and received nothing on account of its

L2Inc common equity interests.  Typically, appellate review of whether a plan of reorganization provides the same treatment for each claim or interest in a class is *de novo*.  Insofar as Ahuja's argument focuses on valuation, however, the clearly erroneous standard of review would apply.  *Cf. Krist v. Kolombos Rest., Inc.*, 688 F.3d 89, 95-98 (2d Cir. 2012) (when mixed questions of fact and law are predominantly factual they are reviewed under clearly erroneous standard).

III.    WAS THE PLAN PROPOSED IN GOOD FAITH AND "NOT BY ANY MEANS FORBIDDEN BY LAW" (11 U.S.C. § 1129(A)(3))?

The Bankruptcy Court answered in the affirmative, noting, among other things, the role played by the Special Committee in the judicially supervised mediation that produced the Plan.  The Bankruptcy Court's finding that the Plan was proposed in good faith is a factual finding that cannot be overturned unless shown to be clearly erroneous.  *See Argo Fund Ltd. v. Bd. of Directors of Telecom. Argentina, S.A. (In re Bd. of Directors of Telecom Argentina, S.A.)*, 528 F.3d 162, 174 (2d Cir. 2008).  With respect to the Bankruptcy Court's ruling that the Plan was not proposed by any means "forbidden by law," insofar as Ahuja has not contested the factual underpinning of that ruling, the Court may review that ruling *de novo*.  *See Koelbl v. Glessing (In re Koelbl)*, 751 F.2d 137, 139 (2d Cir. 1984).

## **STATEMENT OF THE CASE**

### **LightSquared's Chapter 11 Cases**

LightSquared was one of several telecommunications companies licensed by the FCC to use electromagnetic spectrum for mobile satellite system ("MSS") operations that, during the first decade of this century, sought to expand their licenses to include terrestrial operations.  (App 4 (Montagner Decl. ¶ 5).)  An MSS license holder is permitted to effect wireless telecommunications by linking callers through a satellite orbiting the earth.  The signal from a person initiating an MSS call is transmitted from that person's MSS handset to the satellite, which then beams a signal containing the call back to earth, where it is received by the MSS handset of the person called.  Because of the signal strength required for the handset signal to reach the satellite, MSS handsets operate at relatively high power (hundreds of time greater than the power levels of handsets operating on terrestrial systems) and are more expensive than terrestrial-only handsets.  (*See* App 513-514 (3/9/2015 Hr'g Tr. 159:3-160:14 (Smith)).)

MSS operations are used today principally in sparsely populated areas that cannot be served economically by a terrestrial network, which would require construction of far too many cell towers to serve a relative handful of customers, and in other applications where the transmitting device is out of reach of terrestrial cell tower-based networks, such as on airplanes and aboard ships on the high seas.

- 8 -

(*See* App 514-515 (3/9/2015 Hr'g Tr. at 160:19-161:25 (Smith)); App 12, 13-14 (Montagner Decl. ¶¶ 21, 25).)  Because they do not rely upon terrestrial-sourced energy for transmission, MSS devices are also used by police and other emergency responders, who must be able to communicate in circumstances where conventional cell tower communications have been compromised.  (App 12-13 (Montagner Decl. ¶¶ 21-24).)

In seeking to transition from pure MSS operations, LightSquared encountered resistance from the Global Positioning Systems ("GPS") industry, which feared that the performance of GPS devices would be compromised by LightSquared's terrestrial operations.  (App 6-8 (Montagner Decl. ¶¶ 8-11).) LightSquared's primary electromagnetic spectrum, which is held by L2LP, lies in what is known as the "L-Band," and consists of two 10 MHz downlinks, located at 1526 MHz to 1536 MHz ("Lower Downlink") and 1545.2 MHz to 1555.2 MHz ("Upper Downlink"), paired with two 10 MHz uplinks, located at 1627.5 MHz to 1637.5 MHz ("Lower Uplink") and 1646.7 MHz to 1656.7 MHz ("Upper Uplink").[1]  (App 16-18 (Montagner Decl. ¶ 32); App 1213 (PX1088).)  For terrestrial operations, the uplinks carry signals from the handset to a cell tower and

---

[1]     LightSquared has an additional 6 MHz of L-Band spectrum, which must be used exclusively for MSS operations, and, ***most importantly for purposes of this appeal***, an additional 5 MHz of non-L-Band spectrum located between 1670 and 1675 MHz which L2Inc leases from Crown Castle ("Crown Castle Spectrum") and which is fully licensed for terrestrial use.  (App 16-18 (Montagner Decl. ¶ 32).)

the downlinks carry signals in the opposite direction, from the cell tower to a

customer's handset.  The L-Band downlinks and uplinks bracket the GNSS

spectrum band reserved for use by the GPS industry and other geo-positioning

systems.  (*See* Figure 1 annexed to this brief, which is derived from PX1088.)

Although LightSquared's MSS operations had not caused interference with GPS

systems, the GPS industry was concerned that harmful interference would arise

from the vastly increased number of transmissions that would occur in the L-Band

if LightSquared were permitted to conduct terrestrial operations similar to those

conducted by major wireless network carriers like AT&T and Verizon.

LightSquared worked with the GPS industry and others for years, and

believed it had resolved the interference concerns.  (App 25-26 (Montagner Decl.

¶¶ 50-51).)  Confirming that belief, in 2010, the FCC, which has regulatory

jurisdiction, authorized LightSquared to conduct nationwide terrestrial operations

in the L-Band as an adjunct to its MSS operations (the so-called "ancillary

terrestrial component" or "ATC").  (*See* App 498 (3/9/2015 Hr'g Tr. 126:3-12

(Smith)).)  LightSquared was among the first MSS operators to seek ATC approval

from the FCC, and the FCC's grant of approval to LightSquared was consistent

with the National Broadband Plan (released by the FCC in 2010 and intended to

alleviate the shortage of spectrum available for wireless broadband use).[2]  In

reliance upon this FCC approval, LightSquared entered into contracts and incurred

substantial new debt to construct the infrastructure for a terrestrial cellular

network, including a multi-billion dollar agreement with Sprint to construct cell

towers nationwide.  (App 26-27 (Montagner Decl. ¶ 51).)

No sooner was this permission granted, however, than LightSquared

found itself attacked, and its terrestrial operations challenged, by the same GPS

interests it had been led to believe no longer had interference concerns.[3]  The GPS

industry was not alone in expressing concerns; similar questions were raised by,

among others, the Department of Defense and the Department of Transportation

("DOT"), which questioned whether aircraft and other technologies that rely on

---

[2]     *See* App 1245-1249 (National Broadband Plan); *see also* App 679-670
(3/12/2015 Hr'g Tr. 31:23-32:10 (Merson)) (attributing the recent "explosion [in]
the need for mobile data services and in the [associated] spectrum" to the iPhone
and the "smartphone revolution"); App 1251-1270 (Tr. of DISH Network
Corporation's Q2 2014 Earnings Call (Ergen) at 5 (Feb. 23, 2015) ("[T]he number
of things that will be connected to the network is going to grow by 10 times what it
is today–every car, every pet, every child, every refrigerator, every camera, every
security system, every watch, every machine is going to be connected wirelessly to
a network.")).

[3]     LightSquared was owned at the time by Harbinger, which believes, among
other things, that it was misled by the GPS industry and that the FCC's de facto
suspension of its license to conduct terrestrial operations effected an
unconstitutional taking.  These beliefs are the foundation for the litigation
Harbinger eventually filed against the GPS industry and the FCC, discussed in
greater detail in relation to the Plan and the valuation issues raised by Ahuja.

accurate GPS information might be affected.[4]  Claiming that harmful interference with GPS systems from terrestrial operations in the L-Band could not be ameliorated, the GPS industry and those aligned with it persuaded the FCC in 2012 to propose a suspension of the ATC permission it had just granted for LightSquared's L-Band spectrum.  (App 8, 28-30 (Montagner Decl. ¶¶ 11, 55-57).)  Although the challengers focused more aggressively on LightSquared's downlinks, the FCC's actions imperiled LightSquared's uplinks too.  The proposed suspension was the functional equivalent of an actual suspension and precipitated LightSquared's spiral into bankruptcy, its petition for chapter 11 relief being filed on May 14, 2012.

Despite herculean efforts since 2011, LightSquared has been unable to persuade the FCC to withdraw its notice of proposed suspension and enable LightSquared to conduct terrestrial operations with its L-Band spectrum.  (App 541-542 (3/9/2015 Hr'g Tr. 225:21-226:8 (Smith)).)  In 2012, LightSquared filed with the FCC a number of interrelated requests (collectively, the "License Modification") that were intended as a compromise to allow it, on a somewhat reduced and modified basis, to conduct terrestrial operations.  (App 496-497 (3/9/2015 Hr'g Tr. 124:5-125:18) (Smith).)  Specifically, as shown in Figure 2

---

[4]     *See* App 505-516, 534-539 (3/9/2015 Hr'g Tr. 151:12-162:14, 218:20-223:5 (Smith)).  DOT is continuing a formal study of the issue.

annexed to this brief,[5] LightSquared proposed that it would surrender the right to

conduct terrestrial operations in the Upper Downlink (closest to the GNSS Band)

in exchange for permission to conduct wireless terrestrial operations in the 5 MHz

band between 1675 MHz and 1680 MHz ("NOAA Spectrum") currently used by

the National Oceanographic and Atmospheric Administration ("NOAA") for

weather balloons and other activities, in conjunction with L2Inc's adjoining Crown

Castle Spectrum, which was free of any claimed interference issues.  (App 496

(3/9/2015 Hr'g Tr. 124:12-22 (Smith).)  LightSquared proposed that the Crown

Castle Spectrum and the NOAA Spectrum be combined as a single 10 MHz

downlink block, which would be paired with the two L-Band uplinks held by

L2LP.  (*Id.*)  LightSquared further proposed to voluntarily refrain from terrestrial

operations in its Lower Downlink and instead undergo a new rulemaking before

the FCC to determine and set power limits for terrestrial operations in that block

that would eliminate any risk of interference with GPS systems.  (App 496-497

(3/9/2015 Hr'g Tr. 124:23-125:4 (Smith).)

        The License Modification drew objections from the GPS industry and

certain government entities.  These objections challenged LightSquared's thesis

that there was a reduced power level at which terrestrial operations could be

conducted in the Lower Downlink without affecting GPS signals, and persisted in

---

[5]    Figure 2 is derived from PX1088 and Exhibit SP038, received in evidence
during the confirmation hearing on the ThirdAm Plan (as defined below).

attacks on the suitability for terrestrial use of LightSquared's uplinks in light of their proximity to the GNSS band.  To date, the FCC has not approved any of the relief sought by LightSquared in the License Modification.  (App 527 (3/9/2015 Hr'g Tr. 202:18-25 (Smith)).)

A significant aspect of the License Modification is that it proposed to use the Crown Castle Spectrum, the lease for which is an asset of a wholly owned subsidiary of L2Inc, in an integrated spectrum pairing with L-Band spectrum owned by L2LP.  (App 496 (3/9/2015 Hr'g Tr. 124:11-22 (Smith)); App 16-18 (Montagner Decl. ¶ 32).)  The Crown Castle Spectrum does not have interference issues and may be used either as uplink or downlink.  The idea was to use the Crown Castle Spectrum to replace at least a portion of the downlink capacity that had been lost when the FCC proposed to suspend ATC approval for the L-Band.

This was *not* a simple task.  L2Inc and L2LP are separate debtors in these chapter 11 cases, with separate creditors, assets, capital structures, and ownership.  L2Inc's assets are collateral for L2Inc's secured indebtedness but not for secured indebtedness of L2LP; L2LP's assets are collateral for L2LP's secured indebtedness but not for secured indebtedness of L2Inc.  (*See* App 651 (3/11/2015 Hr'g Tr. 17:5-25 (Hootnick)); App 19-21 (Montagner Decl. ¶¶ 35, 38).)  The LightSquared debtors' estates have not been substantively consolidated, and during the course of these cases there were several "standalone" plans of reorganization

- 14 -

filed for L2Inc and for L2LP.[6]  Nevertheless, in light of the difficulties caused by the proposed suspension of the L-Band terrestrial license and the intense, continuing scrutiny of the L-Band downlinks, LightSquared's Special Committee, management, and professional advisors concluded that the greatest value—far greater than could be achieved on a stand-alone basis—would be achieved by combining L2Inc's and L2LP's spectrum assets in a single network.  (*See* App 493-494 (3/9/2015 Hr'g Tr. 121:21-122:2 (Smith)).)  Given the differing assets to which the creditors of L2Inc and L2LP had recourse and the different willingness of individual creditors to defer repayment or incur risk, negotiating arrangements to use the assets on a combined basis in a reorganized company was a complex and difficult endeavor.[7]

---

[6]     *See, e.g.*, Bankr. Dkt. No. 1780 Ex. A, Harbinger Capital Partners LLC's Second Amended Joint Plan of Reorganization for the Inc. Debtors Pursuant to Chapter 11 of the Bankruptcy Code; Bankr. Dkt. No. 1728 Ex. A-3, First Amended Joint Plan of LP Debtors Only Pursuant to Chapter 11 of Bankruptcy Code Proposed by LP Debtors and Ad Hoc Secured Group of LightSquared LP Lenders; Bankr. Dkt. No. 823, Chapter 11 Plan for One Dot Six Corp. Proposed by U.S. Bank National Association and MAST Capital Management, LLC; Bankr. Dkt. No. 764, Joint Chapter 11 Plan for LightSquared LP, ATC Technologies, LLC, LightSquared Corp., LightSquared Inc. of Virginia, LightSquared Subsidiary LLC, LightSquared Finance Co., LightSquared Network LLC, LightSquared Bermuda Ltd., Skyterra Holdings (Canada) Inc., and Skyterra (Canada) Inc., Proposed by the Ad Hoc Secured Group of LightSquared LP Lenders.

[7]     Further complexity arose because L2Inc had guaranteed the secured indebtedness of L2LP in the event L2LP failed to meet its obligations.  (*See* App 568 (3/10/2015 Hr'g Tr. 49:6-19 (Smith)).)

In the early months of the chapter 11 cases, interested parties filed plans that provided for the sale of LightSquared's spectrum assets by auction. LightSquared and its advisors marketed the assets extensively, contacting approximately 90 potential bidders.  (App 589 (3/10/2015 Hr'g Tr. 136:1-9 (Hootnick)).)  The auction did not attract sufficient interest and was canceled in late 2013.  The sole firm bid received was a "stalking horse" bid for L2LP's spectrum only, by an entity controlled by DISH Network Corporation head Charles Ergen that was later transferred to DISH, which was insufficient to pay L2LP's creditors, and that was eventually withdrawn because of claimed concerns regarding GPS interference.

In January 2014, LightSquared and certain sponsor entities announced a plan of reorganization in which the exit financing was contingent upon FCC approval of the License Modification by December 2014.  Scant days later, the FCC unexpectedly filed with the Bankruptcy Court a statement to the effect that the FCC could not say when, if at all, it might grant approval of the License Modification, and cautioning that there was no basis to believe it would act by the December 2014 deadline for the plan's exit financing.  (App 140-143.)  The pending plan of reorganization was withdrawn, and a heavily revised plan ("ThirdAm Plan") was filed in February 2014.  (App 146-245.)  Although still

envisioning FCC approval, the ThirdAm Plan's exit financing was not conditioned on receipt of FCC approval.

The Bankruptcy Court conducted a confirmation hearing on the ThirdAm Plan in March 2014. LightSquared's valuation showing relied upon the enterprise value that would be created by the FCC's grant of the License Modification, which, notwithstanding the aforementioned FCC statement, LightSquared argued was likely to be granted by the end of 2015.[8] (*See* App 297, 308-311 (Decision Denying Confirmation of Debtors' Third Amended Joint Plan 13, 24-27).) LightSquared conceded that its value without the relief envisioned by the License Modification was insufficient to support the proposed reorganization. (App 337 (*Id.* 53).) The Bankruptcy Court refused to confirm the ThirdAm Plan, in substantial part because of uncertainty over whether or when the FCC would approve the License Modification.[9] (App 339, 342-343 (*Id.* 55, 58-59).)

Following its decision denying confirmation of the ThirdAm Plan, the Bankruptcy Court, on May 28, 2014, ordered LightSquared and all parties in interest to mediation supervised by the Honorable Robert D. Drain, United States Bankruptcy Judge for the Southern District of New York. (App 247-255.) The

---

[8]     Based upon exit financing and anticipated cost savings, the ThirdAm Plan actually provided "runway" into the second quarter of 2016 for the FCC to act. (*See* App 462-466 (3/20/2014 Hr'g Tr. 160:5-164:25 (Smith).)

[9]     The Bankruptcy Court also held that the ThirdAm Plan discriminated unfairly against a class of secured claims. (App 343-346 (*Id.* 59-62).)

mediation was unsuccessful, producing nothing but false starts, until December 2014, when agreement—but not a full consensus—was reached on the current Plan. That agreement was, in large part, the product of the unforeseen high prices bid during the FCC's auction of broadband wireless spectrum that began on November 13, 2014 and concluded on January 25, 2015, known as "Auction 97." As a result of the Auction 97 spectrum prices, LightSquared found itself with potential lenders willing to lend money and creditors and third parties willing to invest additional funds that LightSquared believed would be sufficient to support a plan of reorganization. (App 629-630 (3/10/2015 Hr'g Tr. 196:11-197:9 (Hootnick)).)

LightSquared recognized that the Bankruptcy Court's unease may have been increased by the FCC's continuing inaction regarding the License Modification. Indeed, during a hearing on LightSquared's disclosure statement for the Plan on January 20, 2015, the Bankruptcy Court reminded counsel of her prior valuation ruling and strongly admonished counsel against again presenting a valuation that relied on a speculative assumption of regulatory approval.[10] The

---

[10]     *See* App 369 (1/20/2015 Hr'g Tr. 19:17) (noting that the regulatory process for LightSquared could "take ten years"). Moreover, the Bankruptcy Court indicated that it would not reverse its position on the regulatory uncertainty regarding the License Modification and suggested the parties take "a moment to pause and reflect" on the viability of another valuation premised on a hypothetical grant of regulatory approvals. (*See* App 371, 376-377 (*Id.* at 21:10-13, 26:21-27:3).)

reality, however, is that it remains difficult for LightSquared to demonstrate value sufficient to support a plan of reorganization based on a perpetual suspension of its terrestrial downlink license.  Accordingly, while continuing to rely upon an assumption that it would receive regulatory approval for terrestrial operations, LightSquared's valuation assumed a more modest regulatory agenda.  (*See* App 516-517 (3/9/2015 Hr'g Tr. 162:15-163:15 (Smith)).)

Specifically, as shown in Figure 3 annexed to this brief (derived from PX1088), LightSquared focused upon those elements of the License Modification that it believed were the least controversial and therefore most likely to obtain timely regulatory approval:  (a) 10 MHz of paired spectrum[11] consisting of the upper 5 MHz of the Lower Uplink (owned by L2LP) paired with the 5 MHz of unimpaired Crown Castle Spectrum (owned by L2Inc) as downlink, effectively using the lower 5 MHz of the Lower Uplink as a "guard band" to prevent interference with the GNSS block; and (b) 10 MHz of unpaired uplink spectrum consisting of the Upper Uplink (owned by L2LP) (together, the "Alternative

---

[11]    "Paired" spectrum, in which an uplink block is matched or paired with a downlink block, is more attractive and valuable than unpaired spectrum, *i.e.*, spectrum that operates in one direction only.  Cellular network operations require paired spectrum and thus, to establish its own terrestrial network operations, LightSquared would require paired spectrum.  Likewise, if, post-reorganization, LightSquared sought to partner with an existing operator or new entrant, or elected to lease or sell some of its spectrum licenses, paired spectrum would be of greater interest to most counterparties.  (*See* App 613-614 (3/10/2015 Hr'g Tr. 166:17-167:4 (Hootnick)).)

Spectrum Use Approach"). (App 485-487 (3/9/2015 Hr'g Tr. 113:14-115:3

(Smith)); App 608-609 (3/10/2015 Hr'g Tr. 161:17-162:11 (Hootnick)).)

Expressing confidence that it could obtain FCC approval for this limited subset of

spectrum uses— all of which were subsumed within the License Modification—*if*

the Plan were confirmed[12] and if LightSquared thereafter so elected, LightSquared

applied values derived from Auction 97 (which involved spectrum roughly

comparable to LightSquared's) to demonstrate that its enterprise value (without

acquiring the NOAA Spectrum, and, excluding the 20 MHz of L-Band downlink)

would be approximately $9.6 billion.[13]  (App 615-623 (3/10/2015 Hr'g Tr.

168:20-176:13 (Hootnick)).)

---

[12]    Importantly, LightSquared's testimony as to the likelihood of FCC approval was premised on ***prior approval of the Plan*** by the Bankruptcy Court.  LightSquared's CEO Smith testified that it was clear to him that the FCC was unlikely to act until it knew who would control LightSquared's spectrum, and the sound reasons the FCC would have for refraining to act until LightSquared's ownership was clarified.  (*See* App 518-520 (3/9/2015 Hr'g Tr. 164:11-166:25 (Smith)).)  That ownership could only be known *after* a plan of reorganization was confirmed by the Bankruptcy Court.  LightSquared was thus confronting a "chicken or egg" dilemma and was forthright about that in its presentation to the Bankruptcy Court.  Thus, when evaluating the proof with respect to valuation, the Bankruptcy Court understood that LightSquared was not suggesting that favorable FCC action would occur absent a confirmed plan.

[13]    SP Special Opportunities, LLC ("SPSO"), a creditor owned by Charles Ergen, Chairman and controlling stockholder of DISH Network Corporation, holding roughly 50% of L2LP's secured debt, argued that Auction 97 spectrum was not comparable to LightSquared's spectrum addressed in the Alternative Spectrum Use Approach, and that the LightSquared spectrum was worth far less. (App 449-455 (¶¶ 19-25).)

Notably, that valuation, like the one the Bankruptcy Court rejected in 2014, relied upon an assumption of favorable regulatory action.[14]  And, as it did in January 2014, the FCC once again submitted to the Bankruptcy Court a statement explicitly disavowing that regulatory approval for terrestrial use of LightSquared's spectrum would be forthcoming by a date certain or at all.  (App 712 (3/17/2015 Hr'g Tr. 17:10-20 (Pellegrino)).)

Significantly, although it confirmed the Plan, the Bankruptcy Court did ***not*** find that the enterprise value of LightSquared was $9.6 billion, and its decision to confirm was not based upon the existence of such value.  Rather, and particularly because of the unique circumstances that arose shortly before the confirmation hearing began and continued until the final hearing day, whereby other parties explored and unsuccessfully proposed a competing plan of reorganization, the Bankruptcy Court was able to and did find that the value of the combined LightSquared was what the New Investors[15] had agreed to pay for it, and

---

[14]    As discussed above, such regulatory action is significantly more circumscribed than required for the License Modification, which the Bankruptcy Court declined to assume would be given when ruling on the ThirdAm Plan. Ahuja nevertheless contends that approval of the full License Modification, not just the subset contemplated by the Alternative Spectrum Use Approach, should be assumed when valuing the combined LightSquared enterprise.

[15]    "New Investors" refers to Fortress Credit Opportunities Advisors LLC ("Fortress"), Centerbridge Partners, L.P. ("Centerbridge"), SIG Holdings, Inc. ("SIG"), and Harbinger, collectively.  The New Investors constitute substantially

nothing more.  While Ahuja's appeal proceeds from the premise that this finding represented some sort of "retreat" by the Bankruptcy Court—specifically contrived to defeat Ahuja's objection—from its purported prior acceptance of a $9.6 billion valuation, that premise is a fiction.

The evolution of the Plan as ultimately confirmed is important.  As filed in January 2015 and amended in February 2015, the Plan did not include sufficient cash to pay, among others, the claims of creditors holding L2LP's prepetition secured debt.  While many of these creditors were willing to accept new debt securities of reorganized debtors in exchange for their claims, the largest holder of such claims, SPSO, was not, demanding that it be paid in full— approximately $1.5 billion—in cash.  Unable to fund such a payment, LightSquared proposed a "cramdown" plan under which it intended to compel SPSO to accept new debt of a value equal to the value of SPSO's claim, as permitted by section 1129(b) of the Bankruptcy Code.  The confirmation hearing accordingly shaped up as a valuation fight between LightSquared and SPSO, with SPSO arguing that the true value of LightSquared was too small to ensure payment of the cramdown debt LightSquared proposed to deliver to SPSO.

In the weeks leading up to the confirmation hearing, a number of interested parties communicated with LightSquared and the Special Committee to

---

all of the non-debtor Appellees, except that the only "JPM Investment Party" that is a New Investor is SIG.

discuss, and on occasion to propose, what were described as improvements to the Plan, or to features of the Plan that had been devised by LightSquared and the New Investors.  These proposed "improvements," and responsive adjustments implemented by the New Investors, were intended in part to secure the acquiescence of SPSO, either by improving the terms of the debt it would receive, by offering to pay a portion of its claim in cash, or a combination of the above. One day before the confirmation hearing ended, the New Investors disclosed that they had arranged financing that allowed SPSO's claim to be paid in full in cash. (*See* App 722-723 (3/17/2015 Hr'g Tr. 227:21-228:15 (Sussberg)).)  In response, SPSO withdrew its objection to the Plan, and the valuation fight to which LightSquared's and SPSO's respective experts had addressed their energies was no more.  (App 750-752.)  LightSquared and the New Investors were also able to resolve on the final day of the confirmation hearing the remaining objections to confirmation of the Plan—except for Ahuja's.  (App 1022 (3/26/2015 Hr'g Tr. 12:15-18 (Sussberg)).)

The resolution of SPSO's objection meant that the Bankruptcy Court no longer faced the hard question of whether L2LP's value was sufficient to support cramdown of SPSO's senior secured L2LP debt.  Instead, it had before it only the much easier question of whether L2Inc's value was sufficient to pay all creditor and preferred equity interest claims in full, with something left over for

holders of L2Inc's common equity interests.  The Bankruptcy Court correctly concluded it was not sufficient.

### Mechanics of the Plan

The Plan implements a complex series of compromises and new investments.  Although creditors and interest holders whose claims are senior to Ahuja's are deemed satisfied under the Plan, most of them will ***not*** receive cash payment for their claims, but instead have agreed to accept new debt or new securities of the reconstituted successor to L2Inc ("<u>Reorganized L2Inc</u>") or New LightSquared.  A key feature of the Plan is Reorganized L2Inc's contribution of the Crown Castle Spectrum to New LightSquared, thereby enabling New LightSquared to create potentially more valuable "paired" spectrum essential to conduct wireless telecommunications operations.  (*See* App 950 (Plan, Art. IV § B.2(c)).)  Such operations, of course, remain entirely dependent upon a grant of approval by the FCC, as described above.

The contribution of assets to New LightSquared will be effected by an exchange of shares of the direct and indirect subsidiaries of L2Inc that have title to the Crown Castle Spectrum lease and related assets in return for preferred equity interests in New LightSquared and approximately 20% of the common equity interests in New LightSquared.  (App 950 (Plan, Art. IV § B.2(c)).)  As explained more fully below, the Plan provides that SIG will own the common stock of

Reorganized L2Inc, and thus will be the indirect owner of these equity interests in New LightSquared.  (*See* App 943, 951 (Plan, Art. III, § B.14(b)(ii); *id.*, Art. IV § B.2(d)(ii)).)

   Reorganization of L2Inc:  Most of L2Inc's debtor-in-possession financing ("DIP") obligations will be repaid in full in cash, but $41 million of DIP claims at L2Inc are held by SIG, which has agreed not to seek cash payment but instead to convert them on a dollar-for-dollar basis into borrowings under a new credit facility at Reorganized L2Inc ("New L2Inc Loan").  Unlike the DIP facility and the L2Inc prepetition senior secured credit facility (discussed below), the New L2Inc Loan will not be secured by any spectrum assets.  (App 932-933, 949-954 (Plan, Art. II, §§ C, E; *id.* Art. IV, §§ B.1(c), B.2(d)(i), B.4(a)).)  Holders of claims under L2Inc's prepetition senior secured credit facility (all affiliates of MAST Capital Management, LLC) do not receive cash payment from L2Inc, but have instead sold their claims to SIG for cash, at par plus accrued interest.  (App 949 (Plan, Art. IV, § B.1(e)).)  SIG has agreed to convert the claims so purchased, on a dollar-for-dollar basis, into borrowings under the New L2Inc Loan.  (App 936-937, 951-954 (Plan, Art. III, § B.5(c); *id.* Art. IV, §§ B.2(d)(i), B.4(a)).)  Harbinger, which has agreed to contribute certain litigation claims to the reorganized entities, has agreed to accept preferred and common equity in New LightSquared in return for those claims and in satisfaction of its claim under its prepetition subordinated

secured loan to L2Inc.  (App 937 (Plan, Art. III, § B.6(c)).)  Significantly, although

demanding "equal treatment" with Harbinger, Ahuja cannot make any of the

contributions or agreements Harbinger made; he holds no secured debt of L2Inc

and holds no interest in any of Harbinger's contributed litigation claims.  General

unsecured creditor claims against L2Inc will be paid in full in cash.  (App 941

(Plan, Art. III, § B.11(b)).)

        With the exception of SIG, holders of preferred stock interests in

L2Inc will receive "Series C" preferred equity interests in New LightSquared in an

amount equal to the outstanding liquidation preference (without premium) of their

L2Inc preferred stock interests.  (App 943 (Plan, Art. III, § B.14(b)(i)).)  SIG will

receive 100% of the common equity in Reorganized L2Inc in exchange for its

L2Inc preferred stock interest.  (App 943 (Plan, Art. III, § B.14(b)(ii)).)  As the

owner of 100% of the equity in Reorganized L2Inc, SIG may have access to tax

attributes of L2Inc that remain after consummation of the Plan (and that

LightSquared and its advisors had concluded were of no value to LightSquared).

(App 666-667 (3/11/2015 Hr'g Tr. 126:15-127:3 (Hootnick)); *see also* App 636

(3/10/2015 Hr'g Tr. 225:8-12 (Hootnick)).)  Holders of common equity interests in

L2Inc, including Harbinger, Ahuja, and others, will receive nothing on account of

those interests.  (App 943, Plan, Art. III, § B.16(b)).)

Reorganization of L2LP:  The L2LP DIP obligations will be paid in full in cash unless the owners of those claims accept different treatment.[16]  (App 933 (Plan, Art. II §§ D, F).)  All outstanding principal and accrued interest under L2LP's prepetition secured credit facility will convert, on a dollar-for-dollar basis, into second lien debt of New LightSquared, with one procedural wrinkle:  the prepetition secured debt owned by SPSO will be purchased for cash by a group of commitment parties acting through Jefferies, so it is those commitment parties, rather than SPSO, that will receive New LightSquared second lien debt upon conversion of the L2LP prepetition secured debt currently held by SPSO.  (App 938 (Plan, Art. III, §§ B.7(c), B.8(c); *see also* App 735-736 (3/18/2015 Hr'g Tr. 120:20-121:11 (Barr)).)  General unsecured creditor claims against L2LP, including a $750,000 claim held by Ahuja, will be paid in full in cash.  (App 941 (Plan, Art. III, § B.12(b)).)

Holders of preferred equity interests in L2LP were given the choice of receiving either "Series A-2" or "Series C" preferred equity interests in New LightSquared equal to the outstanding liquidation preference (without premium) of their existing L2LP preferred equity interests.  (App 942 (Plan, Art. III,

---

[16]   DIP obligations of L2Inc and L2LP that are repaid in cash will be paid using the proceeds of a new first lien working capital facility, funding for which will be raised in the market.  However, LightSquared may agree with certain DIP lenders to "roll" outstanding DIP obligations into this new first lien facility instead of paying them off in cash when the Plan is consummated.

§ B.13(b)).)  All holders of preferred equity interests who were not New Investors chose to receive "Series A-2" preferred equity interests; those holders of preferred equity interests who were New Investors agreed to receive "Series C" preferred equity interests.  Holders of common equity interests in L2LP will receive nothing on account of those interests.  (App 943 (Plan, Art. III, § B.15(b)).)

Contributions by the New Investors:  The New Investors agreed to make contributions to the LightSquared enterprise in various forms that increase the value of the enterprise.  As noted above, Harbinger agreed to contribute certain litigation claims and to convert certain debt to equity, and will receive in return preferred and 44% of the common equity interests in New LightSquared.  (App 937, 961 (Plan, Art. III, § B.6(c); *id.*, Art. IV § P).)  SIG contributed approximately $354 million to purchase the prepetition senior secured debt of L2Inc from the prior holder (which insisted upon payment in full in cash) and has agreed to exchange this prepetition senior secured debt for an equal amount of New L2Inc Loan, thereby relieving L2Inc of the need to repay the L2Inc senior secured facility in cash.  (App 936, 949-954 (Plan, Art. III, § B.5(c); *id.*, Art. IV, §§ B.1(e), B.2(d)(i), B.4(a)).)  This contribution is in addition to approximately $41 million paid by SIG to purchase a portion of the L2Inc DIP facility claim from the same entity.  (App 949 (Plan, Art. IV, § B.1(c)).)  As noted, SIG agreed to exchange that DIP claim for an equivalent amount of New L2Inc Loan, relieving L2Inc of the

need to repay this claim in cash as well, making an aggregate cash savings to the L2Inc estate of $395 million.  (App 933, 951-954 (Plan, Art. II, § E; *id.* Art. IV, §§ B.2(d)(i), B.4(a)).)[17]

New Investor Fortress is contributing $68,391,643.16 in cash to New LightSquared in exchange for a like face amount of "Series B" preferred equity interests in New LightSquared plus 26.2% of the New LightSquared common equity interests.  (App 949 (Plan, Art. IV, § B.2(b)).)  New Investor Centerbridge is contributing $21,108,531.85 in cash to New LightSquared in exchange for a like face amount of "Series B" preferred equity interests in New LightSquared plus 8.1% of the New LightSquared common equity interests.  (*Id.*)

All elements of the Plan were heavily negotiated over the course of the court-ordered mediation before Judge Drain and afterwards with Judge Drain's involvement, including during the confirmation hearing.  Notably, in addition to the specific contributions itemized above, the New Investors were able to arrange, on a second lien basis, the financing necessary to pay SPSO in full in cash.  (App 735-736 (3/18/2015 Hr'g Tr. 120:20-121:11 (Barr)).)  Given their assessment of the risks confronting the LightSquared enterprise, not least of which is the inability

---

[17]   The agreements by Harbinger to exchange secured debt claims at L2Inc for equity in New LightSquared, and by SIG to exchange secured debt claims at L2Inc for the New L2Inc Loan, were critical because they facilitated the release of liens on the Crown Castle Spectrum without requiring full payment of the debt secured thereby.

to date to persuade the FCC to withdraw in any respect its 2011 proposed

suspension of LightSquared's license to conduct terrestrial telecommunications

operations within the L-Band, the New Investors were not willing to make

additional contributions to the LightSquared enterprise beyond those required to

obtain agreement from LightSquared's creditors and preferred equity holders that

their claims would be deemed satisfied.  Nobody offered LightSquared a better

deal.

## ARGUMENT

### I.     THE PLAN DOES NOT VIOLATE THE ABSOLUTE PRIORITY RULE AND IS FAIR AND EQUITABLE TO AHUJA AND OTHER HOLDERS OF OUT-OF-THE-MONEY COMMON EQUITY INTERESTS

The "absolute priority rule" states that no class of creditors or interest

holders may recover in chapter 11 unless the claims of all creditor and interest

holder classes senior to them have been satisfied in full, barring agreement by a

senior class to lesser treatment of its claims.  *Norwest Bank Worthington v. Ahlers*,

485 U.S. 197, 202 (1988); *see also* 11 U.S.C. § 1129(b)(2).  Far from supporting

Ahuja's appeal, the absolute priority rule is the reason he is entitled to, and

received, nothing on account of his common equity interest in L2Inc.

In appealingly simple—but utterly mistaken—fashion, Ahuja argues

that some generic and undefined "LightSquared" is solvent because its "value" of

$9.6 billion exceeds its $4.8 billion of liabilities.  Ahuja's mistakes are many; each

- 30 -

by itself is sufficient to defeat his appeal, and in combination their effect is devastating.

## A. The Bankruptcy Court Did Not Accept the $9.6 Billion Valuation

First, as shown above, the Bankruptcy Court did *not* find that the value of LightSquared is $9.6 billion. That figure, which corresponds to the mid-point of the net total equity value derived by LightSquared's valuation expert, Mark Hootnick of Moelis & Company ("Moelis"), in his hypothetical "Alternative Spectrum Use Case" presentation, is ***entirely*** dependent upon the FCC granting LightSquared the permission for terrestrial operations it presently does not have. As noted earlier, in 2011 the FCC proposed to suspend LightSquared's permission to conduct terrestrial operations using its L-Band spectrum, effectively blocking any such use, and has to date refused to lift any part of the proposed suspension, despite unstinting efforts by LightSquared to persuade it to do so. As recently as March 17, 2015, the FCC informed the Bankruptcy Court that the FCC remains, as it was in January 2014, when it first addressed the Bankruptcy Court, unable to predict what decision it might make regarding LightSquared's request to reinstate permission to engage in terrestrial wireless operations, or when it might reach a decision. (App 711-712 (3/17/2015 Hr'g Tr. 16:20-17:20).) The Bankruptcy Court was unwilling to engage in speculation about whether or when such

permission might be granted,[18] and Ahuja makes no effort to explain, much less show, why that was clear error.

**B.    Ahuja Fails To Assess Creditor and Interest Holder Recoveries on the Standalone Basis Required by the Supreme Court**

Second, Ahuja creates a fictitious "stew" that improperly throws together all the LightSquared debtors' assets and liabilities, without reference to the entity where they in fact reside, and utterly without regard to how they have been treated historically.  In so doing, Ahuja effectively presumes a substantive consolidation of the LightSquared debtors' estates that has not occurred.  The very Supreme Court authority cited by Ahuja as purportedly authorizing such phantom consolidation, *Consolidated Rock Products v. Du Bois*, 312 U.S. 510 (1941), in fact says just the opposite.  Ahuja focuses on that portion of *Consolidated Rock*, 312 U.S. at 525-26 (prefaced by the clause, "In the second place . . ."), in which the Court noted that the valuation of several entities that were to conduct combined operations post-emergence (the assets of the three pre-petition debtors there were to be combined in a single entity post-emergence) should focus, for purposes of assessing plan feasibility, among other things, upon the future earnings of that

---

[18]    "Accordingly, while Mr. Ahuja invites the Court to conclude that there is a substantial equity cushion based upon the Alternative Spectrum Approach, the regulatory challenges attendant to the realization of the full 9.6 billion dollar valuation remains uncertain and precludes the definitive finding of the existence of the equity cushion that Mr. Ahuja has sought to establish."  (App 1139-1140 (3/26/2015 Hr'g Tr. 129:22-130:3 (Court)).)

combined enterprise, *if* such future earnings can be reliably determined—which is not possible here.[19]

From this, Ahuja mistakenly concludes that a creditor's or interest holder's **right** to participate in the reorganized enterprise that will hold all assets of the several pre-petition entities, as was anticipated by the plan of reorganization at issue in *Consolidated Rock*, is determined by the prospective economics of that newly created combined enterprise. But, in the immediately preceding portion of its opinion, overlooked or purposely ignored by Ahuja, the Supreme Court noted that **"[i]n the first place**, there must be a determination of what assets are subject to the payment of the respective claims" of the several debtors' separate creditors. *Consolidated Rock*, 312 U.S. at 520-21 (emphasis added). In other words, even where a plan of reorganization contemplates that the assets of separate debtors will be combined in a new, reorganized company, as is the case to some degree here, the right of each creditor and interest holder of the separate debtors to participate in

---

[19]   L2Inc and L2LP have consistently had massively negative cash flows throughout their existence. Indeed, viewed in isolation, the debt service, capital obligations, and overhead associated with L2LP's MSS operations exceed the revenue of that business. Assuming LightSquared received full FCC approval for L-Band terrestrial wireless operations today, the infrastructure investment required to construct a nationwide network would put any prospect of earnings speculatively far into the future. LightSquared, essentially still a start-up in a field dominated by much larger players, is simply not a business suited for valuation based upon future earnings. *Cf. In re Genco Shipping & Trading Ltd.*, 513 B.R. 233, 254-56 (Bankr. S.D.N.Y. 2014) (declining to credit Discounted Cash Flow valuation where earnings history and future earnings projections were unreliable) (collecting cases).

the reorganized company is determined by looking at the assets and liabilities of the specific debtor that is the obligor on a standalone basis.

The significance of looking at the assets of each debtor separately was illustrated precisely in *Consolidated Rock*, where the district court (1) had failed to determine either the amount of the deficiency claims of bondholders of the two subsidiary debtors or the value of unmortgaged assets available to satisfy them, and (2) had failed to determine the validity of a key unmortgaged asset:  an apparent $5 million intercompany claim by the subsidiaries against the parent.  Assuming even partial validity of that intercompany claim, "the entire assets of Consolidated [the parent] would be drawn down into the estates of the subsidiaries," which "certainly . . . would render untenable the present contention of Consolidated and the preferred stockholders [of Consolidated] that they are contributing all of the assets of Consolidated to the new company in exchange for which they are entitled to new securities" of the reorganized entity.  *Id.* at 521.  Indeed, the Supreme Court forcefully stated that this standalone, "by debtor" analysis is necessary to comply with the absolute priority rule, *id.* at 520-21—the same absolute priority rule Ahuja wrongly accuses the Appellees of having violated by assiduously following the directives of the Supreme Court in *Consolidated Rock*.[20]

---

[20]     *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414 (1968), also cited by Ahuja, adds nothing to the analysis. There, the Supreme Court echoed its earlier admonition in *Consolidated Rock* that

Ahuja only holds equity interests in L2Inc.  He has no direct rights against any assets of L2LP.  When L2Inc is properly analyzed on a standalone basis, the debts and interests senior to Ahuja's common equity interests far exceed the value of L2Inc's assets.  The Bankruptcy Court expressly found as much:  "The value of the assets of the Inc. Debtors standing alone – without recourse to the assets of the LP Debtors and without combining the value of the [L2]Inc. and [L2]LP assets in one going concern enterprise – is insufficient to support a recovery for common equity holders."  (App 1141 (3/26/2015 Hr'g Tr. 131:20-24 (Court)).)  In other words, the Bankruptcy Court found that L2Inc is insolvent on a standalone basis, which, pursuant to *Consolidated Rock*, means that holders of common stock interests in L2Inc, like Ahuja and Harbinger, can recover nothing on account of those interests.  *See, e.g.*, *In re Genco Shipping & Trading Ltd.*, 513 B.R. 233, 261 (Bankr. S.D.N.Y. 2014) (objection that plan is not fair and equitable "fails given the Court's conclusion that [the debtor] is insolvent and, therefore, the equity holders are not entitled to any recovery"); *In re Drexel Burnham Lambert Group*, 138 B.R. 714 (Bankr. S.D.N.Y. 1992) ("[Section] 1129(b)(2)(C)(i)

---

lower courts must consider prospective earnings (where same can be determined with reasonable certainty) when valuing a debtor's business—an issue not presented here.  Because *TMT Trailer Ferry* only concerned a single debtor, it does not address, let alone alter, the holding of *Consolidated Rock* that, absent substantive consolidation, the rights of creditors and interest holders must be determined on a per-debtor, standalone basis.  None of the other cases cited by Ahuja does so either (*see infra*).

provides that equity holders must receive at least what their interest is worth. Here, [the equity holder] is receiving exactly what [its] interest is worth. Nothing."); *In re Toy & Sports Warehouse, Inc.*, 37 B.R. 141, 153 (Bankr. S.D.N.Y. 1984) ("The equity shareholders may be crammed down in this case simply because the debtors are insolvent and the shares in question have no value.").

The Bankruptcy Court's factual finding as to L2Inc's standalone insolvency is fully supported by the evidentiary record. Ahuja did not challenge that showing at trial, and he does not challenge it on this appeal. The aggregate amount of debt owed by, and liquidation preferences of preferred equity interests in, L2Inc is approximately $1.135 billion.[21] In the "Current Spectrum Approach" described in Moelis's expert report, Moelis opined as to a range of values for L2Inc's spectrum assets on a standalone basis, with the mid-point value being $789 million—nearly $350 million *less* than required for value to reach the L2Inc common stock interests. (App 1124.) Moelis further opined as to a range of values for L2LP's assets on a standalone basis, with the mid-point value being

---

[21]    This figure is comprised of the following: $170 million secured debt owed under L2Inc's DIP facility (App 567 (3/10/2015 Hr'g Tr. 48:14-16)); plus $630 million secured debt under a pre-bankruptcy facility (App 567-568, 574-575 (*id.* 48:20-49:1, 88:23-89:8); plus preferred equity with a $335 million aggregate liquidation preference (without premium) (App 575 (*id.* 89:9-11)). (*See also* App 1272.) All values are as of December 15, 2015—the projected effective date of the Plan.

$2.914 billion.  (*Id*.)  That is less than the $3.67 billion total of L2LP's debt and preferred stock obligations,[22] all of which are senior to the common equity interest L2Inc holds, indirectly, in L2LP.  That means that L2Inc's indirect stock interest in L2LP is worthless, and does not add to L2Inc's value.[23]

## C.    Ahuja Has Not Shown that the Bankruptcy Court's Factual Determinations Regarding Valuation Were Clearly Erroneous

The Bankruptcy Court further observed that any equity cushion suggested by Moelis's Alternative Spectrum Use Approach (which the Bankruptcy Court did not accept) "could not exist but for the many interrelated transactions that undergird the Plan. . . .  [T]he Plan enables the Debtors to unlock significant value by combining the assets of the [L2]Inc and the [L2]LP estates to operate as a going-concern enterprise."  (App 1138, 1140 (3/26/2015 Hr'g Tr. 128:5-9, 130:4-6 (Court)).)  The enhanced value to which the Bankruptcy Court referred arises principally—if not exclusively—from the reorganized entity's hypothetical ability,

---

[22]    This figure is comprised of the following: $400 million secured debt owed under L2LP's DIP facility (App 568 (3/10/2015 Hr'g Tr. 49:6-10)); plus $3 billion secured debt under a pre-bankruptcy facility (App 568 (*id*. 49:11-13)); plus preferred equity with a $270 million aggregate liquidation preference (without premium) (App 574 (*id*. 88:6-8)).  (*See also* App 1272.)  All values are as of December 15, 2015.

[23]    Although Moelis's report included value ranges for which the upper limit exceeded the mid-point values for each of L2Inc and L2LP, the Bankruptcy Court's insolvency determination utilized the mid-point, and Ahuja fails to show that the Bankruptcy Court's weighing of the evidence in this manner was clearly erroneous.

contingent upon regulatory approval, to have at least 10 MHz of *paired* spectrum.

Specifically, providing for the contribution to New LightSquared (formerly L2LP)

of the 5 MHz of Crown Castle Spectrum presently owned by L2Inc, the Plan

would allow New LightSquared to create a 10 MHz pairing comprised of the

Crown Castle Spectrum and the upper 5 MHz of the Lower Uplink (assuming FCC

approval of the Alternative Spectrum Use Approach) or a 20 MHz pairing of the

Upper Uplink and a corresponding downlink consisting of the Crown Castle

Spectrum and the NOAA Spectrum (assuming FCC approval of the License

Modification *and* L2LP's subsequent successful acquisition of the NOAA

Spectrum).  (Each of the foregoing scenarios also would include 10 MHz of

unpaired uplink spectrum.)  This compares favorably with the presently unpaired

5 MHz spectrum holdings of L2Inc and the impaired, effectively unpaired L-Band

spectrum holdings of L2LP.[24]  The record, including the results of Auction 97,

establishes, and Ahuja does not contest, that 10 MHz of paired spectrum (a 5 MHz

---

[24]    *See* App 1224 (Moelis opining that current mid-point value of L2LP's spectrum is $2.914 billion).  As discussed above, in 2010, when the FCC gave LightSquared permission for terrestrial use of its L-Band spectrum, LightSquared had (in L2LP) two 20 MHz paired spectrum blocks:  each of the two 10 MHz uplink blocks was paired with a 10 MHz downlink block.  In 2011, the FCC proposed to suspend that terrestrial approval after hearing objections to terrestrial use of the L-Band, focusing especially, but not exclusively, on the 20 MHz of L-Band downlink.  The de facto suspension effected by that proposal continues in force.  The result is that, in the current "best case," L2LP has been left with 20 MHz of unpaired uplink spectrum, in two 10 MHz blocks, each of which remains subject to claims of potential interference with GPS operations.

uplink paired with a 5 MHz downlink) is worth substantially more than 10 MHz of unpaired uplink or downlink.

Ignoring *Consolidated Rock* and the absolute priority rule, Ahuja argues that he is entitled to the benefit of this unlocked value. He is not.[25] None of the cases cited by Ahuja purports to overrule *Consolidated Rock* and hold that debtors whose estates are not substantively consolidated nonetheless must be valued on a combined basis in order to determine the rights of creditors and stockholders of the individual debtors to participate in the reorganization for purposes of section 1129(b).[26] Moreover, Ahuja's claimed entitlement erroneously presumes that the New Investors would make the contributions under the Plan that unlock the new value in exchange for new equity they would be required to share

---

[25]    Ahuja's position is like a homeowner who defaults on his mortgage, loses his home to the lender in a foreclosure and, upon learning that the lender subsequently refurbished the house and sold it for a profit, demands that the lender share that profit with him, on the theory that the increased value was "inherent" in the property at the time of the default and foreclosure.

[26]    Several of the cases Ahuja cites involved single debtors and thus did not implicate the issue of how multiple debtors should be valued. *See Nat'l Rural Utils. Coop. Fin. Corp. v. Wabash Valley Power Ass'n (In re Wabash Valley Power Ass'n, Inc.)*, 111 B.R. 752 (S.D. Ind. 1990); *In re Bush Indus., Inc.*, 315 B.R. 292 (Bankr. W.D.N.Y 2004); *In re Haskell Dawes, Inc.*, 199 B.R. 867 (Bankr. E.D. Pa. 1996). The courts valued multiple debtors on a combined basis in only three of the cited cases, and in each the debtors had significant collective liabilities for secured funded debt that could have made valuing the debtors on a standalone basis unworkable. *See Genco*, 513 B.R. at 238; *In re Chemtura Corp.*, 439 B.R. 561, 568 (Bankr. S.D.N.Y. 2010); *In re Cellular Info. Sys., Inc.*, 171 B.R. 926, 929 (Bankr. S.D.N.Y. 1994). Here, in contrast, L2Inc and L2LP have clearly separate assets and debts.

with Ahuja and other holders of L2Inc common equity interest.  There is no reason to believe, and Ahuja points to no evidence at all to show, that the New Investors would agree to make the same contributions in a scenario where they were forced to share the new equity with Ahuja, effectively giving him a free ride.  What this means, put another way, is that Ahuja would need to show that the combined value of the Debtors would be the same even without the New Investors' contributions. He has failed utterly to do so, and the Bankruptcy Court's findings that the New Investors' contributions would "unlock significant value," and that the potential equity cushion Ahuja seeks to invoke "simply would not exist in the absence of each of the transactions with the New Investors" (App 1140-1141 (3/26/2015 Hr'g Tr. 130:4-131:16)), are not contested.

Contrary to Ahuja's suggestion, the Bankruptcy Court was not obliged to specify a precise value for the Debtors' combined assets.  Bankruptcy courts have considerable discretion to tailor their valuation analysis to the purpose for which it is being conducted.  *Cf. Gen. Motors Acceptance Corp. v. Valenti (In re Valenti)*, 105 F.3d 55, 62 (2d Cir. 1997); *Roblin Indus.*, 78 F.3d at 35.  It is, moreover, well-settled that "[v]aluation is not an exact science."  *Genco*, 513 B.R. at 242 (collecting cases).  For purposes of overruling Ahuja's objection, it was sufficient for the Bankruptcy Court to find that the value of the Debtors' assets is not more than the aggregate amount of debt and senior interests, such that there is

no "equity cushion" and Ahuja is out-of-the-money. *See, e.g.*, *Genco*, 513 B.R. at

244; *Chemtura*, 439 B.R. at 579.   That is precisely what the Bankruptcy Court did.

Thus, even if Ahuja were correct when he purports to measure his

right to recovery based on the post-reorganization value of the combined entity that

will be New LightSquared—and he is not correct, as shown above—he fails to

point to any contrary evidence that would support an argument that the Bankruptcy

Court's factual finding was clearly erroneous.  Instead, he resorts to

mischaracterizing the Bankruptcy Court's ruling as shifting the burden of proof

from the Debtors to him and requiring that he prove his equity interests are

in-the-money.  (*See* Ahuja Brief at 25-27.)  In so doing, Ahuja simply ignores the

testimony adduced at trial acknowledging (1) that Moelis's valuation opinion

assumed that the FCC dismisses the current objections to terrestrial use of the

L-Band uplinks and grants regulatory approval to use L2Inc's and L2LP's

spectrum assets in a new configuration, and (2) that the prospect LightSquared

would obtain that authorization, which it currently has no intention of even

pursuing, remains uncertain.  (*See* App 545, 546-547, 551, 552 (3/9/2015 Hr'g Tr.

229:4-14; *id.* 230:18-231:5; *id.* 235:3-10; *id.* 236:18-23 (Smith)).)  As noted in Part

I.A above, it is this evidence of regulatory uncertainty that the Bankruptcy Court

cited in support of its finding that there is no "equity cushion."  The Bankruptcy

Court's decision is firmly grounded in the evidence.

Moreover, there was "market" evidence before the Bankruptcy Court that compelled the finding that the combined value of the Debtors' assets does not exceed the aggregate debt and preferred stock interests.  Other interested parties were free to propose alternative plans of reorganization that contemplated a higher valuation for L2Inc and would provide for distributions to holders of common equity interests such as Ahuja.  At the time the Bankruptcy Court entered its order confirming the Plan ("Confirmation Order"), however, there were no such plans on file.[27]  The market had spoken.  *See, e.g.*, *Genco*, 513 B.R. at 260 (lack of interest from investors supported lower valuation); *Chemtura*, 439 B.R. at 586-87 (same).

## D.   Ahuja Misapprehends the New Value Exception to the Absolute Priority Rule and Erroneously Suggests It Applies Here

Given the Bankruptcy Court's finding that there was no "equity cushion," and that Ahuja's common equity interests have no value, there was no reason for the Bankruptcy Court to proceed further by "scrutinizing" the individual contributions being made by the New Investors in exchange for equity in New LightSquared, as Ahuja advocates.  (Ahuja Brief at 28-39.)  All the cases Ahuja relies on in support of his challenges to the New Investors' contributions deal with "new value" plans.  *See, e.g.*, *Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N.*

---

[27]   A competing plan filed by Solus Alternative Asset Management LP, which purported to allow holders of L2Inc common equity interests to participate, did not achieve support (in part because its valuation was not deemed credible by creditors and holders of preferred stock interests) and was eventually withdrawn by its sponsors.  (*See* App 786-788.)

*LaSalle St. P'Ship*, 526 U.S. 434, 437, 440 (1999); *Coltex Loop Cent. Three Partners, L.P. v. BT/SAP Pool C Assocs., L.P. (In re Coltex Loop Cent. Three Partners, L.P.)*, 138 F.3d 39, 40, 41 (2d Cir. 1998). The Plan is not a "new value" plan. Under a "new value" plan, junior creditors or interest holders—generally common equity holders—leap ahead of a more senior class whose claims or interests are not satisfied in full and receive consideration, in the form of an interest in the reorganized company, in return for new contributions to the debtor. In those circumstances, courts scrutinize the new contributions to ensure that the equity holders (or other junior class leaping ahead of a more senior class that is not paid in full) are not being overcompensated with value that rightfully belongs to the senior stakeholders. *See Case v. L.A. Lumber Prods. Co.*, 308 U.S. 106, 122 (1939) (concern with new value plans is that "the creditor's rights could be easily diluted by inadequate contributions by stockholders").

No such concern is implicated here. The standalone valuations provided by Moelis, and the Bankruptcy Court's finding that there is no equity cushion, establish that there is no value that rightfully belongs to Ahuja and other holders of L2Inc common equity interests. Nobody is leaping ahead of Ahuja. What contributions the New Investors make and how the Plan allocates the new equity in LightSquared are none of Ahuja's concern. His objection was properly overruled.

## II.   HOLDERS OF COMMON EQUITY ALL RECEIVE THE SAME TREATMENT UNDER THE PLAN: CANCELLATION OF THEIR VALUELESS INTERESTS

In his appeal, Ahuja argues *for the first time* that the Plan violates section 1123(a)(4) of the Bankruptcy Code, which states that a plan must "provide the same treatment for each claim or interest of a particular class."  Under the Plan, Ahuja's and all other common equity interests in L2Inc are classified in Class 14.  Piggy-backing his flawed absolute priority rule argument and disregarding the Plan's plain terms, Ahuja contends that the Plan provides different treatment to Harbinger for its common equity interests than it does the other members of Class 14.  He is incorrect.

As a threshold matter, Ahuja failed to present this argument to the Bankruptcy Court, despite having ample opportunity.  (*Cf.* App 422-435, 754-784 (objection and post-trial brief); *see* App 831 (Confirmation Order ¶ 3) ("All parties have had a fair opportunity to litigate all issues raised by the Objections, or which might have been raised . . . .").)  Although Ahuja purported to "join" in a separate objection (subsequently withdrawn) by Centaurus Capital L.P., which relied in part on section 1123(a)(4), that objection concerned the treatment of SIG compared to the other holders of *preferred* stock of L2Inc classified in *Class 12*, and had nothing to do with the arguments Ahuja now makes about the treatment of

Harbinger compared to other holders of **common** stock in **Class 14**.  (*See* App 433-434 (Centaurus Obj. ¶¶ 17-18).)

The appellate waiver doctrine exists to ensure that the trial court, which has the ability to take evidence and evaluate credibility of witnesses, is made aware of, and has an adequate opportunity to consider, each argument in the first instance.  No party alerted the Bankruptcy Court to a potential concern under section 1123(a)(4) regarding the treatment of common equity interests in Class 14. "Joining" in the objection of a differently situated stakeholder that makes an entirely unrelated argument, albeit invoking the same section of the Bankruptcy Code, does not avoid appellate waiver.  This Court should therefore deem this argument in support of Ahuja's objection waived.  *See, e.g.*, *Perez*, 2013 U.S. Dist. LEXIS 118918, at *20.

Ahuja's argument fails on its merits too.  The Plan states that all holders of the common equity interests in Class 14, including Harbinger and Ahuja, among others, will receive the same treatment—cancellation of their interests.  Harbinger, however, separately holds a secured claim against L2Inc and has agreed to contribute causes of action personal to Harbinger to New LightSquared.  (*See* App 961 (Plan, Art. IV., § P).)  Thus, although the Plan provides a distribution of new equity interests in New LightSquared to Harbinger,

it expressly does so *on account of Harbinger's secured claim and causes of action*.  (*See* App 937 (Plan, Art. III., § B.6(c)).)

In effect, Ahuja argues that because Harbinger, like him, holds valueless common equity interests in Class 14, it is statutorily prohibited from receiving distributions on account of its separate secured claim and in return for its contributed causes of action unless other members of Class 14, who have no secured claim and are contributing nothing, also receive equity in New LightSquared.  This argument, which would effectively subordinate Harbinger's senior priority secured claim to the same level as common equity, has no legal support.

As courts recognize, section 1123(a)(4) focuses on "a plan's treatment on account of particular claims or interests *in a specific class*—not the treatment that members of the class may separately receive under a plan on account of the class members' other rights or contributions."  *In re Adelphia Commc'ns Corp.*, 368 B.R 140, 249-50 (Bankr. S.D.N.Y. 2007); *accord* 7 Collier on Bankruptcy ¶ 1123.01[4][b] (16th ed.).  Where, as here, a party has multiple claims or interests in multiple classes, the Bankruptcy Code does not mandate that the *overall* treatment that holder receives be exactly the same as the *overall* treatment received by every other party that has a claim or interest in one of the same classes.  Such a

rule would be unworkable and irrational.  Ahuja's treatment does not violate

section 1123(a)(4).[28]

## III.    THE PLAN PROCESS WAS A MODEL OF GOOD FAITH AND COMPLIED WITH ALL APPLICABLE LAWS

Ahuja's final objection is that the Plan violates section 1129(a)(3) of

the Bankruptcy Code, which provides that "[t]he court shall confirm a plan only if

. . . [t]he plan has been proposed in good faith and not by any means forbidden by

law."  The Bankruptcy Court found that both components of section 1129(a)(3)

had been met.  (App 813 (Confirmation Order ¶ Q) ("[T]he Plan has been proposed

in good faith and not by any means forbidden by law, thereby satisfying section

1129(a)(3) of the Bankruptcy Code.").)

Although quoting the statutory requirement of "good faith," the thrust

of Ahuja's argument is that the Plan is implemented by "means forbidden by law."

Appellants understand Ahuja to equate use of means forbidden by law with a lack

---

[28]    The cases on which Ahuja relies do not support his position.  In fact, *In re Leslie Fay Companies, Inc.*, 207 B.R. 764 (Bankr. S.D.N.Y. 1997), contradicts it. There, the court held that a plan could grant new stock options to managers who were holders of old equity interests, even though other equity interests in the same class were being canceled, where the managers were not receiving the new stock options on account of their old equity interest but in exchange for a separate agreement to provide future services.  *Id.* at 791-92.  *In re Modern Steel Treating Co.*, 130 B.R. 60 (Bankr. N.D. Ill. 1991), is wholly inapposite.  There, the court rejected a proposed modification to a plan that would have distributed new stock to a holder of old equity, while other equity interests in the same class were canceled, because the holder had no other claim or interest and was making no other contribution of value and was therefore necessarily receiving the new stock on account of his old equity interest.  *Id.* at 64-65.

of good faith.  Unsurprisingly, Ahuja does not make any other argument

challenging the good faith with which the Plan was proposed.  "[A] plan will be

found in good faith if it was proposed with honesty and good intentions and with a

basis for expecting that a reorganization can be effected."  *Bd. of Directors of*

*Telecom Argentina, S.A.*, 528 F.3d at 174 (quotation omitted); *see also Kane v.*

*Johns-Manville Corp. (In re Johns-Manville Corp.)*, 843 F.2d 636, 649 (2d Cir.

1988).  LightSquared had been in chapter 11 for nearly two years when the

Bankruptcy Court ordered judicially supervised mediation as a last effort to resolve

as many disputes as possible and propose a reorganization to save the company.

The Plan arose after seven months of mediation closely supervised and

meaningfully facilitated by Judge Drain, from which no party was excluded.  (*See*

App 475-478, 697-699 (3/9/2015 Hr'g Tr. 99:15-102:7 (Smith)); (3/16/2015 Hr'g

Tr. 21:2-23:12 (Carr)).) Judge Drain issued several reports over the course of the

mediation in which he specifically noted that the parties had proceeded in good

faith.  (App 257-278, 357-361.)  Further confirming the parties' good faith, in the

final weeks before confirmation, the Plan was refined and improved as a result of

an open competitive bidding process.  Given the limited argument in his opening

brief, Ahuja is barred from arguing on reply that the claimed absence of good faith

arises other than from Harbinger's alleged breach of a majority stockholder

fiduciary duty and its alleged breach of the Settlement Agreement.  *See*, *e.g.*,

*McCarthy v. S.E.C.*, 406 F.3d 179, 186 (2d Cir. 2005); *Norton v. Sam's Club,*

*Wal-Mart Corp.*, 145 F.3d 114, 117-18 (2d Cir. 1998).

There is no merit to Ahuja's assertion that Harbinger, as controlling

shareholder of LightSquared, breached a fiduciary duty it owed him. The Special

Committee had sole responsibility for the negotiation and approval of plans of

reorganization, including the Plan. (*See* App 692, 693 (3/16/2015 Hr'g Tr. 16:5-6,

17:12-23 (Carr)).) Further, in June 2014, all of Harbinger's nominees to the boards

of L2Inc and L2LP resigned, as did the one non-Harbinger holdover director,

leaving only the directors who had been appointed with the Bankruptcy Court's

approval to the Special Committee and CEO Doug Smith. (*See* Letter from

Charles J. Cooper to Marlene H. Dortch, Secretary of FCC (June 18, 2014)

*available at* http://apps.fcc.gov/ecfs/document/view?id=7521330183; *see also* App

581, 692-693 (3/16/2015 Hr'g Tr. 16:25-17:5 (Carr); 3/10/2015 Hr'g Tr. 117:14-21

(Smith)).) Harbinger was thus powerless to use its shareholdings in L2Inc to

influence the negotiation and approval of the Plan. The factual predicate for the

imposition of controlling stockholder fiduciary duties upon Harbinger is thus

absent. *See Abraham v. Emerson Radio Corp.*, 901 A.2d 751, 759 (Del. Ch. 2006)

("[T]he premise for contending that the controlling stockholder owes fiduciary

duties in its capacity as a stockholder is that the controller exerts its will over the

enterprise in the manner of the board itself."). Ahuja cites no contrary evidence,

and merely invites this Court to rely uncritically on the size of Harbinger's stock holdings.[29]

Moreover, even if a fiduciary duty were found to exist, the effective involvement of the Special Committee would bar Ahuja's claim of fiduciary breach.  *See, e.g.*, *Kahn v. Lynch Commc'n Sys., Inc.*, 638 A.2d 1110, 1117 (Del. 1994) (holding that burden of proving entire fairness in interested transaction shifts to plaintiff where transaction is approved by independent committee of directors); *In re Cysive, Inc. S'holders Litig.*, 836 A.2d 531, 532 (Del. Ch. 2003) (interested transaction with shareholder with "potent retributive capacity" found entirely fair on the basis of effective independent committee); *cf. JPMorgan Chase Bank, N.A. v. Charter Commc'ns Operating, LLC (In re Charter Commc'ns, Inc.)*, 419 B.R. 221, 261 (Bankr. S.D.N.Y. 2009) (rejecting claim that plan not reviewed for "entire fairness" under Delaware corporate law was proposed by means forbidden by law because plan settlement was approved by independent board members). The Special Committee—the fiduciary acting on Ahuja's behalf—was intimately involved in the development of the Plan and voted unanimously to approve it. (App 697-699, 1274 (3/16/2015 Hr'g Tr. 21:2-23:12 (Carr); PX1300).)  And in its Confirmation Order, the Bankruptcy Court expressly found that LightSquared,

---

[29]     Nor can Ahuja argue that Harbinger used its majority position to determine the outcome of voting by holders of L2Inc common equity interests with respect to approval of the Plan.  Class 14, in which those interests were placed, was deemed to object and did not vote.

through its Special Committee, has "upheld its fiduciary duty to stakeholders and protected the interests of all constituents with an even hand." (App 813 (Confirmation Order ¶ Q).) Ahuja does not challenge this finding.

The only case Ahuja cites in support of his argument, *In re Bush Industries, Inc.*, 315 B.R. 292 (Bankr. W.D.N.Y. 2004), is readily distinguishable and inapposite. There, the controlling shareholder and chief executive officer of a company negotiated a revised employment agreement ***while still in control and without an independent committee***. *Id.* at 305-06.

Ahuja's erroneous argument regarding his Settlement Agreement is based on a wishful, but unfounded, assertion that the agreement guarantees any plan of reorganization will allow Ahuja to retain his equity interests. A plain reading of the Settlement Agreement does not support this assertion, and, as a legal matter, that agreement could not permissibly contain the commitment Ahuja wrongly claims it does. Finally, Ahuja's attempt to support his argument by accusing Harbinger of having "induced Mr. Ahuja to forego at least $3.25 million of his claim on the assurance that he would receive the same stock that Harbinger possessed and that he would remain similarly situated to Harbinger" (Ahuja Brief at 42) is completely unsubstantiated factually. As the Bankruptcy Court noted, Ahuja presented no evidence at all during the confirmation hearing. (*See* App 743 (3/18/2015 Hr'g Tr. 180:5-8 (Court)).)

- 51 -

Contrary to Ahuja's contention, the Settlement Agreement does not promise Ahuja that he will be a stockholder in the reorganized debtors and does not promise that his position in the reorganized debtors will be similar to Harbinger's.  The Settlement Agreement contains two relevant promises.  First, in Section 4.1, it provides that Ahuja will have:

> an allowed common equity interest in the amount of 8,832,354 shares of current common stock of LightSquared Inc., which shall be subject to dilution only on account of subsequent issuances of current common stock of LightSquared Inc. to the same extent and in the same manner and proportion as all other current common stockholders of LightSquared Inc. are diluted in connection with such issuance . . .

(App 105.)  The language is crucial, reciting that Ahuja receives "an allowed equity interest."  This is bankruptcy parlance that, like the granting of an "allowed claim," focuses upon the amount of Ahuja's common stock interest that will be recognized as legitimate by the Bankruptcy Court.[30]  The effect of Ahuja receiving such an interest is that it gives him a position in the chapter 11 cases akin to that of actual stockholders of L2Inc and places him with them in the same class of interest holders.  It does not promise him an equivalent (or any) equity interest in a reorganized entity, and in that respect, too, is exactly like the stock interests held

---

[30]   There is a distinction between the grant of an allowed interest as provided in the Settlement Agreement and an actual grant of common shares. The latter would have likely resulted in immediate tax consequences for Ahuja while the former allowed Ahuja to argue that any income should be deferred until consummation of a bankruptcy plan.

by the L2Inc common stockholders, who likewise are not guaranteed that they will participate, by reason and on account of their L2Inc common stock interests, in a reorganized entity.  And it certainly does not promise Ahuja that his common equity interest in L2Inc will translate into an interest in a reorganized entity where the common equity interests of other holders do not.

Nor can Ahuja find any support in Section 4.1's anti-dilution provision, which addresses only dilution by issuance of further L2Inc common shares, and which provides, in standard fashion, that Ahuja's interest may not be diluted by an issuance of additional shares to one or more existing L2Inc stockholders from which he is excluded, and that in the event of an issuance of L2Inc common shares that dilutes all existing stockholders, Ahuja's interest must be diluted pro rata with those of the other stockholders and can be neither favored nor disadvantaged through non-proportional dilution.[31]  The anti-dilution clause does not guarantee Ahuja a stock interest in a reorganized company on account of his allowed common equity interest in L2Inc.

---

[31]     *See* Balotti & Finkelstein's Delaware Law of Corporations & Business Organizations § 5.11, 2006 WL 2450940 ("It is desirable to provide for adjustment of the conversion terms to protect against dilution of the shares to be issued by the corporation upon conversion or exchange or of the convertible securities. The General Corporation Law expressly recognizes that such adjustments will be made."); *see also Moran v. Household Int'l, Inc.*, 500 A.2d 1346, 1352 (Del. 1985) (noting that anti-dilution provisions "are customary features of a wide variety of corporate securities").

The second relevant provision in the Settlement Agreement is found in Section 7.1, which provides that "[a]s of the date of the final resolution of the Chapter 11 Cases," Ahuja:

> shall be granted customary rights and protections as a significant minority shareholder in LightSquared Inc. or any successor entity, including in respect of liquidity, governance and access to information, taking into account [Ahuja's] relative ownership percentage in LightSquared Inc. or such successor entity as of such time and the rights and protections granted to or otherwise held by similarly situated shareholders in LightSquared Inc. or such successor entity as of such time.

(App 107.)  Section 7.1 does not contain an explicit grant of a stock interest. Ahuja seeks to read into this provisional, ancillary grant of "customary rights and protections" relating to "liquidity, governance and access to information" applicable *in the event* Ahuja owns a minority stock interest, an enforceable contractual promise that he *will* own such an interest in L2Inc or any successor entity following emergence from chapter 11.  Again, this is not what the provision says.[32]  Indeed, the reference in Section 7.1 to Ahuja's "relative ownership

---

[32]    Significantly, the exposition of "[t]he principal terms of the Settlement Agreement" that LightSquared offered to the Bankruptcy Court when seeking approval of the settlement made no reference at all to the terms of Section 7.1. (*See* App 93-94.)  Surely the omission of the purported affirmative grant of post-emergence stock ownership from the listing of the settlement's principal terms would have drawn a corrective remark from Ahuja's counsel—if the import of Section 7.1 was in fact as Ahuja now suggests.  No such corrective remark was made.

percentage" upon emergence as relevant to the scope of any protections he might receive necessarily allows that he may own no shares at all.  In addition, the rights, if any, that may be conferred upon Ahuja under the provision are expressly required to be the same as "the rights and protections granted to or otherwise held by similarly situated shareholders in LightSquared Inc. or such successor entity as of such time."  Here, the "similarly situated" holders of common equity interests in L2Inc will not participate at all in the reorganized entities and therefore have no relevant shareholder rights and protections.  Consistent with the language of the agreement, neither does Ahuja.

Finally, had the Settlement Agreement included the promise of share ownership Ahuja asserts it does it surely would have been rejected by the Bankruptcy Court as constituting an impermissible *sub rosa* plan—*i.e.*, a transaction that dictates a distribution scheme or other terms that predetermine the content of any subsequent chapter 11 plan.  Such plans are categorically prohibited.  *See Pension Benefit Guar. Corp. v. Braniff Airways, Inc. (In re Braniff Airways, Inc.)*, 700 F.2d 935, 940 (5th Cir. 1983) (reversing approval of asset sale agreement that had "practical effect of dictating some of the terms of any future reorganization plan" because it would "short circuit the requirements of Chapter 11

for confirmation of a reorganization plan by establishing the terms of the plan *sub rosa*").[33]

In sum, Ahuja has failed to point to any evidence establishing that the Bankruptcy Court's good faith findings were clearly erroneous.  *See Koelbl*, 751 F.2d at 139 (2d. Cir. 1984) (rejecting argument that plan was not proposed in good faith because "[t]here is no evidence that [the plan proponent] was dishonest in any way or that his plan has little chance of success").  Nor has he shown the Plan was put forth and will be implemented through unlawful means.

---

[33]     A promise to allow holders of common equity in L2Inc to retain their interests in all circumstances could cause assets to be diverted from holders of senior claims and interests to Ahuja in violation of the absolute priority rule if, as proved to be the case, L2Inc were insolvent.  The Bankruptcy Court cannot be deemed to have given its approval to an agreement containing such an unlawful and unenforceable provision.

## <u>CONCLUSION</u>

For the foregoing reasons, Ahuja's objections were properly overruled by the Bankruptcy Court or are waived.  The Confirmation Order should be affirmed.

Respectfully submitted,

New York, New York
Dated:  May 7, 2015

*/s/ Alan J. Stone*
Matthew S. Barr
Alan J. Stone
Michael L. Hirschfeld
Andrew M. Leblanc
MILBANK, TWEED, HADLEY &
M<sup>C</sup>CLOY LLP
28 Liberty Street
New York, New York  10005-1413
(212) 530-5000

*Attorneys for Debtors and Debtors in
Possession*

## CERTIFICATE OF COMPLIANCE WITH
## <u>FED. R. BANKR. P. 8015(A)(7)(B)</u>

This brief complies with the type-volume limitation of Rule

8015(a)(7)(B) of the Federal Rules of Bankruptcy Procedure because this brief

contains 13,937 words, excluding the parts of the brief exempted by Rule

8015(a)(7)(B)(iii).

Dated:  May 7, 2015

_/s/ Alan J. Stone_

Alan J. Stone

_Attorney for Debtors and Debtors in Possession_

# **ANNEX**

# Fig. 1 – LightSquared and GPS Industry Spectrum





**Downlink:**
**Cell Site to User Device**



**Uplink:**
**User Device to Cell Site**



# Fig. 2 – The License Modification





# Fig. 3 – Alternative Spectrum Use Approach





**Downlink:**
**Cell Site to User Device**



**Uplink:**
**User Device to Cell Site**



May 7, 2015

UNITED STATES CODE SERVICE
Copyright © 2014 Matthew Bender & Company, Inc.
a member of the LexisNexis Group (TM)
All rights reserved.

*** Current through PL 114-11, approved 4/30/15 ***

TITLE 11. BANKRUPTCY
CHAPTER 11. REORGANIZATION
SUBCHAPTER II. THE PLAN

**Go to the United States Code Service Archive Directory**

*11 USCS § 1123*

§ 1123.  Contents of plan

(a) Notwithstanding any otherwise applicable nonbankruptcy law, a plan shall--

   (1) designate, subject to section 1122 of this *title [11 USCS § 1122]*, classes of claims, other than claims of a kind specified in section 507(a)(2), 507(a)(3), or 507(a)(8) of this *title [11 USCS § 507(a)(2), 507(a)(3), or 507(a)(8)]*, and classes of interests;

   (2) specify any class of claims or interests that is not impaired under the plan;

   (3) specify the treatment of any class of claims or interests that is impaired under the plan;

   (4) provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest;

   (5) provide adequate means for the plan's implementation, such as--

      (A) retention by the debtor of all or any part of the property of the estate;

      (B) transfer of all or any part of the property of the estate to one or more entities, whether organized before or after the confirmation of such plan;

      (C) merger or consolidation of the debtor with one or more persons;

      (D) sale of all or any part of the property of the estate, either subject to or free of any lien, or the distribution of all or any part of the property of the estate among those having an interest in such property of the estate;

      (E) satisfaction or modification of any lien;

      (F) cancellation or modification of any indenture or similar instrument;

      (G) curing or waiving of any default;

      (H) extension of a maturity date or a change in an interest rate or other term of outstanding securities;

      (I) amendment of the debtor's charter; or

      (J) issuance of securities of the debtor, or of any entity referred to in subparagraph (B) or (C) of this paragraph, for cash, for property, for existing securities, or in exchange for claims or interests, or for any other appropriate purpose;

   (6) provide for the inclusion in the charter of the debtor, if the debtor is a corporation, or of any corporation referred to in paragraph (5)(B) or (5)(C) of this subsection, of a provision prohibiting the issuance of nonvoting equity securities, and providing, as to the several classes of securities possessing voting power, an appropriate distribution of such power among such classes, including, in the case of any class of equity securities having a preference over another class of equity securities with respect to dividends, adequate provisions for the election of directors representing such preferred class in the event of default in the payment of such dividends;

   (7) contain only provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director, or trustee under the plan and any successor to such officer, director, or trustee; and

(8) in a case in which the debtor is an individual, provide for the payment to creditors under the plan of all or such portion of earnings from personal services performed by the debtor after the commencement of the case or other future income of the debtor as is necessary for the execution of the plan.

(b) Subject to subsection (a) of this section, a plan may--

   (1) impair or leave unimpaired any class of claims, secured or unsecured, or of interests;

   (2) subject to section 365 of this *title [11 USCS § 365]*, provide for the assumption, rejection, or assignment of any executory contract or unexpired lease of the debtor not previously rejected under such section;

   (3) provide for--

      (A) the settlement or adjustment of any claim or interest belonging to the debtor or to the estate; or

      (B) the retention and enforcement by the debtor, by the trustee, or by a representative of the estate appointed for such purpose, of any such claim or interest;

   (4) provide for the sale of all or substantially all of the property of the estate, and the distribution of the proceeds of such sale among holders of claims or interests;

   (5) modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence, or of holders of unsecured claims, or leave unaffected the rights of holders of any class of claims; and

   (6) include any other appropriate provision not inconsistent with the applicable provisions of this *title [11 USCS §§ 101* et seq.].

(c) In a case concerning an individual, a plan proposed by an entity other than the debtor may not provide for the use, sale, or lease of property exempted under section 522 of this *title [11 USCS § 522]*, unless the debtor consents to such use, sale, or lease.

(d) Notwithstanding subsection (a) of this section and sections 506(b), 1129(a)(7), and 1129(b) of this *title [11 USCS §§ 506(b)*, *1129(a)(7)*, and *1129(b)]*, if it is proposed in a plan to cure a default the amount necessary to cure the default shall be determined in accordance with the underlying agreement and applicable nonbankruptcy law.

UNITED STATES CODE SERVICE
Copyright © 2014 Matthew Bender & Company, Inc.
a member of the LexisNexis Group (TM)
All rights reserved.

*** Current through PL 114-11, approved 4/30/15 ***

TITLE 11. BANKRUPTCY
CHAPTER 11. REORGANIZATION
SUBCHAPTER II. THE PLAN

**Go to the United States Code Service Archive Directory**

*11 USCS § 1129*

§ 1129.  Confirmation of plan

(a) The court shall confirm a plan only if all of the following requirements are met:

  (1) The plan complies with the applicable provisions of this *title [11 USCS §§ 101* et seq.].

  (2) The proponent of the plan complies with the applicable provisions of this *title [11 USCS §§ 101* et seq.].

  (3) The plan has been proposed in good faith and not by any means forbidden by law.

  (4) Any payment made or to be made by the proponent, by the debtor, or by a person issuing securities or acquiring property under the plan, for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable.

  (5) (A) (i) The proponent of the plan has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in a joint plan with the debtor, or a successor to the debtor under the plan; and

    (ii) the appointment to, or continuance in, such office of such individual, is consistent with the interests of creditors and equity security holders and with public policy; and

      (B) the proponent of the plan has disclosed the identity of any insider that will be employed or retained by the reorganized debtor, and the nature of any compensation for such insider.

  (6) Any governmental regulatory commission with jurisdiction, after confirmation of the plan, over the rates of the debtor has approved any rate change provided for in the plan, or such rate change is expressly conditioned on such approval.

  (7) With respect to each impaired class of claims or interests--

    (A) each holder of a claim or interest of such class--

      (i) has accepted the plan; or

      (ii) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this *title [11 USCS §§ 701* et seq.] on such date; or

    (B) if section 1111(b)(2) of this *title [11 USCS § 1111(b)(2)]* applies to the claims of such class, each holder of a claim of such class will receive or retain under the plan an account of such claim property of a value, as of the effective date of the plan, that is not less than the value of such holder's interest in the estate's interest in the property that secures such claims.

  (8) With respect to each class of claims or interests--

    (A) such class has accepted the plan; or

    (B) such class is not impaired under the plan.

  (9) Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the plan

provides that--

   (A) with respect to a claim of a kind specified in section 507(a)(2) or 507(a)(3) of this *title [11 USCS § 507(a)(2) or 507(a)(3)]*, on the effective date of the plan, the holder of such claim will receive on account of such claim cash equal to the allowed amount of such claim;

   (B) with respect to a class of claims of a kind specified in section 507(a)(1), 507(a)(4), 507(a)(5), 507(a)(6), or 507(a)(7) of this *title [11 USCS § 507(a)(1), 507(a)(4), 507(a)(5), 507(a)(6), or 507(a)(7)]*, each holder of a claim of such class will receive--

      (i) if such class has accepted the plan, deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or

      (ii) if such class has not accepted the plan, cash on the effective date of the plan equal to the allowed amount of such claim;

   (C) with respect to a claim of a kind specified in section 507(a)(8) of this *title [11 USCS § 507(a)(8)]*, the holder of such claim will receive on account of such claim regular installment payments in cash--

      (i) of a total value, as of the effective date of the plan, equal to the allowed amount of such claim;

      (ii) over a period ending not later than 5 years after the date of the order for relief under section 301, 302, or 303 [*11 USCS § 301, 302, or 303*]; and

      (iii) in a manner not less favorable than the most favored nonpriority unsecured claim provided for by the plan (other than cash payments made to a class of creditors under section 1122(b) [*11 USCS § 1122(b)*]); and

   (D) with respect to a secured claim which would otherwise meet the description of an unsecured claim of a governmental unit under section 507(a)(8) [*11 USCS § 507(a)(8)*], but for the secured status of that claim, the holder of that claim will receive on account of that claim, cash payments, in the same manner and over the same period, as prescribed in subparagraph (C).

   (10) If a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider.

   (11) Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

   (12) All fees payable under section 1930 of title 28, as determined by the court at the hearing on confirmation of the plan, have been paid or the plan provides for the payment of all such fees on the effective date of the plan.

   (13) The plan provides for the continuation after its effective date of payment of all retiree benefits, as that term is defined in section 1114 of this *title [11 USCS § 1114]*, at the level established pursuant to subsection (e)(1)(B) or (g) of section 1114 of this *title [11 USCS § 1114]*, at any time prior to confirmation of the plan, for the duration of the period the debtor has obligated itself to provide such benefits.

   (14) If the debtor is required by a judicial or administrative order, or by statute, to pay a domestic support obligation, the debtor has paid all amounts payable under such order or such statute for such obligation that first become payable after the date of the filing of the petition.

   (15) In a case in which the debtor is an individual and in which the holder of an allowed unsecured claim objects to the confirmation of the plan--

   (A) the value, as of the effective date of the plan, of the property to be distributed under the plan on account of such claim is not less than the amount of such claim; or

   (B) the value of the property to be distributed under the plan is not less than the projected disposable income of the debtor (as defined in section 1325(b)(2) [*11 USCS § 1325(b)(2)*]) to be received during the 5-year period beginning on the date that the first payment is due under the plan, or during the period for which the plan provides payments, whichever is longer.

   (16) All transfers of property under the plan shall be made in accordance with any applicable provisions of nonbankruptcy law that govern the transfer of property by a corporation or trust that is not a moneyed, business, or commercial corporation or trust.

(b)

   (1) Notwithstanding section 510(a) of this *title [11 USCS § 510(a)]*, if all of the applicable requirements of subsection

(a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

  (2) For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:

    (A) With respect to a class of secured claims, the plan provides--

      (i) (I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and

        (II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;

      (ii) for the sale, subject to section 363(k) of this *title [11 USCS § 363(k)]*, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) or (iii) of this subparagraph; or

      (iii) for the realization by such holders of the indubitable equivalent of such claims.

    (B) With respect to a class of unsecured claims--

      (i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or

      (ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property, except that in a case in which the debtor is an individual, the debtor may retain property included in the estate under section 1115 [*11 USCS § 1115*], subject to the requirements of subsection (a)(14) of this section.

    (C) With respect to a class of interests--

      (i) the plan provides that each holder of an interest of such class receive or retain on account of such interest property of a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest; or

      (ii) the holder of any interest that is junior to the interests of such class will not receive or retain under the plan on account of such junior interest any property.

(c) Notwithstanding subsections (a) and (b) of this section and except as provided in section 1127(b) of this *title [11 USCS § 1127(b)]*, the court may confirm only one plan, unless the order of confirmation in the case has been revoked under section 1144 of this *title [11 USCS § 1144]*. If the requirements of subsections (a) and (b) of this section are met with respect to more than one plan, the court shall consider the preferences of creditors and equity security holders in determining which plan to confirm.

(d) Notwithstanding any other provision of this section, on request of a party in interest that is a governmental unit, the court may not confirm a plan if the principal purpose of the plan is the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act of 1933 [*15 USCS § 77e*]. In any hearing under this subsection, the governmental unit has the burden of proof on the issue of avoidance.

(e) In a small business case, the court shall confirm a plan that complies with the applicable provisions of this title and that is filed in accordance with section 1121(e) [*11 USCS § 1121(e)*] not later than 45 days after the plan is filed unless the time for confirmation is extended in accordance with section 1121(e)(3) [*11 USCS § 1121(e)(3)*].

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 7, 2015, a true and correct copy of the foregoing document was served upon all the parties via the Court's CM/ECF system and/or electronic mail.

May 7, 2015
New York, New York

/s/ *Alan J. Stone*
Alan J. Stone

MILBANK, TWEED, HADLEY & M<sup>c</sup>CLOY LLP
28 Liberty Street
New York, New York 10005-1413
Telephone:  (212) 530-5000

*Attorney for Debtors and Debtors in Possession*