# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| LIGHTSQUARED INC., *et al.*, | ) | Bankr. Case No. 12-12080 (SCC) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |
| SANJIV AHUJA, | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| -against- | ) | Case No. 1:15-cv-02342 (KBF) |
| | ) | |
| LIGHTSQUARED INC., *et al.*, | ) | |
| | ) | |
| Appellees. | ) | |
| | ) | |

# LIGHTSQUARED'S OPPOSITION TO
## APPELLANT SANJIV AHUJA'S MOTION FOR STAY PENDING APPEAL

MILBANK, TWEED, HADLEY & McCLOY LLP

Matthew S. Barr
Alan J. Stone
Michael L. Hirschfeld
Andrew M. Leblanc
28 Liberty Street
New York, NY 10005-1413
Phone:  (212) 530-5000
Fax:  (212) 530-5219

*Attorneys for Debtors and Debtors in Possession*

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................. 1

LEGAL STANDARD................................................................................................................. 3

ARGUMENT .............................................................................................................................. 5

I.  Ahuja Has Not Satisfied the Legal Standard for a Stay.................................................... 5

    A.  Factors 1 and 2:  Ahuja Will Not Suffer Irreparable Harm and His
           Appellate Arguments Are Devoid of Merit ........................................................... 5

    B.  Factor 3:  The Potential Harm to LightSquared and Its Stakeholders
           Independently Necessitates Denial of a Stay ........................................................ 10

         1.  Daily Accretions of Interest and Preferred Dividends Would Cause
              LightSquared to Incur Millions of Dollars in Additional Expenses ......... 11

         2.  The Commitment Fee for the Working Capital Facility Will
              Increase by as much as $30 Million with the Passage of Time ................ 15

         3.  LightSquared Could Be Compelled to Make a $50 Million
              "Adequate Protection" Payment to Its Prepetition Lenders..................... 16

         4.  The Inability to Close Before Expiration of the Working Capital
              Facility Commitment on December 15, 2015 Could Cause the
              Reorganization to Fail............................................................................... 17

    C.  Factor 4:  The Public Interest Favors LightSquared's Emergence from
           Bankruptcy............................................................................................................ 20

II.  Any Stay Must be Conditioned on a Bond Sufficient to Protect Lightsquared and its
    Stakeholders from all Injury Flowing from the Stay ..................................................... 21

CONCLUSION......................................................................................................................... 24

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*ACC Bondholder Grp. v. Adelphia Commc'ns Corp. (In re Adelphia Commc'ns Corp.)*,
 361 B.R. 337 (S.D.N.Y. 2007) ......................................................................................... passim

*Aetna Cas. & Sur. Co. v. LTV Steel Co. (In re Chateaugay Corp.)*,
 94 F.3d 772 (2d Cir. 1996) ........................................................................................................5

*Babitt v. Vebeliunas (In re Vebeliunas)*,
 No. 01 Civ. 1108, 2002 U.S. Dist. LEXIS 6142 (S.D.N.Y. Apr. 8, 2002) ...............................3

*Beeman v. BGI Creditors' Liquidating Trust (In re BGI, Inc.)*,
 772 F.3d 102 (2d Cir. 2014) ......................................................................................................5

*Beeman v. BGI Creditors' Liquidation Trust (In re BGI, Inc.)*,
 504 B.R. 754 (S.D.N.Y. 2014) ........................................................................................ passim

*Beogradska Banka A.D. v. Superintendent of Banks (In re Agency for Deposit Ins.,
 Rehab., Bankr. and Liquidation of Banks)*,
 No. 03-9320, 2004 U.S. Dist. LEXIS 3407 (S.D.N.Y. Mar. 4, 2004) ......................................8

*Hirschfeld v. Bd. of Elections*,
 984 F.2d 35 (2d Cir. 1993) .........................................................................................................3

*In re Adelphia Commc'ns Corp.*,
 368 B.R. 140 (Bankr. S.D.N.Y. 2007) .....................................................................................21

*In re Baker*,
 No. 05-3487, 2005 U.S. Dist. LEXIS 36969 (E.D.N.Y. Aug. 31, 2005) ...................................6

*In re Bd. of Dirs. of Multicanal S.A.*,
 No. 04-10280, 2005 Bankr. LEXIS 1865 (Bankr. S.D.N.Y. Jan. 6, 2005) ...............................6

*In re Calpine Corp.*,
 No. 05-60200 (BRL), 2008 Bankr. LEXIS 217 (Bankr. S.D.N.Y. Jan. 24, 2008) ..6, 13, 18, 22

*In re Country Squire Assocs. of Carle Place, L.P.*,
 203 B.R. 182 (B.A.P. 2d Cir. 1996) .......................................................................................8, 9

*In re N.Y. Skyline, Inc. v. Empire State Bldg. Co. (In re N.Y. Skyline, Inc.)*,
 520 B.R. 1 (S.D.N.Y. 2014) .............................................................................................3, 4, 10

*Laroe Estates, Inc. v. TD Bank, N.A. (In re 473 W. End Realty Corp.)*,
 No. 14 CV 2321, 2014 U.S. Dist. LEXIS 77036 (S.D.N.Y. May 12, 2014) .............................6

*Lutin v. United States Bankr. Court (In re Advanced Mining Sys.)*,
    173 B.R. 467 (S.D.N.Y. 1994) ................................................................................9

*Official Comm. of Unsecured Creditors v. PSS Steamship Co. (In re Prudential Lines*
    *Inc.)*,
    928 F.2d 565, 573 (2d Cir. 1991) ........................................................................20

*Orange Cnty. Water Dist. v. Unocal Corp.*,
    584 F.3d 43 (2d Cir. 2009) ....................................................................................9

*Rally Auto Grp., Inc. v. Gen. Motors LLC (In re Motors Liquidation Co.)*,
    No. M-47, 2010 U.S. Dist. LEXIS 118166 (S.D.N.Y. Oct. 29, 2010) ...................4

*S.E.C. v. Daspin*,
    557 F. App'x 46 (2d Cir. Feb. 5, 2014) .................................................................7

*Sprint Nextel Corp. v. DBSD N. Am. Inc. (In re DBSD N. Am., Inc.)*,
    No. 09 Civ. 10156, 2010 U.S. Dist. LEXIS 44996 (S.D.N.Y. May 7, 2010) ................. passim

*Texaco Inc. v. Pennzoil Co.*,
    784 F.2d 1133 (2d Cir. 1986), *rev'd on other grounds*, 481 U.S. 1 (1987) ..............................8

*Triple Net Invs. IX, LP v. DJK Residential, LLC (In re DJK Residential, LLC)*,
    No. 08-10375 (JMP), 2008 U.S. Dist. LEXIS 19801 (S.D.N.Y. Mar. 7, 2008) .............. passim

**STATUTES**

11 U.S.C. § 363 ............................................................................................................ 10

11 U.S.C. § 1101 ............................................................................................................5

**OTHER AUTHORITIES**

Fed. R. Bankr. P. 8007 ............................................................................................3, 4

Fed. R. Bankr. P. 8025 .........................................................................................1, 3, 4

FCC, *Connecting America: The National Broadband Plan*, at xii, 75, 87-88, *available at*
    https://www.fcc.gov/national-broadband-plan. ....................................................21

LightSquared Inc. ("L2Inc"), LightSquared LP ("L2LP"), and certain affiliates (collectively, "LightSquared"), as debtors and debtors in possession in the above-captioned chapter 11 cases and Appellees in this appeal, submit this opposition to the motion of Sanjiv Ahuja ("Ahuja") for an order (i) staying the Bankruptcy Court's Order Confirming Modified Second Amended Joint Plan Pursuant to Chapter 11 of Bankruptcy Code ("Confirmation Order") pending this Court's decision in this appeal, and (ii) if this Court affirms, staying both this Court's judgment and the Confirmation Order pending Ahuja's appeal to the Second Circuit.[1]

## PRELIMINARY STATEMENT

LightSquared stands at the threshold of emerging from chapter 11 after more than three years in bankruptcy.  One of the last remaining hurdles is a Federal Communications Commission ("FCC") proceeding to consider approval of transactions under the Modified Second Amended Joint Plan Pursuant to Chapter 11 of Bankruptcy Code ("Plan") that will result in a change of control of LightSquared's FCC licenses (the "Change of Control Application"). The public comment period in that proceeding closed on July 20, 2015 without any comments filed in opposition.[2]  A customary national security, public safety and law enforcement review by the Department of Justice is ongoing.  Upon completion of that review, the FCC will be able to rule on LightSquared's application and clear the way for LightSquared to emerge from chapter 11.

Ahuja—holder of L2Inc common equity at the absolute bottom of the capital structure and the sole objector to an otherwise fully consensual Plan[3]—asks the Court to keep

---

[1]　Under Rule 8025(c) of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules"), a stay of this Court's judgment automatically would stay the Confirmation Order as well.

[2]　*See* Declaration of James W. Burke Ex. A (FCC Public Notice); *id.* Ex. B (trade article).

[3]　SP Special Opportunities, LLC has objected to certain injunctive provisions of the Confirmation Order, but otherwise fully supports the Plan and does not seek to delay its implementation.

LightSquared shuttered in bankruptcy indefinitely, imperiling the Plan recoveries of every other stakeholder, while he continues to pursue his failed objections on this appeal and a threatened further appeal to the Second Circuit. And he asks the Court to allow him to do all this *without posting a bond*. The Court should deny the requested stay pending appeal, as Ahuja's motion fails to satisfy any of the four criteria for a stay.

       ***First***, Ahuja has not shown irreparable injury. His only claimed harm is that if the Plan is substantially consummated, LightSquared will ***argue*** that his appeal has been rendered equitably moot—an argument that Ahuja asserts in his motion would ***not*** be correct. As a matter of law, this does not constitute irreparable harm that can support a stay. ***Second***, Ahuja has not shown any likelihood of success on the merits. As set forth in LightSquared's appellate brief and reinforced during oral argument, Ahuja has misrepresented the Bankruptcy Court's valuation finding, utterly ignoring the concerns consistently voiced by the Bankruptcy Court since 2013 about the lack of regulatory approval for terrestrial operations; misread controlling Supreme Court precedent; mistakenly sought to invoke the "new value" doctrine in circumstances to which it does not apply; and naïvely and erroneously asked this Court to assume that the billions in new financing, most of it from third parties, and the extensive concessions and compromises by other creditors (holding more than $2 billion in claims that will not be paid in cash) that will allow LightSquared to emerge from bankruptcy would remain in place for Ahuja's benefit, while he offers nothing in return. ***Third***, a stay will impose tens of millions of dollars of additional financial obligations upon LightSquared. Worse still, if the stay were to continue into December 2015, LightSquared would be confronted with the loss of its multi-billion dollar exit financing, causing the entire reorganization to implode by erasing the Plan and the billions in creditor recoveries provided thereunder. ***Fourth***, the public interest

favors LightSquared's proceeding expeditiously with the consummation of its Plan, which is supported by **all** of LightSquared's other stakeholders, and which advances the interests articulated in the FCC's "National Broadband Plan."

Ahuja's request for a stay pending appeal should be denied.  And if the Court determines, nevertheless, to grant a stay, the Court should require Ahuja to post a substantial bond to protect LightSquared from the harm it will suffer.

## LEGAL STANDARD

"A stay of a judgment pending an appeal is an exercise of judicial discretion and is not a matter of right."  *In re N.Y. Skyline, Inc. v. Empire State Bldg. Co. (In re N.Y. Skyline, Inc.)*, 520 B.R. 1, 5 (S.D.N.Y. 2014) (Scheindlin, J.).  In determining whether to grant a stay pursuant to either Bankruptcy Rule 8007(b) or Bankruptcy Rule 8025(b), district courts apply substantially the same four-factor test that circuit courts use to evaluate requests for a stay pending appeal from a district court order and that trial courts use to evaluate requests for injunctive relief.  Courts thus consider:  (1) whether the movant would suffer irreparable injury if a stay were denied; (2) whether the movant has at least a substantial possibility of success on the merits of its appeal; (3) whether other parties would suffer a substantial injury if the stay were granted; and (4) whether the public interest favors a stay.  *See, e.g.*, *N.Y. Skyline*, 520 B.R. at 4-5 (denying stay); *Beeman v. BGI Creditors' Liquidation Trust (In re BGI, Inc.)*, 504 B.R. 754, 762 (S.D.N.Y. 2014) (Scheindlin, J.) (same).[4]  Each of the factors must weigh in favor of a stay,

---

[4]        *See also Sprint Nextel Corp. v. DBSD N. Am. Inc. (In re DBSD N. Am., Inc.)*, No. 09 Civ. 10156, 2010 U.S. Dist. LEXIS 44996, at *6 (S.D.N.Y. May 7, 2010) (Kaplan, J.) (denying stay); *Rally Auto Grp., Inc. v. Gen. Motors LLC (In re Motors Liquidation Co.)*, No. M-47, 2010 U.S. Dist. LEXIS 118166, at *7 (S.D.N.Y. Oct. 29, 2010) (Patterson, J.) (same); *Triple Net Invs. IX, LP v. DJK Residential, LLC (In re DJK Residential, LLC)*, No. 08-10375 (JMP), 2008 U.S. Dist. LEXIS 19801, at *6 (S.D.N.Y. Mar. 7, 2008) (Lynch, J.) (citing *Hirschfeld v. Bd. of Elections*, 984 F.2d 35, 39 (2d Cir. 1993)) (same); *Babitt v. Vebeliunas (In re Vebeliunas)*, No. 01 Civ. 1108, 2002 U.S. Dist. LEXIS 6142, at *4 (S.D.N.Y. Apr. 8, 2002) (Preska, J.) (same).  Several of the cases cited herein were decided under former Bankruptcy Rules

although the strength of the movant's showing that is required with respect to any one of the factors may be greater or lesser depending upon the movant's showing with respect to the others; the movant bears the ultimate burden of establishing that, on balance, a stay is warranted.  *See N.Y. Skyline*, 520 B.R. at 4 n. 5, 5.[5]

Even if the movant meets its burden, moreover, the Court may (and in this case most certainly should) condition issuance of a stay on the movant posting a bond.  Fed. R. Bankr. P. 8007(c), 8025(b)(4).  The default rule is that "the court should set a bond at or near the full amount of the potential harm to the non-moving parties."  *ACC Bondholder Grp. v. Adelphia Commc'ns Corp. (In re Adelphia Commc'ns Corp.)*, 361 B.R. 337, 351 (S.D.N.Y. 2007) (Scheindlin, J.).  "[I]f the movant seeks the imposition of a stay without a bond, the applicant has the burden of demonstrating why the court should deviate from the ordinary full security requirement."  *Triple Net Invs. IX, LP v. DJK Residential, LLC (In re DJK Residential, LLC)*, No. 08-10375 (JMP), 2008 U.S. Dist. LEXIS 19801, at *6 (S.D.N.Y. Mar. 7, 2008) (Lynch, J.) (quotation omitted).

---

8005 and 8017.  Bankruptcy Rules 8007 and 8025, which became effective in December 2014, are derived from former Bankruptcy Rules 8005 and 8017.  Fed. R. Bankr. P. 8007, 8025, committee notes.

[5]      The Bankruptcy Court below already denied Ahuja's request for a stay pending appeal to this Court.  With respect to his request for a stay pending resolution of the current appeal, therefore, Ahuja has "to convince the district court . . . that the bankruptcy judge was incorrect."  *BGI*, 504 B.R. at 761-62 (quoting 10 *Collier on Bankruptcy* ¶ 8005.11 (16th ed. 2013)).  Although Ahuja asserts that the Bankruptcy Court denied his motion for stay without explanation, it is clear from the transcript of the proceedings that the Bankruptcy Court concluded, at a minimum, that Ahuja's impending appeal had no possibility of success on the merits.

## ARGUMENT

### I.    AHUJA HAS NOT SATISFIED THE LEGAL STANDARD FOR A STAY

#### A.    Factors 1 and 2:  Ahuja Will Not Suffer Irreparable Harm and His Appellate Arguments Are Devoid of Merit

"A showing of irreparable harm is the principal prerequisite for the issuance of a stay." *Adelphia*, 361 B.R. at 347 (quotation omitted).  The only potential harm Ahuja identifies is the ***possibility*** that his appeal will be dismissed under the doctrine of "equitable mootness"—a "prudential doctrine" specific to bankruptcy law under which appellate courts "balance the importance of finality in bankruptcy proceedings against the appellant's right to review and relief" and will dismiss an appeal "when, even though effective relief could conceivably be fashioned, implementation of that relief would be inequitable." *Beeman v. BGI Creditors' Liquidating Trust (In re BGI, Inc.)*, 772 F.3d 102, 107 (2d Cir. 2014) (quotations omitted).[6] Thus, by definition, a finding of equitable mootness represents a determination that a balancing of equities dictates that an appellant no longer be permitted to challenge and potentially upset the completion and finality of a reorganization.

As a threshold matter, Ahuja's non-committal argument about the ***possibility*** of equitable mootness, which he expressly "disputes" would apply to his appeal (Ahuja Memo at 5), is insufficient to demonstrate a threat of irreparable injury to support a stay.  "Irreparable harm must be neither remote nor speculative, but ***actual and imminent***." *BGI*, 504 B.R. at 762 (emphasis added).  Here, far from showing the imminent threat of actual injury, Ahuja posits that

---

[6]    In the Second Circuit, "[r]eviewing courts presume that it will be inequitable or impractical to grant relief after substantial consummation of a plan of reorganization." *Aetna Cas. & Sur. Co. v. LTV Steel Co. (In re Chateaugay Corp.)*, 94 F.3d 772, 776 (2d Cir. 1996).  Substantial consummation occurs upon a "transfer of all or substantially all of the property proposed by the plan to be transferred; assumption by the debtor or by the successor to the debtor under the plan of the business or of the management of all or substantially all of the property dealt with by the plan; and commencement of distribution under the plan."  11 U.S.C. § 1101(2).

if the Plan is substantially consummated following the requested approval of the Change of Control Application by the FCC, LightSquared will likely argue that his appeal has been equitably mooted—although, Ahuja contends, such an argument would be flawed and unavailing.  Ahuja cannot have it both ways—seeking a stay based solely on the possibility that his appeal may be equitably mooted while simultaneously asserting that equitable mootness would not, in fact, apply to his appeal.

Moreover, even if Ahuja were to acknowledge (as he does not) that his appeal would be mooted in the event the Plan were consummated, "[a] majority of courts have held that a risk of mootness, standing alone does not constitute irreparable harm."  *Adelphia*, 361 B.R. at 347 (collecting cases).[7]  In determining whether the possibility of equitable mootness constitutes irreparable injury, courts also consider the likelihood that the appellant would prevail on appeal. *See, e.g.*, *BGI*, 504 B.R. at 763 ("[T]he seriousness of that threat [of equitable mootness] is inextricably related to the appellants' likelihood of success on the merits.") (quotation omitted).[8] The same principle applies outside of the bankruptcy context:  the Second Circuit has similarly evaluated the strength of an appellant's arguments in determining whether the risk that an appeal could be rendered moot (there, in the constitutional sense) constitutes irreparable harm

---

[7]     *See also In re Calpine Corp.*, No. 05-60200 (BRL), 2008 Bankr. LEXIS 217, at *13-14 (Bankr. S.D.N.Y. Jan. 24, 2008) (Lifland, J.) ("[M]erely invoking equitable mootness . . . – a risk that is present in any post-confirmation appeal of a chapter 11 plan – is not sufficient to demonstrate irreparable harm."); *In re Bd. of Dirs. of Multicanal S.A.*, No. 04-10280, 2005 Bankr. LEXIS 1865, at *6 (Bankr. S.D.N.Y. Jan. 6, 2005) (Gropper, J.) ("There is substantial authority, however, that the risk of an appeal being rendered moot does not in and of itself constitute irreparable harm, even if it may be a relevant factor"); *In re Baker*, No. 05-3487, 2005 U.S. Dist. LEXIS 36969, at *29-30 (E.D.N.Y. Aug. 31, 2005) ("As other courts have noted, the possibility that an appeal will be rendered moot by a denial of stay does not, in and of itself, constitute irreparable harm").

[8]     *See also Laroe Estates, Inc. v. TD Bank, N.A. (In re 473 W. End Realty Corp.)*, No. 14 CV 2321, 2014 U.S. Dist. LEXIS 77036, at *5 (S.D.N.Y. May 12, 2014) (Briccetti, J.) ("[T]he risk of mooting an appeal does not constitute irreparable injury when, as here, the appeal is unlikely to succeed."); *DBSD*, 2010 U.S. Dist. LEXIS 44996, at *6 ("The seriousness and likelihood of the irreparable injury threatened in a case such as this     . . . is inextricably related to the appellants' likelihood of success on the merits.").

warranting a stay.  *See S.E.C. v. Daspin*, 557 F. App'x 46, 49 (2d Cir. Feb. 5, 2014) ("Daspin

also argues that, absent a stay, he would be compelled to testify, effectively mooting his appeal

and causing irreparable harm by depriving him of his appellate rights. . . .  However, Daspin's

appeal is unlikely to succeed.  Consequently, denying a stay would not deprive him of significant

rights.  Thus, this factor supports denying a stay.").

Because the only potential injury identified by Ahuja is the risk of equitable

mootness (which he disputes), the question of whether Ahuja will suffer irreparable harm merges

with the question of whether he has shown a sufficient likelihood of prevailing on appeal.  Here,

for the reasons set forth in LightSquared's appellate brief and at oral argument, there is no

substantial possibility that Ahuja will prevail in this appeal.  This alone justifies denial of

Ahuja's motion.[9]

Moreover, as Ahuja's own case authority reflects, modern decisions will consider

a risk of equitable mootness as constituting irreparable harm ***only*** if the appeal at issue presents a

"***significant*** claim of error."  *See Adelphia*, 361 B.R. at 348; *see also BGI*, 504 B.R. at 763;

*DBSD*, 2010 U.S. Dist. LEXIS 44996, at *6.  For example, in *Adelphia*, perhaps the leading case

espousing this view in this district, Judge Scheindlin found a risk of equitable mootness

constituted irreparable harm sufficient to warrant a stay pending appeal (conditioned on posting a

bond for ***$1.3 billion***) where the appellants asserted a failure by the plan proponents to comply

with a key order of the bankruptcy court, and the bankruptcy court's failure to enforce its own

---

[9]     LightSquared will not respond at length to Ahuja's summary presentation on the "merits" of his
appeal (Ahuja Memo at 8-11) other than to observe that the summary (1) repeats Ahuja's erroneous
attempt to apply the "new value" case authority, which scrutinizes attempts by equity holders to "leap
ahead" of secured and unsecured creditors more senior in the capital structure, to a situation where this
simply did not occur, and (2) continues Ahuja's obdurate refusal to recognize that the Bankruptcy Court
expressly declined to adopt LightSquared's valuation because the Bankruptcy Court perceived continuing
uncertainty that LightSquared's quest for FCC approval to conduct terrestrial wireless broadband
operations would be resolved favorably.

order, all amounting to what Judge Scheindlin believed "could be a fundamental violation of [the] Apellants' constitutional due process rights."[10]  361 B.R. at 358; *see also id.* at 360.  In contrast, in *DJK Residential*, Judge Lynch held that the possibility of equitable mootness did not qualify as irreparable harm where the appellant presented "merely an argument that the Bankruptcy Court was wrong on the merits of two decisions."  2008 U.S. Dist. LEXIS 19801, at *10 (specifically distinguishing *Adelphia*).  Here, as in *DJK Residential*, Ahuja argues only that the Bankruptcy Court committed legal error; Ahuja raises no objection that compares to the constitutional claims at issue in *Adelphia*.[11]  Thus, the possibility that Ahuja's appeal may be rendered moot does not qualify as irreparable harm.

The cases cited by Ahuja in support of his irreparable injury argument are not on point.  The possibility that an appeal would be mooted, under the equitable mootness doctrine or otherwise, was not at issue in either *Texaco Inc. v. Pennzoil Co.*, 784 F.2d 1133 (2d Cir. 1986), *rev'd on other grounds*, 481 U.S. 1 (1987), or *Beogradska Banka A.D. v. Superintendent of Banks (In re Agency for Deposit Ins., Rehab., Bankr. and Liquidation of Banks)*, No. 03-9320, 2004 U.S. Dist. LEXIS 3407 (S.D.N.Y. Mar. 4, 2004).  In both *BGI* and *DBSD*, the district courts did not find that there was irreparable injury and ultimately denied the movant's request for a stay pending appeal.  *BGI*, 504 B.R. at 766, 770; *DBSD*, 2010 U.S. Dist. LEXIS 44996, at *6, 10.  And the approximately two decades-old decisions in *In re Country Squire Assocs. of*

---

[10]    Moreover, as discussed below, Judge Scheindlin required the appellants to post a bond "commensurate with the threatened loss to the non-moving parties . . . in the amount of $1.3 billion." *Adelphia Commc'ns*, 361 B.R. at 368.

[11]    Ahuja tries to invest his appeal with some greater significance by asserting that it "concerns whether the absolute priority rule may be circumvented via a negotiated settlement, and therefore has major implications."  (Ahuja Memo at 11.)  Apart from the fact that his appeal is premised on a misreading of the absolute priority rule and of the key Supreme Court decision on which he purports to rely, Ahuja misdescribes the issue presented.  LightSquared does ***not*** assert that the absolute priority rule may be overridden by a negotiated settlement; rather, it asserts that the Plan conforms entirely to the absolute priority rule.  The "issue" contrived by Ahuja in an attempt to support his stay request is simply not an issue presented by his appeal.

*Carle Place, L.P.*, 203 B.R. 182 (B.A.P. 2d Cir. 1996), and *Lutin v. United States Bankruptcy Court (In re Advanced Mining Sys.)*, 173 B.R. 467 (S.D.N.Y. 1994), did not address appeals from confirmed chapter 11 plans, and are out of step with the majority of decisions, including the more modern decisions from this circuit, which hold that the possibility of equitable mootness is not sufficient by itself for a finding of irreparable harm.  *Cf.* footnote 7 *supra*.  Moreover, in contrast to Ahuja here, the appellants in *Country Squire* and *Advanced Mining* had a substantial likelihood of success on their appellate claims.  *See Country Squire*, 203 B.R. at 184; *Advanced Mining*, 173 B.R. at 470.[12]

The possibility that Ahuja's appeal may be deemed equitably moot at a future date should not be viewed as an "unfairness" requiring relief.  As the doctrine's name implies, "equitable" mootness is a judicial recognition that there are competing equities at issue when an objector like Ahuja appeals from a bankruptcy court confirmation order.  If Ahuja's appeal is ultimately found to be moot, it will only be because a federal court has determined that the other stakeholders' interests in finality—which arguably are at their apex in the unique context of bankruptcy reorganization under chapter 11—are paramount to any individual interest Ahuja may have in the continued prosecution of his appeal.

---

[12]     The unpublished order in *In re DBSD North America, Inc.*, No. 10-1175, ECF No. 222 (2d Cir. Oct. 5, 2010), which Ahuja cited in his June 17, 2015 letter to the Court but not in his motion papers is also inapposite.  Although the movants in *DBSD* argued that they would suffer irreparable injury from equitable mootness, the two-sentence order did not address these arguments, and in fact was unaccompanied by any supporting reasoning, and is therefore not entitled to any precedential weight. *See, e.g.*, *Orange Cnty. Water Dist. v. Unocal Corp.*, 584 F.3d 43, 51 (2d Cir. 2009) ("Although our decision in *MTBE* could be read to suggest that challenges based upon the governmental unit exception to § 1452(a) cannot be waived under § 1447(c), a *sub silentio* holding is not binding precedent.") (quotation omitted).

**B.      Factor 3:  The Potential Harm to LightSquared and Its Stakeholders Independently Necessitates Denial of a Stay**

Ahuja's stay request is further undermined by the substantial, and potentially catastrophic injury that LightSquared and its stakeholders will suffer during the pendency of the stay—harms against which Ahuja strenuously asserts he should not be required to supply a bond. *See N.Y. Skyline*, 520 B.R. at 14 n. 77 ("[T]he failure of a party to address its burden with respect to a bond may weigh against granting a stay.").  As discussed below and in the accompanying declaration of Mark Hootnick, LightSquared faces:  (1) daily accretions of roughly $1.8 million in its debt and preferred equity that will sap the limited working capital of L2LP's reconstituted successor ("New LightSquared") (which itself will consist of newly borrowed funds) and saddle it with additional debt and preferred equity obligations it would not incur but for the stay; (2) potential increases in the commitment fees payable to third-party lenders in connection with the projected exit financing; (3) the possibility that LightSquared will be required, as early as December 10, 2015, to pay as much as $50 million in additional "adequate protection" payments to L2LP's secured creditors, at the behest of its largest secured creditor, SP Special Opportunities, LLC ("SPSO"), as a result of LightSquared's continued use of cash collateral;[13] (4) the expiration, on December 15, 2015 and December 31, 2015, respectively, of the third-party commitments for first and second lien exit financing, which would kill the Plan and eliminate the payments to creditors contemplated thereunder, including the approximately $1.5 billion payable on the secured claim of SPSO; and (5) the expiration of the $700 million of outstanding L2Inc and L2LP "debtor-in-possession" ("DIP") loans, with no presently identifiable

---

[13]      *See generally* 11 U.S.C. § 363(e) (authorizing bankruptcy courts to condition use of property on "adequate protection" of non-debtor party's interest in that property).  Although any "adequate protection" payments would be offset against the amounts L2LP owes to its secured creditors, the order directing the payments could require cash payment, thus depleting LightSquared's liquidity.

means of refinancing, leading to further defaults and a bankruptcy death spiral.  Ahuja is

certainly aware that these injuries would flow from the stay he seeks, yet he disingenuously

suggests that "[a] stay will not cause substantial injury to LightSquared or any other party"

because "LightSquared in not on the verge of running out of cash."  (Ahuja Memo at 6.)[14]

Lest Ahuja suggest that LightSquared is painting an unduly alarmist picture,

LightSquared notes that the stay Ahuja seeks would operate in this Court **and** during the

pendency of a possible appeal to the Second Circuit.  According to the "Federal Court

Management Statistics" published by the Administrative Office of the U.S. Courts, for the twelve

month period ending March 31, 2015, the Second Circuit's "Median Time From Filing Notice of

Appeal to Disposition" was 10 months, which would extend the stay well into 2016.  (Burke

Decl. Ex. C.)  Although it is within the Second Circuit's discretion to grant an expedited

schedule, the ultimate disposition of an expedited appeal (were the Circuit inclined to grant it)

could well occur after the December 15, 2015 expiration of LightSquared's exit financing

commitment.  All the injuries listed above would occur.

     **1.**     **Daily Accretions of Interest and Preferred Dividends Would Cause LightSquared to Incur Millions of Dollars in Additional Expenses**

To fund the post-bankruptcy operations of New LightSquared and the

distributions of cash and new debt and equity instruments to stakeholders promised under the

Plan, the Plan calls for multiple financings, including a first lien "Working Capital Facility" and

---

[14]     Ahuja's false suggestion that LightSquared will not run out of cash is of a piece with his equally false suggestions that this is a "solvent" debtor reorganization (Ahuja Memo at 7) and that any injury to LightSquared arising from a stay will merely affect the "equity cushion" Ahuja asserts belongs to him (*id.*).  In making these inaccurate claims, Ahuja flagrantly ignores the fact that LightSquared will indeed run out of cash at the end of the year unless the financings and other transactions contemplated by the Plan are completed by then, and that the limited working capital LightSquared will have under the Plan following emergence is entirely dependent upon the compromises made by parties senior to him in the capital structure, accepting less than payment in full of their claims and thereby enabling New LightSquared to sustain additional borrowings required to obtain that working capital.  There is no "equity cushion," and the working capital borrowed as a result of compromises made by others certainly does not belong to Ahuja.

a "Second Lien Exit Facility."  (Plan, Art. IV, § B.3.)  While LightSquared remains in

bankruptcy, interest is accreting on L2Inc's and L2LP's current DIP financings at rates of 9%.

(Hootnick Decl. ¶ 7.)  Under the Plan, these DIP loan obligations will be repaid in full from the

funds available to New LightSquared under the Working Capital Facility.  (Plan, Art. IV,

§ B.3(a)(i).)  Thus, every additional dollar of DIP debt that accretes during a stay pending appeal

will reduce New LightSquared's working capital by the same amount.  The current aggregate

daily accretion is approximately $168,000, which translates to $5 million per month.  (Hootnick

Decl. ¶ 7.)

        Similarly, interest is accreting on L2LP's prepetition secured debt at a rate of

17%.  (Hootnick Decl. ¶ 13.)  This debt will be exchanged dollar-for-dollar for new debt of New

LightSquared under the Second Lien Exit Facility.  (Plan, Art. III, §§ B.7, B.8; Hootnick Decl.

¶ 15.)  Every additional dollar of interest that accretes on the prepetition secured debt during a

stay would therefore increase the principal amount of New LightSquared's obligations under the

Second Lien Exit Facility.  The aggregate daily accretion is approximately $1.2 million, which

translates to approximately $37 million per month.  (Hootnick Decl. ¶ 13.)  And the injury to

LightSquared represented by this increased principal amount of post-emergence debt would be

compounded further by the interest that would accrue on that additional principal amount over

the term of the Second Lien Exit Facility.

        L2Inc's prepetition secured debt and the preferred equity interests in L2LP and

L2Inc are also currently accreting at rates of 20% and 9.75%, respectively.  (Hootnick Decl. ¶¶

13, 18.)  Under the Plan, prepetition secured debt in L2Inc and L2LP preferred equity interests

will be exchanged dollar-for-dollar, on a fully accreted basis, for new preferred equity interests

in New LightSquared with a liquidation preference equal to the accreted value of the existing

debt and interests that are being exchanged.  (Plan, Art. III, §§ B.6, B.13.)  Likewise, additional

accretion of L2Inc preferred equity interests increases the amount of preferred equity in New

LightSquared that will be distributed pursuant to the Plan.[15]  (Plan, Art. IV, § B.2(c)(ii);

Hootnick Decl. ¶ 20.)  As the new preferred equity interests of New LightSquared will be subject

to mandatory redemption in cash at a future date (Hootnick Decl. ¶ 29), every additional dollar

by which the existing preferred equity interests  and the L2Inc secured debt accrete (other than

accretion on those interests that will be satisfied by the issuance of new preferred equity to SIG)

translates into a future cost to New LightSquared.

        The aggregate cost to New LightSquared from all of this interest and preferred

equity accretion ultimately would depend on the duration of the stay.  By way of example,

however, assuming that LightSquared were in a position to consummate the Plan on September

30, 2015, and that a stay continued through December 15, 2015, the projected cost to

LightSquared would be approximately $145 million.[16]  (Hootnick Decl. ¶ 30.)

        Courts have recognized that "the accrual of interest is a real and significant harm

that must be considered" when evaluating the harm to a debtor company during an appeal.

*Adelphia*, 361 B.R. at 353; *see also Calpine Corp.*, 2008 Bankr. LEXIS 217, at *16-17

(estimating that the debtors' fees and interest "could amount to over $250 million, a significant

---

[15]     Pursuant to the Plan, holders of L2Inc Preferred Stock other than SIG Holdings, Inc. ("SIG") will
receive an amount of preferred equity in New LightSquared equal to such holders' *pro rata* share of the
aggregate L2Inc Preferred Stock Liquidation Preference. (Plan, Art. III, § B.14(b).)  These non-SIG
holders account for approximately 25% of the aggregate amount of outstanding L2Inc Preferred Stock.

[16]     LightSquared uses September 30, 2015 in the hypothetical discussed herein for ease of
calculation only because certain interest and preferred equity amounts compound on that date.  Were the
FCC to approve the Change of Control Application prior to September 30, 2015, the aggregate cost from
a stay would be even greater than suggested in LightSquared's hypothetical.

portion of which would have to be paid in cash upon emergence").[17]  Here, the "real and significant harm" LightSquared would suffer in the form of millions of dollars of additional, unmitigated expenses justifies the Court denying even a brief stay pending this Court's decision.

LightSquared previewed the several harms it could suffer from even a limited stay in its July 17, 2015 letter to this Court.  Contrary to Ahuja's false assertion (Ahuja Memo at 12), LightSquared showed unambiguously that a delay in emergence from bankruptcy caused by a stay pending appeal will increase the absolute amount of New LightSquared's indebtedness post-emergence.  LightSquared also showed that such a delay in emergence would reduce the amount of working capital available to New LightSquared.  Each of the foregoing represents a quantifiable injury that would be directly attributable to the stay, and Ahuja's suggestion that only the former would constitute cognizable injury is pure nonsense.  Both are harmful to New LightSquared, and the amount of the injury is plainly quantifiable.

Ahuja's argument that there is no injury because interest payments and preferred dividends will accrue at higher rates under LightSquared's exit financing is both factually untrue and non-responsive to the injury LightSquared will suffer.  In the first place, the effective blended interest rate currently being paid on the aggregate indebtedness that will be refinanced under the Plan—roughly $700 million of DIP loans and $3 billion of prepetition secured debt—is significantly greater than the blended interest rate that would be payable today on such amounts under the exit financing.  (Hootnick Decl. ¶ 26.)  In the second place, New LightSquared's exit financing indebtedness and its post-emergence preferred equity obligations are for specified terms, which will only begin to run upon emergence.  (Hootnick Decl. ¶¶ 27, 29.)  Postponing

---

[17]     The same is true with respect to professional and other administrative fees.  *See Adelphia*, 361 B.R. at 353.  While in bankruptcy, LightSquared continues to incur professional fees and expenses that it would not incur outside of bankruptcy.  LightSquared has budgeted $5.4 million per month for bankruptcy-related professional fees and expenses for the remainder of 2015.  (Hootnick Decl. ¶ 21.)

LightSquared's emergence from bankruptcy will *not* shorten the terms of those obligations and therefore will not create any savings to New LightSquared.  To the contrary, delaying LightSquared's emergence simply increases the principal amounts of its post-emergence indebtedness and preferred equity obligations.  Every additional dollar of accretion in LightSquared's current financing and preferred equity interests after the point when LightSquared could have emerged from bankruptcy but for a stay is a pure loss to New LightSquared—an amount that it would not otherwise have been required to pay.

### 2.  The Commitment Fee for the Working Capital Facility Will Increase by as much as $30 Million with the Passage of Time

Under the credit agreement for the $1.5 billion Working Capital Facility, LightSquared is obligated to pay a one-time commitment fee, which is a percentage of the total loan amount.  The percentage applicable to calculate the commitment fee depends on how much time elapses before the loan is funded, with the fee amount "stepping up" at agreed intervals, the longer the commitment remains undrawn.  Assuming, for example, that a stay continues beyond September 12, 2015, LightSquared would be required to pay a 1.5% fee, or $22.5 million, instead of the 1% fee, or $15 million, it would pay if the lenders funded the Working Capital Facility before then.  (Hootnick Decl. ¶ 24.)  This would result in a further cost to LightSquared of $7.5 million.  The commitment fee steps up twice more, in October and November 2015, and by December 15, 2015, LightSquared would be required to pay a fee of $45 million—$30 million more than if it were to close on or before September 12, 2015.  (Hootnick Decl. ¶ 24.) Any increase in the amount of the fee arising by reason of a stay would represent additional injury Ahuja would have the Court ignore.

### 3. LightSquared Could Be Compelled to Make a $50 Million "Adequate Protection" Payment to Its Prepetition Lenders

Ahuja makes misleading reference to a purported "finding" by the Bankruptcy Court at a post-confirmation "cash collateral" hearing on April 7, 2015 that there would be no material risk of diminution in value of its spectrum assets were LightSquared to remain in bankruptcy. (Ahuja Memo at 6; Samet Decl. Ex. 7.) The Bankruptcy Court made no such finding. The April 7 hearing actually addressed objections filed by SPSO, which holds half of L2LP's prepetition secured debt, to LightSquared's proposal to stop making adequate protection payments of $6.25 million per month for the benefit of the L2LP prepetition secured lenders, and to offer them instead a superpriority claim for any loss suffered in the event of a diminution in asset value. Adopting a "wait and see" approach, the Bankruptcy Court entered an order preserving all of SPSO's rights to seek additional adequate protection and set December 10, 2015 as a control date. (Burke Decl. Ex. D (Bankruptcy Court Order ¶¶ 7(b)(i), 28).)

The Bankruptcy Court specifically noted, however, that if LightSquared had not completed its exit from bankruptcy by then or was not clearly set to do so by December 15, 2015 (when its exit financing commitment would expire), SPSO would be free to exercise its remedies and seek retroactive payment of adequate protection for the eight months from May through December 2015—an aggregate total of $50 million at the previously prevailing monthly rate. Critically missing from Ahuja's misleading description of the April 7 hearing and its outcome is the fact that in the circumstances that would cause SPSO to renew its demand for adequate protection, LightSquared would ***not*** have $50 million in cash to make such a retroactive payment.

    **4.**      **The Inability to Close Before Expiration of the Working Capital Facility Commitment on December 15, 2015 Could Cause the Reorganization to Fail**

Should the Court impose a stay that continues through December 2015, the impact on LightSquared's reorganization could be catastrophic.  It is a condition precedent to the Plan becoming effective that the agreements governing the Working Capital Facility and the Second Lien Exit Facility (the "Working Capital Facility Credit Agreement" and the "Second Lien Exit Credit Agreement") "shall have been executed and delivered," and that "all conditions precedent to the consummation thereof shall have been waived or satisfied in accordance with the terms thereof."  (Plan, Art. IX, § B.6.)  The continuation of a stay in December 2015, however, would put the Working Capital Facility in jeopardy.  One of the terms and conditions on which the Working Capital Facility lenders (third parties independent from the plan proponents) committed to extend credit to New LightSquared is that their loan commitments will automatically terminate in full on December 15, 2015, if the conditions precedent to the lenders' obligations are not satisfied prior to that date.  (Burke Decl. Ex. E (Term Sheet at 4).)  And one of the conditions precedent in Article IV of the agreement is that the Confirmation Order must be "unstayed."  (*Id*.)  Thus, if a stay is in effect on December 15, 2015, the lenders under the Working Capital Facility will cease to have any obligation to extend credit to New LightSquared.

The Second Lien Exit Facility would be similarly at risk.  Section 3(d) of the Second Lien Commitment Letter provides that it is a condition to the lender's loan commitment that the Confirmation Order be "unstayed."  (Burke Dec. Ex. F.)  And the lender retains the right to terminate its loan commitment on December 31, 2015, at the latest.  (*Id.* § 11.)

If the funds available under either of these commitments are not available, LightSquared will be unable to meet its obligations to its stakeholders and the Plan will fail.  Although Ahuja will doubtless argue that LightSquared could seek replacement financing, there

is significant uncertainty as to whether it could succeed, and, if so, the economic terms on which such replacement funding could be had.  (Hootnick Decl. ¶ 32.)

Notably, LightSquared's current DIP financing, on which it is relying to fund its operations and restructuring costs during bankruptcy, will mature on December 30, 2015. (Burke Decl. Ex. G (DIP Order ¶ 2(a)); Hootnick Decl. ¶ 9.)  By that date, LightSquared is projected to owe approximately $700 million under its DIP financing.  (Hootnick Decl. ¶ 9.)  The Plan provides for LightSquared's DIP loan obligations to be repaid substantially from the proceeds of the Working Capital Facility.  (Plan, Art. IV, § B.3(a)(i).)  If the lenders' commitments under that facility terminate on December 15, 2015, LightSquared would be unable to repay its DIP lenders, and likewise would have no funds to continue operations, making liquidation inevitable.  In such circumstances, stakeholder recoveries would be drastically reduced and, for some, eliminated entirely.

Judge Kaplan's decision in *DBSD* denying a stay pending appeal of his judgment is highly instructive here.  In *DBSD*, as in this case, the appellants sought to enjoin the debtors from consummating a confirmed bankruptcy plan in the event that the FCC ruled on certain change of control applications.  2010 U.S. Dist. LEXIS 44996, at *4.  And, as here, the effectiveness of the bankruptcy plan in *DBSD* was contingent on a financing commitment that was likely to expire during the pendency of the appeal.  *Id.* at *7-8.  On the record before him, Judge Kaplan found that there was "at least a cognizable risk that [the financing commitment] w[ould] not be extended" and that "[i]f the commitment in fact does expire before the plan becomes effective, the entire restructuring may fall apart."  *Id.*; *see also id.* at *8 ("I am not so naïve as to believe that an extension of the financing commitment is not at least a possibility. Nor, however, am I so naïve as to assume that it inevitably will be extended.").  Judge Kaplan

therefore held that the threat of harm to the debtors' reorganization weighed against granting a stay. *Id.* at *8. The exact same reasoning applies equally here. [18]

Although the Second Circuit subsequently granted a stay pending appeal in an unpublished order in *DBSD*, by the time it did so counsel for the plan proponents (who had provided the financing commitment) had represented to the district court that they were "unlikely" to withdraw their commitment and had in fact extended their exit financing commitment multiple times. (*See* Burke Decl. Ex. H at 36:24-37:1; *id.* Ex. I ¶ 13.)

Here, unlike in *DBSD*, Ahuja (who bears the burden of proof) has presented no evidence that LightSquared's lenders will extend their exit financing commitments. The situation here is therefore analogous to the situation before Judge Kaplan, except that the risk that LightSquared's lenders may not extend their commitments is greater than in *DBSD*. The *DBSD* exit lenders were the plan proponents, who would control the debtor upon consummation of the plan. Here, in contrast, the exit financing will come from third parties that will have no relationship with New LightSquared except as lenders, and hence will have far less incentive to extend their commitments (particularly in the rising interest rate environment predicted by year-end).[19]

---

[18]   *See also DJK Residential*, 2008 U.S. Dist. LEXIS 19801, at *11 (debtors would be irreparably harmed by a stay which would "jeopardize [the debtors'] exit financing, which may require renegotiation of their creditor agreements," and "could cause substantial harm to the business"); *Calpine Corp.*, 2008 Bankr. LEXIS 217, at *15-16 ("[T]he Debtors' operations will be funded through a $7.6 billion secured exit-financing facility. . . . A stay of the Confirmation Order would present a substantial risk that a condition precedent to financing will fail and the Debtors could lose their exit financing, forcing them back to restructuring, looking to obtain new exit financing in an unfavorable capital market environment. The evidence shows that if the Debtors were required to negotiate a new exit financing commitment at this stage, the Debtors would incur an additional $900 million in aggregate interest expense alone.") (denying request for stay).

[19]   In addition to imperiling LightSquared's exit financing, a stay could also lead to termination of the "Plan Support Agreement" between and among the proponents of the Plan (other than LightSquared). It is a condition precedent to the Plan becoming effective that this Plan Support Agreement be "in full force and effect." (Plan, Art. IX, § B.11.) If the Confirmation Order remains stayed on December 15,

Finally, as set forth in the Hootnick Declaration, the Court should consider the impact that a stay would have on New LightSquared's ability to achieve its business plan. The Plan will provide finite working capital, and the competitive reality of the wireless broadband market will provide limited time, for New LightSquared to accomplish all that it must (*e.g.*, resolving regulatory issues) in order to become a viable presence as a provider of terrestrial wireless broadband services. The establishment of a viable reorganized debtor is, of course, a principal goal of reorganization chapter 11.[20] A stay would be antithetical to this interest in multiple ways, not only diverting New LightSquared's limited financial resources, but also, effectively, stealing from it the critical time it needs to implement its business plan. *See DJK Residential*, 2008 U.S. Dist. LEXIS 19801 at *11-12 (irreparable injury to non-movants where it was "in the interest of virtually all parties . . . for the plan adopted by the Bankruptcy Court to succeed, and for Debtors to continue in operation" and a stay "would jeopardize [the debtor's] ability to keep their business afloat" including by "limit[ing] their liquidity"). For this reason, too, a stay is inappropriate.

### C.   Factor 4:  The Public Interest Favors LightSquared's Emergence from Bankruptcy

Finally, Ahuja cannot show that the public interest supports a stay. To the contrary, the public interest generally favors the expeditious resolution of bankruptcy

---

2015, however, any party to the Plan Support Agreement can terminate that agreement. (Burke Decl. Ex. J, at § 4.)

Ahuja argues that there is no evidence that any party would terminate the Plan Support Agreement (Ahuja Memo at 6), but, again, it is Ahuja, not LightSquared, who bears the burden of proof, and he must establish that the parties to the Plan Support Agreement would *not* terminate that agreement. He has not done so, and effectively asks the Court to speculate that termination would not occur. Such speculation is no substitute for the required showing, and it in fact fails to consider the grave economic implications should LightSquared not exit bankruptcy by December 15, 2015 discussed above.

[20]   *See Official Comm. of Unsecured Creditors v. PSS Steamship Co. (In re Prudential Lines Inc.),* 928 F.2d 565, 573 (2d Cir. 1991) ("[A] paramount and important goal of Chapter 11 is the rehabilitation of the debtor by offering breathing space and an opportunity to rehabilitate its business and eventually generate revenue.") (quotation omitted).

proceedings, and that is especially so here, where LightSquared has been in bankruptcy for more than three years and Ahuja is the sole objector seeking to block consummation of an otherwise consensual plan.  *See DBSD*, 2010 U.S. Dist. LEXIS 44996, at *9-10 ("If there is a public interest at stake here, it is in allowing companies that have confirmed plans of reorganization to consummate those plans and emerge from chapter 11 without unnecessary delay so that they may become successful entities.  Certainly no public interest would be served by granting appellants even a 14-day stay in circumstances in which the existence of such a stay could result in the expiration of the commitment for exit financing and the failure of the plan of reorganization.");  *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 284 (Bankr. S.D.N.Y. 2007) (Gerber, J.) ("In this case, 30 of 30 classes that voted on the plan supported it . . . It would be grossly unconscionable, in my view, to thwart the will of such an overwhelming majority to accommodate the desires of such a small minority, who are simply dissatisfied with the Settlement under the Plan").[21]  Any further delay in LightSquared's emergence from bankruptcy, therefore, will only harm the public interest.

## II.   ANY STAY MUST BE CONDITIONED ON A BOND SUFFICIENT TO PROTECT LIGHTSQUARED AND ITS STAKEHOLDERS FROM ALL INJURY FLOWING FROM THE STAY

In arguing that no bond should be required, Ahuja advances the novel position that the need for a bond is governed by the extent of the appellant's financial resources, rather than by the scope of the injury a stay would inflict upon the debtor and its stakeholders.  As Ahuja would have it, because his own financial resources are small in relation to the injury he

---

[21]     Moreover, in its "National Broadband Plan," the FCC has announced the policy goals of making additional electromagnetic spectrum available for mobile broadband use and accelerating terrestrial deployment of spectrum.  (FCC, *Connecting America: The National Broadband Plan*, at xii, 75, 87-88, *available at* https://www.fcc.gov/national-broadband-plan.)  The business plan LightSquared is pursuing will help to achieve both goals, and emergence from bankruptcy, so that LightSquared may proceed in earnest to achieve these goals, is thus plainly in the public interest.

would inflict by a stay, he should be excused from posting a bond.  Not surprisingly, Ahuja cites no authority supporting his position.

Should the Court decide to grant Ahuja a stay of the Confirmation Order pending appeal, the Court plainly should condition the stay on Ahuja's posting a bond sufficient to cover all the above-described damages that may arise because of the stay.  As LightSquared noted in its letter dated July 17, 2015, and as the detailed information contained in the Hootnick Declaration confirms, the damage flowing from even the 14-day stay Ahuja initially sought would exceed $24 million.  A stay that would delay LightSquared's exit from bankruptcy from September 30, 2015 until December 14, 2015 would require a bond of not less than $230 million, representing approximately $145 in interest and preferred dividend accruals, $14 million in restructuring related fees and expenses, $22.5 million in additional Working Capital Facility commitment fees, and $50 million in potential adequate protection payments that SPSO would almost certainly demand if it appeared that LightSquared would not exit bankruptcy by December 15, 2015.  A stay that would extend beyond December 15, 2015, would require a multi-billion dollar bond, to cover the LightSquared stakeholders' loss of cash payments and other value they would receive under the Plan.

Imposing such a bond is fully consistent with precedent in this circuit.  In *Adelphia Communications*, Judge Scheindlin granted a stay pending appeal conditioned on the appellants posting a bond in the amount of ***$1.3 billion***, designed to cover approximately $490 million of additional interest accretion, $715 million of expected losses, in the form of price discounts and underwriting fees, from an initial public offering of stock that would be triggered as a result of the delayed emergence from bankruptcy, plus an additional cushion for professional fees and other less quantifiable costs.  361 B.R. at 368.  Similarly, in *Calpine*, Judge Lifland

(former Chief Judge of the Bankruptcy Court) denied the requested stay pending appeal but noted that had a stay been granted, it would have been conditioned upon "the posting of a bond to cover the enormous risk of loss to the Debtors, their estates, creditors and interest holders in the range of *$900 million to $1 billion*," to cover additional interest expense the Debtors could incur if they were unable to close on their existing exit financing.  2008 Bankr. LEXIS 217, at *21-22 (emphasis added).

Ahuja has shown no reason to justify a departure from the "ordinary full security requirement" noted in *DJK Residential*, 2008 U.S. Dist. LEXIS 19801, at *6.  Nor can Ahuja avoid the bond requirement by arguing that the plan proponents agreed to support the Plan through December 15, 2015, and that he is therefore somehow entitled to a stay without posting a bond for "at least as long as LightSquared gave itself to close on its exit facilities following FCC approval of the [Change of Control] Application."  (Ahuja Memo at 14.)  While the plan proponents and the exit lenders are committed until December 15, 2015, it is certainly in the interests of LightSquared, the plan proponents, and LightSquared's stakeholders to exit bankruptcy at the earliest possible date, and there is no question that LightSquared will suffer injury if, able to exit sooner, it is nevertheless compelled to remain in bankruptcy by a stay.  And, finally, there is no warrant for the 14-day stay without a bond requested by Ahuja.  (Ahuja Memo at 13-14.)  Notably, LightSquared did not "give itself" 10 business days to close, but rather the lenders *required* LightSquared to use commercially reasonable efforts to close within that time period, including satisfying conditions that include the Plan becoming effective.  That is an outside date, which further evidences the perceived risk from LightSquared remaining in bankruptcy longer than is required.  The reality is that LightSquared, if unrestrained by a stay, would seek to close on its financing commitments and exit bankruptcy promptly after a favorable

- 23 -

FCC determination on the Change of Control Application.  In any event, the fact that LightSquared may, but need not, take up to 10 business days to close on the Working Capital Facility, does not provide any logical justification for *staying* LightSquared from closing for the duration of that period without the protection of any bond.

## CONCLUSION

For the foregoing reasons, LightSquared respectfully requests that the Court deny Ahuja's motion for a stay pending appeal.  In the event the Court grants Ahuja's motion, however, LightSquared requests that the Court require Ahuja to post a bond in an amount commensurate with the potential duration of the stay, computed at not less than of $230 million for a stay expiring by its terms not later than December 14, 2015, and in an amount not less than $3 billion for a stay that could, by its terms, extend to and beyond December 15, 2015.

Respectfully submitted,

New York, New York                         */s/ Michael L. Hirschfeld*
Dated:  July 23, 2015                       Matthew S. Barr
                                            Alan J. Stone
                                            Michael L. Hirschfeld
                                            Andrew M. Leblanc
                                            MILBANK, TWEED, HADLEY & M$^C$CLOY LLP
                                            28 Liberty Street
                                            New York, NY  10005-1413
                                            (212) 530-5000

                                            *Attorneys for Debtors and Debtors in Possession*