UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: July 29, 2015
```

-------------------------------------------------------------X

In re LIGHTSQUARED, INC., et al.,          :
                                           :
                    Debtors.               :
                                           :        15-cv-2342 (KBF)
-------------------------------------------------------------X
                                           :
SANJIV AHUJA,                              :        OPINION & ORDER
                                           :
                    Appellant,             :
                                           :
        -v-                                :
                                           :
LIGHTSQUARED INC., et al.,                 :
                                           :
                    Appellees.             :
-------------------------------------------------------------X

KATHERINE B. FORREST, District Judge:

        This is an appeal from the Bankruptcy Court's (Chapman, J.) order dated

March 27, 2015, confirming the debtors'[1] Modified Second Amended Joint Plan

Pursuant to Chapter 11 of the Bankruptcy Code (the "Plan").[2]  (Bankr. Dkt. 2276,

Attached as Appendix to Brief for Debtor-Appellees ("App."), ECF No. 23.)  The Plan

was proposed by a group including Fortress Credit Opportunities Advisors LLC

("Fortress"), Centerbridge Partners, L.P. ("Centerbridge"), Harbinger Capital

---

[1] The Chapter 11 debtors are LightSquared Inc, LightSquared Investors Holdings Inc., One Dot Four Corp., One Dot Six Corp., SkyTerra Rollup LLC, SkyTerra RollupSub LLC, SkyTerra Investors LLC, TMI Communications Delaware, Limited Partnership, LightSquared GP Inc., LightSquared LP, ATC Technologies, LLC, LightSquared Corp., LightSquared Finance Co., LightSquared Network LLC, LightSquared Inc. of Virginia, LightSquared Subsidiary LLC, LightSquared Bermuda Ltd., SkyTerra Holdings (Canada) Inc., SkyTerra (Canada) Inc., and One Dot Six TVCC Corp..  These entities are collectively referred to as "LightSquared" or "the debtors".

[2] The Bankruptcy Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b).  This Court has jurisdiction to hear appeals from final judgments, order and decrees of the Bankruptcy Court pursuant to 28 U.S.C. § 158(a)(1).  "The confirmation of a plan in a Chapter 11 proceeding is an event comparable to the entry of a final judgment in ordinary civil litigation."  In re American Preferred Prescription, Inc., 255 F.3d 87, 92 (2d Cir. 2001) (citations omitted).

Partners LLC ("Harbinger") and LightSquared (collectively, the "Plan Proponents"). The Plan has the additional support of SIG Holdings, Inc. and/or one of its designated affiliates ("SIG", and collectively with Fortress, Centerbridge and Harbinger, the "New Investors"), MAST Capital Management, LLC ("MAST") and Prepetition Inc. Agent.  (See Transcript of March 26, 2015 Confirmation Hearing ("Tr.") at 102, Bankr. Dkt. 2285, App. 1009-1178.)

Appellant Sanjiv Ahuja is a former Chief Executive Officer ("CEO") and holder of approximately 8% of the existing common equity interests ("Existing Inc. Common Equity Interests") of debtor LightSquared, Inc. ("Old LightSquared"). Under the Plan confirmed by the March 27, 2015 Order, Ahuja receives no equity in the reorganized LightSquared (also referred to as the "Reorganized Debtor" or "New LightSquared").  On appeal, Ahuja argues that (1) the Plan violates the "fair and equitable" requirements of 29 U.S.C. § 1129, (2) the Plan violates the equality of treatment rule of § 1123(a)(4), and (3) the Plan was not proposed in good faith. Ahuja's arguments are premised on his positions – articulated in various ways – regarding the enterprise value of the New LightSquared, that it is unfair that Harbinger receives equity in the New LightSquared while Ahuja does not, that senior classes received more value than that which they have contributed, and that eliminating Ahuja's equity position demonstrates that hthe Plan was not proposed in good faith as it is contrary to a settlement agreement into which he had entered.

For the reasons set forth below, this Court finds that Ahuja's arguments lack merit.  The Bankruptcy Court's order of March 27, 2015, is AFFIRMED.

## I.   STANDARD OF REVIEW

The district court acts as the first level appellate review for orders from a bankruptcy court.  See Fed. R. Bankr. P. 8013.  On appeal, the district court may "affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings."  Id.  A bankruptcy court's conclusions of law are reviewed de novo and findings of fact are reviewed for clear error.  In re Ames Dep't Stores, Inc., 582 F.3d 422, 426 (2d Cir. 2009) ("We will determine that a finding is 'clearly erroneous' when we are left with the definite and firm conviction that a mistake has been made.")  Mixed questions of law and fact are subject to de novo review.  AUSA Life Ins. Co. v. Ernst & Young, 206 F.3d 202, 209 (2d Cir. 2000).

## II.   FACTS RELEVANT TO THIS APPEAL[3]

The debtors are providers of wholesale mobile satellite communications and broadband services in North America.[4]  "Through its ownership of several satellites and licenses to use mobile satellite spectrum issued by the Federal Communications Commission ("FCC"), LightSquared delivers voice and data services to mobile devices used by individuals, the military, first responders and other safety professionals." 513 B.R. at 62.  The FCC licenses LightSquared's use of electromagnetic spectrum for its mobile satellite system ("MSS") operations.  An

---

[3] The procedural history of this matter is set forth in the Bankruptcy Court's decision, In re LightSquared, 513 B.R. 56 (2014), as well as its March 26, 2015 decision (Appendix to Brief for Debtor-Appellees ("App") 789-890).   The Court recites here only those facts necessary to its decision on this appeal.

[4] When referred to in their reorganized form, the debtors are the "Reorganized Debtors."

MSS license holder is permitted to effect wireless telecommunications by linking callers through a satellite orbiting earth.  LightSquared has been seeking to transition away from pure MSS operations.  LightSquared's primary electromagnetic spectrum, which is held by L2LP (a separate debtor), lies in what is referred to as the "L-Band."  The L-Band consists of two 10 MHz downlinks, paired with two uplinks. For terrestrial operations, the uplinks carry signals from the handset to a cell tower and the downlinks carry signals in the opposite direction, from the cell tower to a customer's handset.  The L-Band downlinks and uplinks bracket a spectrum band reserved for use by the GPS industry and other geo-positioning systems.  Although LightSquared's MSS operations have not caused interference with GPS systems, the GPS industry has expressed concerns that harmful interference could arise from the increased number of transmissions that would occur in the L-Band if LightSquared were permitted to conduct terrestrial operations similar to those conducted by major network wireless carriers.

In 2010, the FCC authorized LightSquared to conduct nationwide terrestrial operations in the L-Band as an adjunct to its existing MSS operations.  (App. 498.) LightSquared then entered into a number of contracts and incurred substantial debt to construct the infrastructure for a terrestrial cellular network.  Based on what LightSquared has referred to as reaction by the GPS industry which claimed that its terrestrial operations would be harmed from terrestrial operations in the L-Band, in 2012 the FCC proposed a suspension of the permission it had previously granted LightSquared.  (App. 26-30.)   The proposed suspension was the functional

equivalent of an actual suspension.  On May 14, 2012, LightSquared filed for bankruptcy under Chapter 11 of the Bankruptcy Code.  LightSquared continues to operate its businesses and manage its properties as debtor in possession pursuant to sections 1107(a) and 1108 of the Code.

There are $4.29 billion in claims and interests asserted against LightSquared that are senior to the common equity.  The senior claims and interests include general unsecured claims and preferred equity.  Harbinger has secured claims as well as 90% of the common equity of LightSquared Inc. and certain litigation claims ("Harbinger Litigations").[5]  Pursuant to a settlement of certain employment-related claims (described below), Ahuja owns approximately 8% of LightSquared's common equity.

Following the FCC's proposed suspension, LightSquared filed interrelated requests (collectively, the "License Modification") with the FCC that would allow it to conduct terrestrial operations on a somewhat reduced and modified basis.  (App. 496-97.)  A significant aspect of the License Modification is that it proposes to use the spectrum referred to as the "Crown Castle Spectrum."  The lease for this spectrum is an asset of a wholly owned subsidiary of L2Inc, in an integrated spectrum pairing with L-Band spectrum owned by L2LP.  LightSquared asserts that the Crown Castle Spectrum does not have the interference issues which led to the suspension and may replace at least a portion of the capacity lost due to the

---

[5] The Harbinger Litigations include the Claims and Causes of Action against the FCC and GPS Industry, an appeal of the Bankruptcy Court's rulings in connection with an adversary proceeding, a RICO action, and any other claims or causes of action in connection with the debtors, their business, or any interest in the debtors. (Tr. 103.)

suspension.  Notably, L2Inc and L2LP are separate debtors in the Chapter 11 cases – they have separate and different assets, capital structures, owners and creditors. L2Inc's assets are pledged as collateral for L2Inc's secured indebtedness but those same assets are not collateral for L2LP's secured indebtedness, and vice versa.   In light of the difficulties caused by the proposed suspension of L-Band terrestrial license and the continuing scrutiny of the L-Band, LightSquared's Special Committee, management and advisors concluded that the greatest value (and greater than could be achieved on a standalone basis) would be achieved by combining L2Inc's and L2LP's spectrum assets into a single network; the Plan therefore contemplates such combination.  Such combination is not a formal substantive consolidation of assets; it is a functional combination.

In a January 2014 filing with the Bankruptcy Court the FCC stated that it could not represent when or if it would approve the License Modification requested by LightSquared.  (App. 140-143.)  In February 2014, LightSquared filed the Third Amended Plan.  (App. 146-245.)  While exit financing was not conditioned on FCC approval of the License Modification, FCC approval was nonetheless critical for ensuring that LightSquared had sufficient value to support its proposed reorganization under that plan.  (App. 337.)  The Third Amended Plan provided for a distribution to common equity holders of 30% of a class of common shares.  This point is worth pausing on: pursuant to this prior plan – in contrast to the later filed Plan here at issue – Ahuja stood to receive an equity distribution.

6

The Bankruptcy Court held a multi-day confirmation hearing on the Third Amended Plan commencing on March 19, 2014 and concluding with closing statements on May 6, 2014. It issued extensive findings of fact and conclusions of law on July 11, 2014. 513 B.R. 56 (2014).  The Bankruptcy Court included a substantial set of findings regarding valuation.  Id. at 77-81.  It found, for instance, that, "While effectiveness of the Plan is not conditioned on FCC approval of LightSquared's pending License Modification Application, LightSquared's Plan relies on opinions offered at the Confirmation Hearing that the FCC will approve the pending License Modification Application and the later use of its Lower Downlink within the timeframes upon which the valuation is based." Id. at 69.

As part of these 2014 findings, the Bankruptcy Court also found that various valuations, including that by Dr. Mark Hootnick, a Managing Director of Moelis & Company, relied on unsupported speculation as to the likely outcome and timing of the FCC's approval of the License Modification.  Id. at 76 ("Mr. Hootnick's valuation rises or falls with Mr. McDowell's opinions on the timing of FCC approvals.")  The Bankruptcy Court noted that for his part, McDowell "pointed to no evidence indicating that the FCC will proceed along the timeline suggested, offered no evidence that he had any knowledge of how or when the National Telecommunications and Information Administration or any coordinate agency intends to act with respect to LightSquared's application and could not credibly estimate or state when any required rulemaking proceeding may be commenced or how long it would take.  His opinion is simply educated guess and cannot be

7

afforded significant weight." Id. at 71. The Bankruptcy Court refused to confirm the Third Amended Plan, in large part because of this uncertainty as to FCC approval of the License Modification. (App. 339, 342-43.)[6]

From November 13, 2014 until January 25, 2015, the FCC auctioned certain broadband wireless spectrum in what was known as "Auction 97" (involving spectrum arguably comparable to LightSquared's). As a result of unexpectedly robust prices bid during Auction 97, potential lenders, investors and third parties became willing to lend and invest additional funds into LightSquared. (App. 629-30.)

On December 10, 2014, a group including Fortress, Centerbridge, SIG, and Harbinger (the "New Investors") pledged to support what ultimately became the Plan. The New Investors also committed to a combined investment in the Reorganized Debtor with a quantity of new money.

In a hearing on January 20, 2015, the Bankruptcy Court indicated that it would not reverse its position on the regulatory uncertainty regarding the License Modification and suggested that the parties take a "moment to pause and reflect" on the viability of another valuation premised on a hypothetical grant of regulatory approvals." (App. 371, 376-77.)

LightSquared subsequently filed what became the Plan. The Plan made a valuation assumption of $9.6 billion based on FCC approval (which is assumed only

---

[6] An additional basis for the Bankruptcy Court's decision was that the Third Amended Plan discriminated against a class of secured claims. (App. 343-346.)

to occur after confirmation of the Plan), of the less controversial aspects of the License Modification.  (App. 485-87.)  The Plan's valuation is also based on prices set at Auction 97.  (App. 615-23.)  Following filing of the Plan, the FCC again filed a statement with the Bankruptcy Court disavowing regulatory approval for terrestrial use of LightSquared's spectrum by a certain date or at all.  (App. 712.)

A confirmation hearing on the Plan commenced on March 9, 2015 and concluded on March 26, 2015. (App. 467-748.)  Following closing arguments, the Bankruptcy Court confirmed the Plan with a decision read into the record – but, as discussed more fully below, did not find that the enterprise value of LightSquared was $9.6 billion.  (App. 1009-1178.) The Bankruptcy Court entered the Order confirming the Plan the next day (the "Confirmation Order").  (App. 789-890.)

Sanjiv Ahuja filed a notice of appeal of the Confirmation Order to this Court that same day.  (ECF No. 1.)[7]  Oral argument on that appeal occurred on June 4, 2015.[8]

## III.   THE BANKRUPTCY COURT'S DECISION

In its thoughtful and reasoned decision, the Bankruptcy Court carefully recited findings from the seven day confirmation hearing and ultimately concluded

---

[7] Briefing for this appeal was coordinated with the related bankruptcy appeal at 15-cv-2848 (KBF). A decision will separately issue for that appeal.

[8] On July 20, 2015, Ahuja moved for an expedited stay of the Confirmation Order. (ECF No. 34.) In light of the instant decision, that motion is denied as moot. However, even if this Court were to consider the motion on the merits, it would nonetheless deny the motion for substantially the same reasons as those set forth herein:  Ahuja cannot demonstrate a substantial possibility, let alone a likelihood, of success on the merits.  See In re Adelphia Communications Corp., 361 B.R. 337, 346 (S.D.N.Y. 2007) (evaluating stay request under former Rule 8005); In re BGI, Inc., 504 B.R. 754, 763 (S.D.N.Y. 2014) ("[T]he seriousness of that threat [of equitable mootness] is inextricably related to the appellants' likelihood of success on the merits.") (quotation omitted).

"that the Debtors have carried their burden of proof with respect to the structure and valuation premise of the Plan and have otherwise demonstrated that Plan complies with all provisions of the Bankruptcy Code." (Tr. 99-100.)[9]  This decision followed the extensive findings of fact previously made by the Bankruptcy Court with regard to the Third Amended Plan. 513 B.R. 56 (2014).  The Bankruptcy Court again heard from a number of witnesses live and reviewed numerous documents received into evidence. (Tr. 115.)  The Bankruptcy Court noted that "[t]estimony was particularly focused on the issue of the value of LightSquared's spectrum and Moelis & Company's use of two different valuation approaches."  (Tr. 115.)  The Bankruptcy Court had, in short, extensive firsthand familiarity with the record and facility with the relevant facts.

The Plan[10] and related documents contemplate the following:

1.      New money investments by the New Investors;

2.      The conversion of the Prepetition LP Facility Claims into new second lien debt obligations;

3.      SIG's purchase of the Prepetition Inc. Facility Non-Subordinated Claims for the Acquired Inc. Facility Claims purchase price and the conversion of the Acquired Inc. Facility Claims into the Reorganized LightSquared Inc. Facility;

4.      Payment in full and in cash of LightSquared's unsecured claims;

---

[9] The Bankruptcy Court incorporated by reference its written decision at 513 B.R. 56 (2014). (Tr. at 100.)
[10] Modified versions of the Plan were filed on March 17 and March 26, 2015. (Bankr. Dkt. Nos. 2238, 2268.)

5.      The provision of approximately $210 million through a new debtor-in-possession ("DIP") facility;

6.      The provision of $1.25 billion in new money as working capital for the Reorganized Debtors;

7.      The assumption of certain liabilities;

8.      The resolution of all inter-estate disputes;

9.      A negotiated settlement between Harbinger and other Plan Proponents that includes the Harbinger Litigations.  (Tr. 103.)

Under the Plan, Harbinger will exchange its $198 million secured claim against LightSquared Inc. (valued at $227 million by including post-petition interest) and its claims in the Harbinger Litigations for:

1.      $227 million in preferred interests in New LightSquared;

2.      $122 million in the same preferred interests in New LightSquared;

3.      44.45% of the common equity of New LightSquared; and

4.      A call option to purchase an additional 3% of common equity.

(Disclosure Statement at Art. A. I.A.3.c., Bankr. Dkt. No. 2035, p. 28 of 355.)  There is no specific value attributable to the Harbinger Litigation.

Fortress and Cambridge currently have secured pre-petition claims totaling $967.1 million and Fortress also holds $115.4 million in preferred interests. (Bankr. Dkt. No. 2261 at Ex. K, p. 596 of 596.)  These interests are being exchanged for equal amounts of exit loans and preferred interests in New LightSquared.  Fortress and Cambridge are also contributing $89.5 million to the New LightSquared.  In

11

exchange, they are receiving $89.5 million in preferred interests and 34.3% of the new common equity.  (Plan Art. IV.B.2.b, Bankr. Dkt. No. 2276, p. 160 of 215.)  SIG is exchanging its $338 million in secured claims against LightSquared Inc. (valued at $403 million with post-petition interest), plus $227 million in existing preferred securities in LightSquared Inc. for $518 million in new preferred interests along with 21.25% of the common equity of New LightSquared.  (Plan Art. IV.B.d, Bankr. Dkt. No. 2276, p. 162 of 215.)[11]

On the final day of the Confirmation Hearing, the Bankruptcy Court heard oral argument on the sole remaining objections to the Plan – those brought by Ahuja.  (Tr. 105.)

The Bankruptcy Court recited the relevant background and details of LightSquared's License Modification and found that "LightSquared has been pursuing a solution through the License Modification Application that would provide it with 30 megahertz of spectrum, an amount LightSquared states is sufficient to implement its business plan." (Tr. 101.) The Bankruptcy Court noted that "as of the date of this Bench decision, the License Modification Application remains pending."  (Tr. 102.)  It remains pending still.

The Bankruptcy Court found that Hootnick of Moelis had used the following two valuation approaches:  (1) the Current Spectrum Approach, which applies comparable transaction values from the years 2009 – 2012, to LightSquared's L-Band spectrum and applies values from the Auction 97 to the already-in-use Crown

---

[11] SIG also receives certain net operating losses.

Castle Spectrum, and (2) the Alternative Use Spectrum Approach which contemplates a potential deployment of certain uplink and downlink (Crown Castle) spectrum; this approach involves only a subset of LightSquared's spectrum and assumes regulatory approval for the terrestrial use of such spectrum. (Tr. 115.) LightSquared had argued that this latter approach was best able to capture the "significant value inherent in LightSquared's spectrum assets, as evidence by the dramatic increase in spectrum value observed in Auction 97…" (Tr. 116.)

The Bankruptcy Court heard testimony specifically on issues relating to enterprise valuation from Douglas Smith, the CEO, President and Chairman of LightSquared. Smith testified that he had requested that Moelis prepare the valuation analysis based on the Alternative Spectrum Use Approach and he believes that the Current Use Spectrum Approach undervalues LightSquared's assets. (Tr. 117.) Smith also testified that the Alternative Spectrum Use Approach does not fully capture the value of LightSquared and that it involves less regulatory risk; he expressed a high level of confidence that it could be cleared for use by the FCC in a relatively short period of time. (Tr. 118.) The Bankruptcy Court found Smith's testimony "compelling" and "affords his testimony great weight." (Tr. 119.)

The Bankruptcy Court also heard again (as it had in the winter of 2014) from Hootnick of Moelis on valuation issues. (Tr. 119.) The Bankruptcy Court noted that his testimony was "complete, coherent and compelling." (Tr. 119.) Hootnick opined that the Current Spectrum Approach undervalues LightSquared's spectrum assets. (Tr. 120.) He also opined that based on the Alternative Spectrum Use Approach,

and according to ranges of dollars per megahertz, LightSquared had a net enterprise value of approximately $9.6 billion – the midpoint on a range of values. (Tr. 120.)  The Bankruptcy Court noted that "Hootnick acknowledged that, if the pending License Modification Application were ultimately approved by the FCC…LightSquared may be worth dramatically more." (Tr. 121.) Hootnick, however, offered no opinion as to timing of any regulatory approval.  (Tr. 121.)  The Bankruptcy Court further noted (without extensive discussion) that additional testimony both confirmed and criticized Hootnick's opinions. (Tr. 121.)

The Bankruptcy Court carefully and thoroughly reviewed the objections of Ahuja. (Tr. 123.)  As background to Ahuja's objections, the Bankruptcy Court noted that pursuant to an employment agreement dated October 2009, he had served as Chairman of the Board of Directors and CEO of LightSquared. (Tr. 123.)  He resigned that position effective February 10, 2012. (Tr. 123.)  On July 6, 2012, and following the filing of the initial bankruptcy petition, Ahuja, Harbinger and the debtors entered into a settlement agreement ("Settlement Agreement") to resolve issues relating to his employment agreement, including compensation issues. (Tr. 123.)  The Settlement Agreement provided for the following:

1. Termination of Ahuja's employment,

2. His employment agreement and related documents would be deemed formally rejected pursuant to § 365 of the Bankruptcy Code, and

3.  In full and complete satisfaction of any claims that he might have,
    he would receive $750,000 dollars in an allowed, unsecured
    nonpriority claim against LightSquared LP, and an allowed
    common equity interest in the amount of 8,832,354 shares of Old
    LightSquared's common equity, referred to as "Existing Inc.
    Common Equity Interests."

(Tr. 123-24.)  The Bankruptcy Court entered an order approving the Settlement
Agreement on July 17, 2012. (Bankr. Dkt. No. 223.) The Bankruptcy Court
specifically noted that Ahuja objected to the Plan on the basis that it was not fair
and equitable to holders of Existing Inc. Common Equity Interests in that the Plan
allegedly provided that senior claimants stood to receive more than full
compensation for their claims, in violation of the absolute priority rule, and that the
Plan Proponents had failed to show an exception to that rule. (Tr. 124.)

The Bankruptcy Court noted that the Plan was negotiated and approved on
behalf of L2Inc – the entity from which Ahuja's shares derive – by a special
committee of independent directors (the "Special Committee") with no connection to
Harbinger.  The Special Committee was appointed at the urging and with the
supervision of the Bankruptcy Court in 2013.  The Bankruptcy Court explicitly
found in its Confirmation Order that LightSquared, through the Special Committee,
has "upheld its fiduciary duty to stakeholders and protected the interests of all
constituents with an even hand."  (App. 813.)

15

The Bankruptcy Court further noted that Ahuja's claims were premised on the faulty assumption that there was a substantial equity cushion in the Reorganized Debtors. (Tr. 125, 128.)  According to the Bankruptcy Court, Ahuja's calculation was based on an enterprise value of $9.6 billion, minus outstanding liabilities of $4.3 billion.  (Tr. 125.)  Ahuja, however, presented no evidence during the confirmation hearing to support the existence of an equity cushion.  (Tr. 128.)  His argument was therefore premised solely on the Alternative Spectrum Use Approach valuation which assumes regulatory approval.  As to that, the Bankruptcy Court made the specific finding that "While the Court has found the Alternative Use Spectrum Approach valuation presented by Mr. Hootnick to be compelling as to the value of the debtors' spectrum assets, the Court cannot accord the Alternative Use Spectrum Approach all the weight necessary to conclude, with the requisite certainty, that the Reorganized Debtors will with certainty, have an equity cushion sufficient to provide a recovery to any holder of Existing Inc. Common Equity Interests."  (Tr. 128.)

The Bankruptcy Court based its factual finding on its subsidiary findings that the Alternative Use Spectrum Approach "involves a subset of the spectrum rights covered by the debtors' License Modification Application and assumes that the FCC will grant the additional regulatory approval necessary to make use of that L-Band spectrum on a "terrestrial-only basis."  (Tr. 129.)  The Bankruptcy Court found that its prior determination – set forth in 315 B.R. 56 – as to the uncertainty of the FCC approval process was relevant to valuation.  (Tr. 129.)  Further, the

Bankruptcy Court noted that its finding was based on the fact that Smith, LightSquared's CEO, had testified that LightSquared was in fact continuing to pursue the entirety of the License Modification, not just the portion to which the Alternative Use Spectrum Approach relied, and as to which regulatory approval was expected to be easier.  (Tr. 118, 129.)  The Bankruptcy Court specifically found that the timing of any FCC approval remains unknown (tr. 129) and further noted that the FCC had stated on the record in a proceeding held on January 27, 2014, that the "FCC does not support any plan in these cases and has provided no indication regarding the timing of the License Modification Application or any other matters involving LightSquared." (Tr. 129.)  In conclusion, the Bankruptcy Court found that "the outcome of the regulatory challenges attendant to the realization of the full 9.6 billion dollar valuation remains uncertain and precludes the definitive finding of the existence of the equity cushion that Ahuja has sought to establish." (Tr. 129-30.)

The Bankruptcy Court further found that the Plan allows the debtors to "unlock significant value" by combining assets of L2Inc and L2LP and obtaining new money contributions of the New Investors.  (Tr. 130.)  It found that "without these contributions, there would be no value flowing to, let alone through, the Debtors' debt obligations to satisfy the claims of the creditors in full, creditors who are indisputably senior to Mr. Ahuja." (Tr. 130.)  The Bankruptcy Court concluded that the post-reorganization value of all LightSquared assets (combining L2Inc and L2LP) nonetheless did not exceed the amount of debt and preferred stock

17

liquidation preferences senior to common equity interests.  It found, "Each of the New Investors is senior to Mr. Ahuja in the capital structure and is in no way jumping ahead of common equity." (Tr. 132.)  Under the Plan, no equity holder received equity in the Reorganized Debtor on account of those equity holdings.

The Bankruptcy Court found additionally that "The equity cushion to which Mr. Ahuja points simply would not exist in the absence of each of the transactions with the New Investors, and because the accretion of debt on LightSquared's post-emergence capital structure will inevitably eat into this equity cushion until value can be realized, the amount of such equity cushion, if any, is incorrectly overstated by Mr. Ahuja." (Tr. 131.)  In other words, if regulatory approval takes a while – which it could – it could well eat up any equity cushion that might otherwise exist. In that sense, the "cushion" is illusory.

The Bankruptcy Court found that no holder of Existing Inc. Common Equity Interests will receive any recovery under the Plan (tr. 131.) and that L2Inc (from which Ahuja's interests derive) is insolvent on a standalone basis.  This means, of course, that holders of common stock interests in L2Inc, like Ahuja and Harbinger, cannot receive a new equity distribution on account of those interests.  As the Bankruptcy Court explained, "The value of the assets of the Inc. Debtors standing alone – without recourse to the assets of the LP Debtors and without combining the value of the [L2]Inc. and [L2]LP assets in one going concern enterprise – is insufficient to support a recovery for common equity holders." (Tr. 131.)  The Bankruptcy Court found that the Plan does not discriminate unfairly and is fair and

equitable with respect to the Existing Inc. Common Stock Equity.  (Tr. 132.)
Ahuja's objections were accordingly overruled. (Tr. 132.)

IV.   DISCUSSION

Ahuja uses the same bundle of claims to support his arguments: that the
Bankruptcy Court found (must have found, or should have found) that the
enterprise had a valuation of $9.6 billion, which in turn means that there is a
substantial equity cushion in the Reorganized Debtors; that Harbinger's receipt of
equity in the New LightSquared means Ahuja must also receive equity; that senior
classes received more value than that which they have contributed; and that
eliminating Ahuja's equity position is contrary to the Settlement Agreement, which
gave him equity in L2Inc.  Ahuja asserts that the Bankruptcy Court therefore erred
in confirming the Plan as it (1) violates the absolute priority rule of 11 U.S.C. §
1129(b), (2) violates the equal treatment requirements of 11 U.S.C. § 1123(a)(4) by
providing for different treatment as between Harbinger's and Ahuja's common
equity interests; and (3) violates 11 U.S.C. § 1129(a)(3) that a plan be proposed in
good faith.  None of these arguments has merit.

A.   Absolute Priority Rule

Section 1129 of the Bankruptcy Code sets forth two requirements that a
debtor must meet in order to confirm a Chapter 11 plan. First, section 1129(a)(8)
requires that each impaired class accept the plan. See In re Boston Post Rd. Ltd.
P'ship, 21 F.3d 477, 480 (2d Cir. 1994).  Second, in the event that an impaired class
of creditors rejects a plan, a plan may nonetheless be "crammed down" over such

objection(s) pursuant to section 1129(a)(10), so long as the plan meets all of the statutory requirements provided in § 1129 and at least one class of impaired claims held by non-insider creditors has accepted the plan. 11 U.S.C. § 1129(a)(10); see also In re Coltex Loop Central Three Partners, L.P., 138 F.3d39, 42 (2d Cir. 1998).

A primary requirement for a "crammed down" plan is that it is "fair and equitable", a test which has two components: (1) the plan may not give property to a junior class "on account of" their claims or interests without holders of senior classes receiving the full value of their claims; and (2) the plan may not give property to senior classes in excess of the full value of their claims. In re Chemtura Corp., 439 B.R. 561, 592 (Bankr. S.D.N.Y. 2010); COLLIER ON BANKRUPTCY ¶ 1129.03[4][a][ii] (15th ed. rev. 2007) ("The second major component of the 'fair and equitable' requirement is that no creditor or interest holder be paid a 'premium' over the allowed amount of its claim. Once the participant receives or retains property equal to its claim, it may receive no more.")

Whether a plan satisfies the absolute priority rule of 11 U.S.C. § 1129(b) is a question of law reviewed de novo on appeal. In re DBSD North America, Inc., 634 F.3d 79, 94 (2d Cir. 2011).  The "absolute priority rule" states that no class of creditors or interest holders may recover in Chapter 11 unless the claims of all creditor and interest holder classes senior to them have been satisfied in full, barring agreement by a senior class to lesser treatment of its claims. 11 U.S.C. § 1129(b)(2); see also Norwest Bank Worthington v. Ahlers, 485 U.S. 197, 202 (1988). The Plan Proponents bear the burden of proving by a preponderance of the evidence

20

that the plan complies with the absolute priority rule. In re Cellular Info. Sys., Inc., 171 B.R. 926,929-30 (Bankr. S.D.N.Y. 1994).

    1. Ahuja's absolute priority claim

  As an equity holder in Old LightSquared (or L2Inc), Ahuja does not participate in the Plan.  No such equity holder does.  No class junior to Ahuja "leaps over" his class; there simply is no violation of the absolute priority rule.

  Ahuja's claim here is based upon his assertion that distribution of all of the common equity in the New LightSquared to the New Investors, and denying the old equity holders a distribution, is contrary to the Bankruptcy Code's requirements that a plan be fair and equitable.  But the fair and equitable rule is designed to insure similar treatment as to all members of a class and to insure no leap-frogging over a class or member of a class.  Here, neither of these considerations is at issue as there is similar treatment and no leap-frogging.  Instead, Ahuja's claim should be understood as asserting a general lack of fairness.  In this regard, he asserts that the Bankruptcy Court has made both legal and factual errors including that the Bankruptcy Court erred by shifting the burden of proof to him.  His arguments depend upon (1) his mistaken understanding of the value of others' claims and contributions, and (2) a mistaken view that the Bankruptcy Court's enterprise value is too low.

  Ahuja asserts that while the Plan Proponents are required to prove that it is fair and equitable by a preponderance of the evidence, the Bankruptcy Court inappropriately shifted the burden to him to show the opposite.   Ahuja further

argues that even putting this aside, the Bankruptcy Court committed legal error regarding the nature of the evidence that she could take into consideration in determining enterprise value, and that such legal error was then followed by a factual error based on this standard.  Each of these arguments lacks merit.

As discussed above, the Bankruptcy Court found as a factual matter that the enterprise value for the Reorganized Debtor is below that required to establish a sufficient equity cushion to allow for a distribution to holders of Existing Inc. Common Equity Interests.  The burden was on the Plan Proponents to show that the value of the Reorganized Debtor could support the Plan.  The Bankruptcy Court did not shift that burden to Ahuja.  Indeed, it specifically found that the "Debtors have carried their burden of proof with respect to the structure and valuation premise of the Plan and have otherwise demonstrated that the Plan complies with all applicable provisions of the Bankruptcy Code." (Tr. 100.)  The Bankruptcy Court then recited a number of specific findings based on the evidence presented by the debtors.  While the Bankruptcy Court did note that Ahuja had failed to present any evidence to support his view that an equity cushion exists, that was not burden shifting.  Rather, the Bankruptcy Court's statement meant nothing more than it had determined that Ahuja's claims lacked an evidentiary basis in the record.  Ahuja also points to the Bankruptcy Court's statement that it could not accord "the Alternative Spectrum Use Approach all the weight necessary to conclude, with the requisite certainty," that the Reorganized Debtors will have an equity cushion.  (Tr.

128.)  That statement plainly describes the Bankruptcy Court's weighing the evidence, not requiring a particular level of proof from Ahuja.

Next, Ahuja attempts to convert the Bankruptcy Court's factual finding as to enterprise value, to which a "clearly erroneous" standard of review applies, into legal error.  According to Ahuja, such legal error is on "all fours" (Oral Argm't 8) with that discussed by the Supreme Court in <u>TMT Trailer Ferry</u>, 390 U.S. 414 (1968).  Ahuja argues that the Bankruptcy Court, as in <u>TMT Trailer Ferry</u>, erred by failing to take future events into consideration in a valuation analysis.  Here, the future event causing the most significant valuation swing is regulatory approval; the Bankruptcy Court certainly took all of the evidence provided regarding the likelihood and timing of regulatory approval into account – including the FCC's own statement in the record.

In <u>TMT Trailer Ferry</u>, the Supreme Court reversed and remanded a decision by the Southern District of Florida confirming a plan of reorganization which excluded equity holders from participation.  The Supreme Court described the Bankruptcy Court's obligation to determine that a plan is fair and equitable and that this standard incorporates the 'absolute priority rule' under which creditors and equity holders participate only in accordance with their respective priorities.  <u>Id.</u> at 440. "Since participation by junior interests depends upon claims of senior interests being fully satisfied, whether a plan of reorganization excluding junior interests is fair and equitable depends upon the value of the reorganized company."  <u>Id.</u> at 441.  As a matter of law, in determining a company's value, a court should

take into consideration the expectation of value obtained from the company's assets.

Id. at 442.  In TMT Trailer Ferry, the Supreme Court noted that the lower court had failed to take into consideration the more efficient and profitable utilization of existing productive properties. Id. The Supreme Court stated:

> Since its application requires a prediction as to what will occur in the future, an estimate, as distinguished from mathematical certitude, is all that can be made. But that estimate must be based on an informed judgment which embraces all facts relevant to future earnings capacity and hence to present worth, including, of course, the nature and condition of the properties, the past earnings record, and all circumstances which indicate whether or not that record is a reliable criterion of future performance.

Id. at 442 (quoting Consolidated Rock Prods. Co. v. DuBois, 312 U.S. 510 (1941).) Notably, the Supreme Court found that the lower court had made a factual determination of company valuation based on an erroneous legal standard which failed to include "the value of the company once it was out of reorganization."  Id. at 444-45.  It stated that "[t]he fundamental reason that there was insufficient evidence concerning the future prospects of TMT was that the trial court showed itself unalterably hostile to inquiries directed to TMT's future." Id. at 449.  As a result, the lower court's valuation improperly lacked certain evidence regarding future prospects. Id.

This case does not support Ahuja's position.  It is factually readily distinguishable as here Judge Chapman allowed in substantial evidence regarding the future prospects of the company and undeniably took it into consideration in rendering her decision.  That her valuation determination was not at a level which allows for participation by Ahuja was not due to a misconception or misapplication

24

of the legal standard, but rather based on the Bankruptcy Court's reasoned factual determination as to valuation.

As clearly set forth in the Bankruptcy Court's extensive findings, it well understood the components of the various valuations proposed as well as the regulatory risks with regard to those valuations. The Bankruptcy Court did not err – let alone clearly err – in determining that there was insufficient equity cushion. Indeed, this finding is not dependent solely upon any particular valuation number – it is based upon the Bankruptcy Court's combined findings regarding likely value at some future point if regulatory approvals are obtained.

Ahuja next argues that the only justification for giving Harbinger (in particular) an equity distribution is the purported value of the new money from the New Investors, of which Harbinger is one, and settlement of the Harbinger Litigations.  This, according to Ahuja, relies upon a case law standard first discussed in Case v. Los Angeles Lumber Prods. Co., 308 U.S. 106, 126 (1939).  In Case, the Supreme Court ruled that old equity holders could obtain a distribution of shares in excess of their prior holdings if they could show that they made a contribution to the reorganized entity that was new, substantial, money or money's worth, necessary for a successful reorganization, and reasonably equivalent to the value of the property being received.  Case, 308 U.S. at 121; see also Coltex, 138 F.3d at 43.  Ahuja argues that in Coltex the Second Circuit declined to hold that the new value exception survived the Bankruptcy Code. See also Norwest Bank Worthington v. Ahlers, 485 U.S. 197, 208-09 (1988) (holding that even if the new

25

value exception survived the Bankruptcy Code, in order for old equity to receive a

distribution on account of a new contribution to the reorganized entity, such

contribution had to be something which has a "place in the asset column of the

balance sheet of the new entity," and "could be exchanged in the market for

something of value to the creditors today.")  According to Ahuja, since the Supreme

Court again sidestepped the new value exception in <u>Bank of America Nat'l Trust</u>

<u>and Savings Assoc. v. 203 N. LaSalle St. P'ship</u>, 526 U.S. 434, 443 (1999), <u>Coltex</u> is

binding precedent in the Second Circuit.  Thus, according to Ahuja, the new value

exception is not applicable in the Second Circuit and the Bankruptcy Court erred in

allowing new value to result in a higher value of property received.  Ahuja

additionally argues that, at the very least, the Bankruptcy Court erred by

approving the Plan without making a factual determination that the New Investors

were not being paid more than in full.  Ahuja's arguments are mistaken.[12]

First, the new value cases cited by Ahuja are inapposite.  The Plan and

distributions here do not depend on new value.  Rather, the Bankruptcy Court made

a specific factual finding that the combination of the L2Inc and L2LP assets is what

gives the Reorganized Debtor its real value.  (Tr. 130.)  The agreement of the New

---

[12] Several of the cases Ahuja cites involved single debtors and thus did not implicate the issue of how multiple debtors should be valued. <u>See</u> In re Wabash ValleyPower Ass'n, Inc., 111 B.R. 752 (S.D. Ind. 1990); <u>In re Bush Indus., Inc.</u>, 315 B.R. 292 (Bankr. W.D.N.Y 2004); <u>In re Haskell Dawes, Inc.</u>, 199 B.R. 867 (Bankr. E.D. Pa. 1996). The courts valued multiple debtors on a combined basis in only three of the cited cases, and in each the debtors had significant collective liabilities for secured funded debt that could have made valuing the debtors on a standalone basis unworkable. <u>See</u> In re Genco Shipping & Trading Ltd., 513 B.R. 233, 238 (Bankr. S.D.N.Y. 2014); <u>In re Chemtura Corp.</u>, 439 B.R.561, 568 (Bankr. S.D.N.Y. 2010); <u>In re Cellular Info. Sys., Inc.</u>, 171 B.R. 926, 929 (Bankr. S.D.N.Y. 1994). Here, in contrast, L2Inc and L2LP have clearly separate assets and debts.

Investors to support a Plan allowing differing assets from two unconsolidated debtors (L2Inc and L2LP) to be combined is the "but for / without which not" to value. In other words, L2Inc simply could not achieve solvency alone, and the Bankruptcy Court so found.  The "new money" invested may add value of the Reorganized Debtor by providing working capital and enabling the assets to combine.  The Plan Proponents have carried their evidentiary burden on this point. Once the Plan Proponents proffered sufficient evidence to meet their burden, Ahuja's failure to introduce contrary evidence allows for no other finding on this issue by the Bankruptcy Court.

In addition, once the Bankruptcy Court found that there was an insufficient equity cushion for a distribution to the Existing Inc. Common Equity Interests, it was not obligated to arrive at a precise dollar figure for the individual contributions made by the New Investors.  Again, the cases Ahuja cites in this regard are not apposite as they deal primarily with "new value" plans.  See Bank of Am., 526 U.S. at 437; Coltex, 138 F.3d at 41.  The Plan is not a "new" value plan – in such a plan, junior creditors "leap over" more senior creditors whose claims are not paid in full. Here, the standalone valuation found by the Court is that there is no equity cushion.  That finding is no "leap" ahead of Ahuja.

Finally, Ahuja argues that the Bankruptcy Court erred in approving a Plan which provided that Harbinger – as a holder of Existing Inc. Common Equity Interests – could receive common equity in the Reorganized Debtor when Ahuja could not.  This argument is based on a false factual premise.  The record clearly

indicates, and the Bankruptcy Court so found, that Harbinger had a number of separate interests in LightSquared.  Among these were its preferred equity interests, its Harbinger Litigation Claims, and substantial common equity.  The Bankruptcy Court found that the Plan's distribution to Harbinger was based on the first two sets of interests – not the common equity.

      B.    <u>Equal Treatment Rule</u>

Ahuja's second argument on appeal concerns an alleged violation of § 1123(a)(4) of the Bankruptcy Code.  Ahuja has waived this argument by failing to make it below and raising it for the first time on appeal. In all events, this argument fails on the merits.

Section 1123(a)(4) of the Bankruptcy Code states that a plan must "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest."  11 U.S.C. § 1123(a)(4).  Equality of treatment involves two facets: (1) all class members must receive equal value, and (2) each class member must pay the same consideration in exchange for its distribution. <u>In re Quigley Co.,Inc.</u>, 377 B.R. 110, 116-17 (Bankr. S.D.N.Y. 2007).  Whether similarly situated equity holders are being treated the same is a mixed question of law and fact reviewed <u>de novo</u> on appeal. <u>In re New Power Co.</u>, 438 F.3d 1113, 1117 (11th Cir. 2006).

For the same reasons as those discussed above, the Plan does not violate section 1123(a)(4).  The Bankruptcy Court made factual determinations as to the

positions and contributions of Harbinger and Ahuja.  The Bankruptcy Court specifically found that Harbinger's participation was based on its preferred equity interests in Old LightSquared and the contributions of the Harbinger Litigation.

C.   Proposal in Good Faith and "Not by Any Means Forbidden by Law"

Ahuja's final appeal argument is that the Plan violates § 1129(a)(3) of the Bankruptcy Code, providing that the plan must be "proposed in good faith and not by any means forbidden by law."  This argument fares no better than those discussed above.

Section 1129(a)(3) of the Bankruptcy Code provides that "[t]he court shall confirm a plan only if. . . [t]he plan has been proposed in good faith and not by any means forbidden by law."  "[A] plan will be found in good faith if it was proposed with honesty and good intentions and with a basis for expecting that a reorganization can be effected." Bd. of Directors of Telecom Argentina, S.A., 528 F.3d 162, 174 (2d Cir. 2008) (quotation omitted); see also In re Johns-Manville Corp., 843 F.2d 636, 649 (2d Cir. 1988).  The Bankruptcy Court's determinations of fact on good faith are reviewed for clear error and conclusions of law are reviewed de novo. Telecom Argentina, 528 F.3d at 174.

The Bankruptcy Court found in the Confirmation Order that "the Plan has been proposed in good faith and not by any means forbidden by law, thereby satisfying section 1129(a)(3) of the Bankruptcy Code."  (App. 813.)  The evidence in the record amply supports this finding.  To the extent Ahuja's claim is that he was misled into thinking that when signing the Settlement Agreement he would

necessarily receive shares in the Reorganized Debtor, that argument is without merit.  Nothing in the Settlement Agreement creates obligations by any Plan Proponent to insure that Ahuja will be a stockholder in the Reorganized Debtor. The good faith of the Special Committee and the Plan Proponents is, in any event, supported by the prior proposal of the Third Amended Plan which – had it been confirmed – would have provided that Ahuja receive common stock in the Reorganized Debtor.  The Third Amended Plan was not approved due most significantly to the Bankruptcy Court's findings as to insufficient value in the enterprise.  Ahuja's claims are, in effect, claims for breach of the Settlement Agreement.  They do not amount to a plan proposed in bad faith.

V.     CONCLUSION

For the reasons set forth above, the Bankruptcy Court's order confirming the Plan, entered on March 27, 2015, is AFFIRMED.

The Clerk of Court is directed to close the motion at ECF No. 34 and terminate this action.


SO ORDERED.

Dated:     New York, New York
           July 29, 2015


_____
        KATHERINE B. FORREST
        United States District Judge

30